# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.                         Case No. 0:23-cv-61188

MIGUEL CARDONA, in his official
capacity as Secretary of Education;
JAMES KVAAL, in his official
capacity as Under Secretary of Education;
NASSER PAYDAR, in his official
capacity as Assistant Secretary for
Postsecondary Education; HERMAN
BOUNDS JR., in his official capacity
as Director, Accreditation Group,
Office of Postsecondary Education;
RICHARD CORDRAY, in his official
capacity as Chief Operating Officer,
Federal Student Aid; ANNMARIE
WEISMAN, in her official capacity
as Deputy Assistant Secretary for
Policy, Planning, and Innovation,
Office of Postsecondary Education,

    *Defendants*.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    Almost 100 years ago, the Supreme Court asked the following: "[W]ould it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups . . . because such associations or groups are familiar with the problems of their enterprises?" *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935).

2.     The question was rhetorical. The answer was a resounding "no." And the reason is obvious—doing so would be "utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id.*

3.     Not to be confused with the "public non-delegation doctrine," which governs legislative delegations to the Executive Branch, the "private non-delegation doctrine" governs delegations to private entities. Public delegations raise doubts of their own, *see, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2119 (2019) ("Congress may not transfer to another branch powers which are strictly and exclusively legislative." (quotations omitted)), but private delegations are so constitutionally odious that the Supreme Court has not "merely . . . reject[ed] the idea," it "has also called [them] insulting names." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) (collecting authorities).

4.     Nonetheless, in higher education, Congress has ceded unchecked power to private accrediting agencies to dictate education standards to colleges and universities, and it has forbidden the U.S. Department of Education (the Department) from meaningfully reviewing, approving, or rejecting those standards.

5.     Making matters worse, Congress has given accreditors broad power to *apply* their own standards to colleges and universities, subject only to limited judicial review.

6.     Accreditation standards are not advisory or optional. Rather, *all* postsecondary institutions must be accredited by a recognized accrediting agency to

be eligible for *any* federal funding programs for higher education. 20 U.S.C. § 1099c(a);
20 U.S.C. § 1001.

7.      As a result, private accrediting agencies act "[a]s gatekeepers to $112
billion in annual federal student aid"[1]—"prox[ies] for the federal department whose
spigot [they] open[] and close[]," *Chi. Sch. of Automatic Transmissions, Inc. v.
Accreditation All. of Career Schs. & Colls.*, 44 F.3d 447, 449 (7th Cir. 1994) (Easterbrook,
J.).

8.      Making matters worse, colleges and universities cannot freely choose
their masters, as federal law requires them to show "reasonable cause" to change
accreditors. 20 U.S.C. § 1099b(h).

9.      The result is that private accrediting agencies enjoy near limitless power
over state institutions. When an accreditor even suggests that an institution is violating
accreditation standards, "that suggestion carries with it the clout of the federal
government." Jeffrey C. Martin, *Recent Developments Concerning Accrediting Agencies in
Postsecondary Education*, 57 Law & Contemp. Probs. 121, 130 (1994) (quoting former
Secretary of Education Lamar Alexander).

10.     Florida's postsecondary institutional accreditor, the Southern
Association of Colleges and Schools Commission on Colleges (SACS), routinely
wields this power to interfere with the sovereign prerogatives of Florida and other

---

[1] U.S. Dep't of Educ., *Great Transparency of Accrediting Agency Recognition* (Feb. 8, 2022),
https://www2.ed.gov/admins/finaid/accred/greater-transparency-in-accreditor-recognition.pdf.

States. For example, SACS recently threatened the accreditation of Florida State University (FSU) merely because FSU was considering the State's Commissioner of Education for university president.[2]

11.     In another recent incident, SACS publicly boasted of its plan to prevent the University of North Carolina from establishing a program focused on ideological diversity.[3] And in Georgia, SACS threatened the federal funding of *every public college and university in the State* over the possible appointment of a former governor to oversee the state university system.[4]

12.     None of SACS's actions have any relationship to education quality or to protecting Congress's investment in students. Instead, SACS insists that public colleges and universities be free from "undue influence"—a euphemism for SACS's position that these public institutions be unaccountable to the people or their elected representatives. Indeed, then-Governor Rick Scott could not even speak out about a deadly hazing incident without drawing the ire of SACS.[5]

---

[2] Divya Kumar, *Richard Corcoran out of FSU presidential search; three academics move on* (May 15, 2011), https://www.tampabay.com/news/education/2021/05/15/richard-corcoran-out-of-fsu-presidential-search-three-academics-move-forward/.

[3] The Editorial Board, *The University of North Carolina Fight Escalates*, Wall St. J. (Feb. 12, 2023), https://www.wsj.com/articles/the-university-of-north-carolina-fight-escalates-unc-belle-wheelan-sacs-higher-education-college-accreditation-free-expression-d2077882.

[4] Eric Stirgus, et al., *Agency warns Georgia Regents against politicizing chancellor search*, Atl. J.-Const. (Apr. 27, 2021), https://www.ajc.com/education/agency-warns-georgia-regents-against-politicizing-chancellor-search/NDBHGL3YGFB5FMPUVH6S5OHRSM/.

[5] Fahima Haque, *FAMU may lose accreditation*, Wash. Post (Dec. 28, 2011), https://www.washingtonpost.com/blogs/therootdc/post/famu-may-lose-accreditation/2011/12/28/gIQA7DshMP_blog.html.

13.     When Congress makes a broad delegation to the Executive Branch, Americans can at least hope to elect a new Chief Executive. Moreover, they can seek judicial review of unlawful executive action in the interim. But when Congress delegates power to a private entity, even those minimal checks are unavailable or effectively absent.

14.     In other words, "[o]ur Constitution, by careful design, prescribes a process for making law, and within that process, there are many accountability checkpoints." *Dep't of Transp. v. Ass'n of Am. Railroads* (*Amtrak II*), 575 U.S. 43, 61 (2015) (Alito, J., concurring). "It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints." *Id.*

15.     Congress's desire that federal funds flow to legitimate institutions is understandable. But it must rely on government actors—both state and federal—to provide those assurances. It cannot lend the power of the purse to private entities by giving them the keys to billions in federal education dollars.

16.     In addition to violating the private non-delegation doctrine, the current accreditation scheme violates two other constitutional doctrines.

17.     First, it violates the Appointments Clause because private accreditors "exercis[e] significant authority pursuant to the laws of the United States" on a "continuing" basis but are not "appointed in the manner prescribed by" the Appointments Clause. *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)). According to the U.S. Supreme Court, determining

"eligibility for funds" is a "significant governmental duty exercised pursuant to a public law" and implicates the Appointments Clause. *Buckley*, 424 U.S. at 140–41.

18.     Second, it violates the Spending Clause because "[a] law must 'unambiguously' link its conditions to the receipt of federal funds and define those conditions clearly enough for the states to make an informed choice." *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1143 (11th Cir. 2023) (quotations omitted).

19.     Finally, the Department's recent actions with respect to accreditation violate the Administrative Procedure Act (APA). Last year, Florida enacted SB 7044, which requires postsecondary institutions to change accreditors. Florida did so in an attempt to mitigate many of the harms caused by the statutory scheme at issue in this case. In response, the Department issued guidance to accreditors seeking to deter new accreditors from working with Florida.[6]

20.     For these reasons, and those that follow, Florida seeks relief from this Court.

## PARTIES

21.     Plaintiff the State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens. Florida runs numerous public colleges and universities, which must comply with the challenged requirements or lose billions of dollars in federal funds. As the

---

[6] *See* Letter from Herman Bounds Jr., Dir., Accreditation Group, U.S. Dep't of Ed. (July 19, 2022), https://www2.ed.gov/admins/finaid/accred/letter-to-institutional-accreditors.pdf (describing new guidance measures).

State's Chief Legal Officer, the Attorney General is charged with representing the interests of the State in civil suits. § 16.01(4), (5), Fla. Stat.[7]

22.    Defendants are appointed officials of the U.S. Department of Education and are responsible for enforcing the challenged requirements.

23.    Defendant Miguel Cardona is the Secretary of Education and is responsible for enforcing the challenged requirements. Florida sues him in his official capacity.

24.    Defendant James Kvaal is the Under Secretary of Education and is responsible for enforcing the challenged requirements. Florida sues him in his official capacity.

25.    Defendant Nasser Paydar is the Assistant Secretary for Postsecondary Education and is responsible for enforcing the challenged requirements. Florida sues him in his official capacity.

26.    Defendant Herman Bounds Jr. is the Director of the Accreditation Group of the Office of Postsecondary Education and is responsible for enforcing the challenged requirements. Florida sues him in his official capacity.

27.    Defendants Richard Cordray is the Chief Operating Officer, Federal Student Aid, and is responsible for enforcing the challenged requirements. Florida sues him in his official capacity.

---

[7] The power to sue in the name of the State includes the power to assert injuries to public colleges and universities. *E.g.*, *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1029–30 (M.D. Fla. 2021).

28.     Defendant Annmarie Weisman is the Deputy Assistant Secretary for Policy, Planning, and Innovation, Office of Postsecondary Education, and is responsible for enforcing the challenged requirements. Florida sues her in her official capacity.

## JURISDICTION AND VENUE

29.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201–2202, 5 U.S.C. § 706, the U.S. Constitution, and the Court's equitable powers.

30.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff the State of Florida is a resident of every judicial district in its sovereign territory, including this district (and division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018); *Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022).[8] Moreover, multiple state postsecondary institutions are located here.

### The Department of Education and Accreditation

31.     At the beginning of the 20th Century, as the availability of postsecondary education grew, accreditation entities formed as voluntary associations that assessed postsecondary institutions. Matthew W. Finkin, *The Unfolding Tendency in the Federal*

---

[8] *Accord Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *see also Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (explaining that "the state government . . . resides at every point within the boundaries of the state").

*Relationship to Private Accreditation in Higher Education*, 57 Law & Contemp. Probs. 89, 89–90 (1994).

32.    In 1952, however, Congress began formally relying on accreditors' determinations. Julee T. Flood & David Dewhirst, *Shedding the Shibboleth: Judicial Acknowledgement that Higher Education Accreditors Are State Actors*, 12 Geo. J.L. & Pub. Pol'y 731, 743–44 (2014). The federal government, now providing financial assistance to certain students via the G.I. Bill, sought to ensure that federal funds flowed to reputable institutions. *Id.* Congress outsourced that task to the preexisting network of private accrediting agencies. *Id.*

33.    This new scheme charged the Commissioner of Education (now the Secretary of Education) with "recognizing" accrediting agencies. Finkin, *Unfolding Tendency*, *supra*, at 93; Pub. L. No. 82-550, § 253(a), 66 Stat. 663, 675 (1952). Thus, the accrediting agencies' determinations took on "regulatory consequences." Martin, *supra*, at 123–24.

34.    Those regulatory consequences grew exponentially when Congress passed the Higher Education Act of 1965 (HEA), which expanded federal loan and grant programs beyond veterans to include the vast majority of American students. Flood & Dewhirst, *supra*, at 744–45. Under the HEA, the Commissioner of Education determined which accrediting agencies were "reliable authorities" regarding education quality. *E.g.*, Pub. L. No. 89-329, secs. 302(c), 435(a), 441(3), § 123(b)(1), 79 Stat. 1219, 1229, 1247–48, 1249–50 (1965). Only institutions "accredited by a nationally

recognized accrediting agency or association" approved by the Commissioner were eligible to participate in student loan and grant programs. *Id.*

35.     Part of Congress's motivation in delegating oversight to private accreditors was to avoid "federal control of education." Finkin, *Unfolding Tendency*, *supra*, at 95 (quoting Mathew W. Finkin, *Reforming the Federal Relationship to Education Accreditation*, 57 N.C. L. Rev. 379, 381 (1979)). In other words, by outsourcing the creation of accreditation standards, Congress sought to avoid "do[ing] indirectly, what it was directly forbidden to do"—dictating state educational standards. *Id.*

36.     Until 1992, the HEA provided no guidance regarding how to determine if accreditors were "reliable authorities." In 1992, however, Congress made several significant changes. Flood & Dewhirst, *supra*, at 746.

37.     First, the 1992 amendments set out criteria regarding the structure and procedures of accrediting agencies, including requirements that the agency be separate from trade associations, have public participation, and give educational institutions due process. *Id.* at 747; Higher Education Amendments of 1992, Pub. L. No. 102-325, sec. 499, § 496, 106 Stat. 448, 641–43, *codified at* 20 U.S.C. § 1099b(a).

38.     Second, the 1992 amendments provided general requirements regarding what topics accreditors' standards must assess, such as student achievement, curriculum, and the rate of default on student loans. Flood & Dewhirst, *supra*, at 747; Pub L. No. 102-325. sec. 499, § 496, 106 Stat. 448, 642–43, *codified at* 20 U.S.C. § 1099b(a)(5).

39.     Third, although the 1992 amendments required accreditors to assess certain topics, Congress was careful to clarify that accreditors determine the substantive standards for those topics and are independent of the Department. The amendments provided that "[n]othing in this Act shall be construed to permit the Secretary to establish standards for accrediting agencies or associations that are not required by this section," and "[n]othing in this Act shall be construed to prohibit or limit" accrediting agencies "from adopting additional standards not provided for in this section." Pub. L. No. 102-325, sec. 499, § 496(g), 106 Stat. 448, 645, *codified as amended at* 20 U.S.C. § 1099b(g).

40.     In 2008, Congress further clarified accreditors' independence by prohibiting the Department from "promulgat[ing] any regulation with respect to the standards of an accreditation agency" or creating "standards that accrediting agencies or associations shall use to assess any institution's success with respect to student achievement." Higher Education Opportunity Act, Pub. L. No. 110-315, sec. 495(3), (4), § 496(g), (o), 122 Stat. 3078, 3327 (2008), *codified at* 20 U.S.C. § 1099b(g), (o).

### The Modern Accreditation Landscape

41.     Under the current scheme, private accreditors act "[a]s gatekeepers to $112 billion in annual federal student aid."[9]

---

[9] U.S. Dep't of Educ., *Greater Transparency of Accrediting Agency Recognition* (Feb. 8, 2022), https://www2.ed.gov/admins/finaid/accred/greater-transparency-in-accreditor-recognition.pdf.

42.    To be eligible to participate in federal student aid programs, Title IV of the HEA requires "qualifying institutions of higher education" to (1) have "legal authority to operate within a State," (2) demonstrate "administrative capability and financial responsibility," and (3) be accredited by a recognized accrediting agency. 20 U.S.C. § 1099c(a); 20 U.S.C. § 1001(a) (defining "institution of higher education"). The Department determines whether an institution has met these requirements. 20 U.S.C. § 1099c(a).[10]

43.    As to the first requirement, an institution is "legally authorized" by a State "if the State has a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws" and the institution is either chartered by the State, licensed by the State, or is an exempt religious institution. 34 C.F.R. § 600.9(a), (b).

44.    As to the second requirement, the Department independently evaluates whether the institution has the administrative capability to administer Title IV programs. *See* 34 C.F.R. § 668.16 (listing criteria for administrative competency).

45.    At issue here is the third requirement: accreditation. An institution must be accredited by an accrediting agency determined by the Department to be a "reliable authority as to the quality of education or training offered." 20 U.S.C. § 1099b(a).[11]

---

[10] This combination of requirements results in the so-called "triad," *Auburn Univ. v. S. Ass'n of Colls. & Schs.*, 489 F. Supp. 2d 1362, 1368 (N.D. Ga. 2002), comprising the States, which authorize institutions to operate within their borders, private accreditors, and the Department, which approves accreditors and certifies that an institution meets these requirements.

[11] This process is often referred to as "recognition" of accrediting agencies. 20 U.S.C. § 1099b.

The HEA sets both a floor and a ceiling for which accrediting agencies are "reliable authorities."

46.    It first mandates that accrediting agencies meet minimum requirements for the composition and governance of the agency and the procedures by which it evaluates institutions. 20 U.S.C. § 1099b(a)(1)–(4). And it requires that recognized accrediting agencies have substantive standards to evaluate institutions like "curricula," "faculty," and "success with respect to student achievement." 20 U.S.C. § 1099b(a)(5).

47.    Although the HEA requires accrediting agencies to *have* standards on those topics, it clearly prohibits the Department from playing a role in determining *the content* of those standards. In particular, the HEA expressly prohibits the Department from "promulgat[ing] any regulation with respect to the standards of an accrediting agency." 20 U.S.C. § 1099b(o).

48.    The HEA also prohibits the Department from establishing criteria beyond those enumerated by the statute. 20 U.S.C. § 1099b(g); *accord id*. § 1099b(n)(3).

49.    Conversely, the HEA expressly allows accrediting agencies to "adopt[] additional standards not provided for" in the HEA and insulates those standards from review by the Department. 20 U.S.C. § 1099b(g), (n)(3); *accord id.* § 1099b(p); 34 C.F.R. § 602.16(f) ("An agency that has established and applies the standards in paragraph (a) of this section may establish any additional accreditation standards it deems appropriate.").

13

50.    In sum, the Department evaluates accreditors based only on the limited criteria in § 1099b. Accreditors in turn may evaluate institutions based on any standards whatsoever, and the Department is forbidden from considering the substance of those standards in determining whether the accreditor is "reliable."

51.    If all that were not clear enough, a catchall provision in Title IV spells it out: the Department may not "exercise any direction, supervision, or control . . . over any accrediting agency or association." 20 U.S.C. § 3403(b).

52.    At the same time, the HEA severely limits the remedies available to educational institutions that are subject to accrediting agencies. First, the HEA provides no mechanisms for the Department to review adverse accreditation decisions and even requires institutions to "submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration prior to any other legal action." 20 U.S.C. § 1099b(e).

53.    Second, the HEA prohibits institutions from changing accrediting agencies unless they demonstrate "reasonable cause" to the Department's satisfaction, 20 U.S.C. § 1099b(h), thus forcing institutions to remain under the authority of accrediting agencies they disagree with.

54.    Third, even though accrediting agencies wield enormous government power, courts have concluded that they are not state actors for purposes of the Constitution nor agencies for purposes of the APA. *Auburn Univ. v. S. Ass'n of Colls. & Schs.*, 489 F. Supp. 2d 1362, 1371 n.5 (N.D. Ga. 2002) (collecting cases); *William*

*Loveland Coll. v. Distance Ed. Accreditation Comm'n*, 347 F. Supp. 3d 1, 12 nn.11–12 (D.D.C. 2018) (same).

55.   Fourth, the HEA purports to strip state courts of jurisdiction to hear *any* civil action involving "the denial, withdrawal, or termination of accreditation." 20 U.S.C. § 1099b(f). Simultaneously, the HEA does not provide a cause of action for adverse accreditation actions. *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1221–25 (11th Cir. 2002) (collecting cases).

56.   Without jurisdiction in state court, and without an express federal cause of action, federal courts have invented a deferential due process claim against accreditors under federal common law. Surprisingly, courts have afforded private accrediting agencies the same deference they would a politically accountable public agency. *See Pro. Massage Training Ctr. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 171 (4th Cir. 2015) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Specifically, a plaintiff may only prevail on a due process claim if it can establish that the accrediting agency's decision is "arbitrary and unreasonable," "an abuse of discretion," or not "based on substantial evidence." *Id.* (quotations omitted).[12]

---

[12] *Accord Chi. Sch. of Automatic Transmissions*, 44 F.3d at 449; *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 712–13 (6th Cir. 2006); *Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colls. & Secondary Schs.*, 432 F.2d 650, 655–58 (D.C. Cir. 1970); *Wilfred Acad. of Hair & Beauty Culture v. S. Ass'n of Colls. & Schs.*, 957 F.2d 210, 214 (5th Cir. 1992).

57.     In short, accreditors' standards are insulated from meaningful review by the Department. Similarly, accreditors' decisions applying those standards are subject to only deferential review in court. As a result, accrediting agencies have the power to hold billions of federal education dollars hostage based on the formulation and application of substantive education standards that are immune from meaningful government supervision.

## The Private Non-Delegation Doctrine and Appointments Clause

58.     "Just as it is a central tenet of liberty that the government may not permit a private person to take property from another private person or allow private individuals to regulate other private individuals, it follows that the government may not empower a private entity to exercise unchecked legislative or executive power." *Oklahoma v. United States*, 62 F.4th 221, 228 (6th Cir. 2023) (citations omitted). "Those who govern the People must be accountable to the People." *Id.*

59.     "Private entities may serve as advisors that propose regulations. And they may undertake ministerial functions, such as fee collection. But a private entity may not be the principal decisionmaker in the use of federal power, may not create federal law, may not wield equal power with a federal agency, or regulate unilaterally." *Id.* at 229 (citations omitted). To do so would be "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

60.     An entity exercises regulatory power if it "decide[s] the applicability of standards that provide content to generally applicable rules of private conduct." *Amtrak II*, 575 U.S. at 89 (Thomas, J., concurring in the judgment); *accord id.* at 58–59

(Alito, J., concurring) (arguing that the power to issue metrics and standards for private rail carriers is "obviously regulatory").

61.    Even where standards do not directly operate on a party, they are regulatory if they have a "coercive effect" on private conduct. *Id.* at 59 (citing *Bennett v. Spear*, 520 U.S. 154, 169 (1997)); *see also Buckley*, 424 U.S. at 140 (characterizing "determinations of eligibility for funds" as "legislative" in nature); *United States v. Dierckman*, 201 F.3d 915, 922 (7th Cir. 2000) (describing exercise of Congress's spending power as "indirect regulation"); *Haight v. Thompson*, 763 F.3d 554, 568–69 (6th Cir. 2014) (describing the spending power as States "receiving federal funds in return for allowing Congress to regulate where it otherwise could not").

62.    Where a private entity wields regulatory power, it must "'function[] subordinately' to an agency with 'authority and surveillance' over it." *Nat'l Horsemen's*, 53 F.4th at 881 & n.21 (citing authorities). Put another way, "Congress may formalize the role of private parties in proposing regulations so long as that role is merely 'as an aid' to a government agency that retains the discretion to 'approve[], disapprove[], or modif[y]' them." *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.* (*Amtrak I*), 721 F.3d 666, 671 (D.C. Cir. 2013) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)), *rev'd on other grounds Amtrak II*, 575 U.S. 43.

63.    For example, the Supreme Court upheld a scheme in which a private board proposes prices that are subject to approval or disapproval by a federal agency. *See Adkins*, 310 U.S. at 399; *see also, e.g.*, *Pittston Co. v. United States*, 368 F.3d 385, 394–

97 (4th Cir. 2004) (similar); *United States v. Frame*, 885 F.2d 1119, 1128–29 (3d Cir. 1989) (similar).

64.     Similarly, the Supreme Court found no fault with a scheme that gives an agency power to act contingent on the approval of private parties that would be directly affected by that action. *See Currin v. Wallace*, 306 U.S. 1, 15–16 (1939) (Secretary of Agriculture authorized to designate markets subject to uniform standards only when approved by two-thirds of tobacco producers selling within those markets);[13] *accord Ky. Div. Horsemen's Benevolent & Protective Ass'n v. Turfway Park Racing Ass'n*, 20 F.3d 1406, 1416–17 (6th Cir. 1994) (upholding scheme that required majority of horse owners and trainers to approve prohibition of betting on races involving their horses).

65.     What Congress may not do is authorize a private party to wield government power and limit the power of the Executive Branch to review the actions of the private party. *See Nat'l Horsemen's*, 53 F.4th at 884.

66.     The Fifth Circuit recently invalidated part of the Horseracing Integrity and Safety Act (HISA) because it did just that. *See id.* There, HISA granted a private entity authority to establish standards and programs that govern horseracing. *Id.* at 882–83. The Federal Trade Commission (FTC) could only review the rules for consistency with the statute and prior regulations, and the FTC could only recommend modifications, not formally require changes. *Id.* at 884–87. The Fifth Circuit found the

---

[13] Justice Thomas has suggested that *Currin* is no longer good law after the Court's holding in *INS v. Chadha*, 462 U.S. 919, 952–53 (1983), that a veto involves an exercise of legislative power. *Amtrak II*, 575 U.S. at 90 (Thomas, J., concurring in the judgment).

Act's exclusion of agency review of "policy choices in formulating rules" to be constitutionally fatal. *Id.* at 885.

67.     After Congress amended the scheme to give the FTC broad power to modify rules, the Sixth Circuit found that "true oversight authority" existed and upheld the amended scheme. *Oklahoma*, 62 F.4th at 230. As Judge Sutton explained, "[a] private entity may aid a public federal entity that retains authority over the implementation of federal law. But if a private entity creates the law or retains full discretion over any regulation, *Carter Coal* and *Schechter* tell us the answer: that it is an unconstitutional exercise of federal power." *Id.* at 228–29.

68.     Relatedly, Officers of the United States must be appointed in compliance with Article II, Section 2, of the Constitution. This ensures that "[t]he President . . . ha[s] 'the general administrative control of those executing the laws.'" *Amtrak II*, 575 U.S. at 64 (Alito, J., concurring) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)).

69.     Any person who exercises "significant authority pursuant to the laws of the United States" on a "continuing" basis is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by the Appointments Clause. *Lucia*, 138 S. Ct. at 2051 (quoting *Buckley*, 424 U.S. at 126); *accord Edmond v. United States*, 520 U.S. 651, 662 (1997) (noting that the "significant authority" test "marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather . . . the line between officer and nonofficer").

70.     For principal officers, the Constitution requires appointment by the President and confirmation by the Senate. U.S. Const. art. II, § 2; *United States v. Germaine*, 99 U.S. 508, 509–10 (1878). For inferior officers, Congress may expressly provide an alternative method for appointment by statute. U.S. Const. art. II, § 2; *Germaine*, 99 U.S. at 509–10. "That all persons who can be said to hold an office . . . were intended to be included within one or the other of these modes of appointment there can be but little doubt." *Germaine*, 99 U.S. at 510.

### The Spending Clause and the Tenth Amendment

71.     Under current precedent, Congress has "wide berth to not only tax and spend but also to exert influence on the states by attaching strings to federal funding." *West Virginia*, 59 F.4th at 1140; *see* U.S. Const. art. I, § 8, cl. 1. "Congress may, within limits, compel states to 'tak[e] certain actions that [it] could not [otherwise] require them to take,' and a state's acceptance of the federal funds will generally constitute consent to the conditions imposed by Congress." *West Virginia*, 59 F.4th at 1140 (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999)).

72.     But Congress's power to influence state policy through spending is not limitless. "The legitimacy of Congress's exercise of the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' Respecting this limitation is critical to ensuring that Spending Clause legislation does

not undermine the status of the States as independent sovereigns in our federal system." *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) (quotations and citations omitted).

73.     In *South Dakota v. Dole*, 483 U.S. 203 (1987), "the Court identified five elements that conditional funding grants must satisfy to pass constitutional muster under the Spending Clause: (1) the expenditure must 'advance the general welfare'; (2) any attached condition must be 'unambiguous[]'; (3) conditions must relate 'to the federal interest in particular national projects or programs'; (4) conditions cannot violate another constitutional provision; and (5) conditions cannot 'be so coercive . . . [that] pressure turns into compulsion.'" *West Virginia*, 59 F.4th at 1141 (quoting *Dole*, 483 U.S. at 207–11). At issue here are the ambiguity and coercion requirements.

74.     First, a state must be able to adequately ascertain the obligations of the spending condition to knowingly accept the funds. *Id.* at 1141–43. "A law must 'unambiguously' link 'its conditions to the receipt of federal funds and define those conditions clearly enough for the states to make an informed choice." *Id.* (quoting *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004)). Put another way, a State must "know what rules they must follow and 'what sort of penalties might be on the table.'" *Id.* at 1143 (quoting *Kentucky v. Yellen*, 54 F.4th 325, 348 (6th Cir. 2022)).

75.     Second, Congress may not use "financial inducements to exert a 'power akin to undue influence.'" *NFIB*, 567 U.S. at 577 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). While the Supreme Court has not fixed a particular line "where persuasion gives way to coercion," it has made clear that Congress is not free

to penalize States by threatening to take away existing funds for failure to comply with wholly new requirements. *Id.* at 585.

76.     "Congress may not simply 'conscript state [agencies] into the national bureaucratic army.'" *Id.* at 585 (quoting *FERC v. Mississippi*, 456 U.S. 742, 775 (1982) (O'Connor, J., concurring in judgment in part and dissenting in part)). It must "speak with a clear voice" and "enable the States to exercise their choice knowingly, cognizant of the consequence of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

### Florida's University and College System

77.     The State of Florida is home to the nation's preeminent colleges and universities. Florida has been ranked the #1 public higher education system in the nation by *U.S. News and World Report* for seven consecutive years.[14]

78.     The State is constitutionally charged with overseeing all public universities and colleges in the State. *See* Fla. Const. art. IX.

79.     The Board of Governors of the State University System oversees the State's twelve public universities, while the Board of Education oversees the Florida College System, which is comprised of Florida's 28 public colleges.

80.     All 40 Florida public universities and colleges are eligible to participate in programs governed by Title IV of the HEA.

---

[14]       https://www.fldoe.org/newsroom/latest-news/florida-is-ranked-as-number-one-state-for-education-by-u-s-news-world-report.stml.

81.     In the 2021–2022 school year, Florida's twelve universities dispersed $2.2 billion in federal student aid to over 250,000 students across the State.

82.     Florida's 28 public colleges likewise disburse approximately $933.4 million annually. These funds account for roughly 42% of the Florida College System's $2.205 billion budget for the 2022–2023 school year.

83.     Florida's total state budget last year was $112.1 billion.

84.     Florida's institutions incur considerable costs to comply with accreditation requirements. For example, accreditation costs an individual university roughly $12 million a year. These costs include annual fees and dues paid directly to an accrediting agency, university personnel, consultants and software necessary to comply with accreditor requirements, and site visits by accreditor representatives.[15]

### Accreditors' Pattern of Abuses

85.     As discussed, accreditors wield enormous power—largely unchecked—and have wielded that power to undermine the States' sovereign control over their own institutions.

86.     In 2021, for example, SACS threatened the accreditation status of FSU because the Florida Board of Governors was considering the Florida Commissioner of Education for FSU president. Among other reasons, SACS raised concerns that the Commissioner of Education, who oversees *all* Florida colleges, lacked "appropriate

---

[15]     https://www.flbog.edu/wp-content/uploads/2022/08/Full_Board_02a_Accreditation_Report_082522_CE.pdf

experience and qualifications" to oversee a *single* university. Proceeding with this candidate, per SACS, "endanger[ed] the institution['s] access to federal financial aid."[16]

87.    This was not SACS's first time threatening Florida's institutions. Following a deadly hazing incident at Florida A&M University (FAMU) in 2011, then-Governor Rick Scott publicly suggested that the university's president should be suspended. SACS responded by chastising the Governor for daring to express his opinion on decisions by a *state-owned* university and threatening FAMU's accreditation.[17]

88.    Similarly, in 2013, SACS threatened the accreditation status of the University of Florida after Governor Scott reportedly asked the president to postpone his retirement.[18]

89.    Similar incidents have occurred in other States. In 2012, for example, SACS threatened the University of Virginia because the school's governing board

---

[16] Letter to Sydney Kitson, Chair, Fla. Bd. of Gov'rs, from Belle S. Wheelan, President, SACS (May 13, 2021), https://www.scribd.com/document/508024434/SACS-Letter-to-Sydney-Kitson#; Divya Kumar, *Richard Corcoran out of FSU presidential search; three academics move on* (May 15, 2011), https://www.tampabay.com/news/education/2021/05/15/richard-corcoran-out-of-fsu-presidential-search-three-academics-move-forward/.

[17] American Council of Trustees and Alumni, *Florida Rising: An Assessment of Public Universities in the Sunshine State* 39 (June 2013), https://www.fgcu.edu/facultysenate/archivedmeetings/files/12-13-2013_actafloridarisingreportflorida6_6_13.pdf.

[18] Tia Mitchell, *Gov. Rick Scott's involvement in UF president decision under review*, Tampa Bay Times (Jan. 18, 2013), https://www.tampabay.com/news/education/college/gov-rick-scotts-involvement-in-uf-president-decision-under-review/1271239/.

asked the president to resign.[19] And in 2019, SACS threatened the University of South Carolina because Governor Henry McMaster, who serves as a member of the school's board of trustees by law, S.C. Code § 59-117-10, was involved in selecting the university's next president.[20]

90.   Most recently, SACS picked a fight with the University of North Carolina (UNC) over the creation of a new program, voted on by the UNC Board of Trustees, that promises to hire professors from across the ideological spectrum and is designed to "end political constraints on what can be taught in university classes."[21] A SACS official issued a letter of inquiry to UNC about the program and publicly boasted that SACS would "either get them to change it, or the institution will be on warning." It is no cause for great concern, the official said, because "we assume institutions are innocent until proven guilty."[22] After UNC's President sent a letter assuring SACS that no decisions had been made, SACS closed the inquiry.[23]

---

[19] Jenna Johnson, *U-Va. receives warning from accreditors after failed ouster of president in June*, Wash. Post (Dec. 11, 2012), https://www.washingtonpost.com/local/education/u-va-receives-warning-from-accreditors-after-failed-ouster-of-president-in-june/2012/12/11/3a5553d0-43b1-11e2-8e70-e1993528222d_story.html.

[20] Lucas Daprile, *McMaster's role in University of South Carolina presidential search may hurt accreditation* (July 15, 2019), https://www.greenvilleonline.com/story/news/2019/07/15/sc-gov-henry-mcmasters-involvement-presidential-search-may-threaten-uscs-accreditation/1734120001/.

[21] The Editorial Board, *UNC Takes on the University Echo Chamber*, Wall St. J. (Jan. 26, 2023), wsj.com/articles/university-of-north-carolina-school-of-civic-life-and-leadership-board-of-trustees-11674773696?mod=Searchresults_pos6&page=1.

[22] The Editorial Board, *The University of North Carolina Fight Escalates*, Wall St. J. (Feb. 12, 2023), https://www.wsj.com/articles/the-university-of-north-carolina-fight-escalates-unc-belle-wheelan-sacs-higher-education-college-accreditation-free-expression-d2077882.

[23] Abby Pender, *UNC accreditation inquiry regarding school of civic life and leadership resolved* (Apr. 5, 2023) https://www.dailytarheel.com/article/2023/04/university-school-of-civic-life-unc-march-update.

91.    SACS's interference does not stop at the institutional level. In 2021, the Board of Regents of the University System of Georgia, the governing board of all state colleges and universities, was considering former Georgia Governor Sonny Perdue as Chancellor.[24] SACS sent a letter to the university system warning that Perdue's candidacy threatened the *entire state university system's* accreditation, which would result in "bad press," "loss in enrollment and donations," and loss of "access to federal financial aid" for students.

92.    For its part, SACS pins most of these "inquiries" on compliance with its requirement that institutions have a governing board that "protects the institution from undue influence by external persons or bodies."[25] In SACS's view, "[g]overning boards are the ones that are responsible for ensuring the well-being of the institution, not the governor, not legislators, not Jane and John Citizen."[26]

93.    Other accrediting agencies have expressed similar views. Just a few months ago, the president of the New England Commission of Higher Education wrote in an op-ed: "The responsibility for the development of . . . academic programs

---

[24] Eric Stirgus, et al., *Agency warns Georgia Regents against politicizing chancellor search*, Atl. J.-Const. (Apr. 27, 2021), https://www.ajc.com/education/agency-warns-georgia-regents-against-politicizing-chancellor-search/NDBHGL3YGFB5FMPUVH6S5OHRSM/.

[25] *The Principles of Accreditation: Foundations for Quality Enhancement*, S. Ass'n of Colls. & Schs. Comm'n on Colls. 13–14 (Dec. 2017), https://sacscoc.org/app/uploads/2019/08/2018PrinciplesOfAcreditation.pdf

[26] Jeff Amy, *Accrediting agency asks about politics in Georgia search*, AP News (Apr. 27, 2021), https://apnews.com/article/donald-trump-government-and-politics-sonny-perdue-georgia-education-73ac21582fe7e0ef60952b91f8e78d56.

rests squarely with the faculty, not the president, not the governing board and absolutely not the government."[27]

## Recent Developments

94.    Before 2020, accreditors were not only unaccountable private actors wielding immense government power but also operated as regional monopolies. That is why all of Florida's colleges and universities are currently accredited by SACS.

95.    In 2020, however, the Department revised its regulations to disrupt these monopolies and promote competition in accreditation. *See* 84 Fed. Reg. 58834 (final rule); 84 Fed. Reg. 27404, 27418 (proposed rule explaining changes to regional designations).

96.    In 2022, the Florida Legislature, prompted by the Department's actions and incensed by SACS's abuses, passed SB 7044, which requires public colleges and universities to switch accreditors.[28] Ch. 2022-70, § 4, at 7, Laws of Fla; *see also* Ch. 2023-82, § 11, at 14, Laws of Fla. (amending SB 7044).

---

[27]    Lawrence Schall, *Accreditors Can Hold the Line*, Inside Higher Ed (Apr. 10, 2023), https://www.insidehighered.com/opinion/views/2023/04/10/accreditors-can-hold-line.

[28] SB 7044 originally required institutions to switch accreditors every accreditation cycle. Ch. 2022-70, § 4, at 7, Laws of Fla. (adding § 1008.47(2)(a), Fla. Stat.). In 2023, the law changed to require only a one-time change in accreditors. Ch. 2023-82, § 11, at 14, Laws of Fla. (amending § 1008.47(2)(a), Fla. Stat.).

97.     SACS vehemently opposed SB 7044. Belle Wheelan, president of SACS, suggested that Florida was "angry with [her] for doing [her] job" and "upset because [SACS] stepped into [its] business."[29]

98.     The Department, now under the Biden Administration, similarly viewed SB 7044 with hostility, going so far as to send a letter of opposition to Governor DeSantis after the law was passed but before he signed it into law. Ex. 1.

99.     Once SB 7044 took effect, the Biden Administration escalated that hostility. On July 19, 2022, the Department issued three "guidance documents" expressly aimed at SB 7044.

100.    First, the Department published a dear colleague letter on its website, which "reiterate[d]" the standards the agency would apply to determine whether an institution has "reasonable cause" to change accreditors under 20 U.S.C. § 1099b(h). GEN-22-10, Guidance for Institutions Seeking to Change or Add Accrediting Agencies, U.S. Dep't of Ed. (July 19, 2022).[30] One factor the agency will assess is "whether . . . the institution's membership in the accrediting agency would be voluntary, as required for recognition of the accrediting agency." *Id.* What the letter fails to acknowledge, however, is that the "voluntar[iness]" requirement in 20 U.S.C.

---

[29] Emma Whitford, *Florida Could Make Switching Accreditors Mandatory*, Inside Higher Ed (Feb. 10, 2022), https://www.insidehighered.com/news/2022/02/11/florida-bill-would-require-colleges-change-accreditors.

[30] Available at https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-19/guidance-institutions-seeking-change-or-add-accrediting-agencies.

§ 1099b(a)(2) governs the relationship between accreditors and institutions. It does not prevent the sovereign States from running the institutions they own and govern.

101.    Second, the Department simultaneously sent a letter to accrediting agencies "clarify[ing] the voluntary membership requirement." Letter from Herman Bounds Jr., Dir., Accreditation Group, to Institutional Accrediting Agencies (July 19, 2022).[31] In that letter, the Department highlighted SB 7044, suggested that Florida's law "potentially undermines the voluntary nature of the relationship," and instructed accrediting agencies to conduct an independent evaluation of whether an institution's attempt to change agencies is voluntary. *Id.*

102.    Third, in another dear colleague letter, the Department purported to update the procedures for an institution seeking to change accreditors. GEN-22-11, Procedures for Institutions Seeking Approval of a Request to Change or Add Accrediting Agencies (July 19, 2022) (updated Sept. 26, 2022).[32] Under this letter, the Department requires institutions to obtain the Department's approval before they even *begin* the process of changing accrediting agencies. *Id.*

103.    On the same day it announced these three "guidance documents," the Department published a blog post on its website written by Antoinette Flores, Senior Advisor, Office of Postsecondary Education, entitled "Postsecondary Accreditation

---

[31] Available at https://www2.ed.gov/admins/finaid/accred/letter-to-institutional-accreditors.pdf.

[32] Available at https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-19/procedures-institutions-seeking-approval-request-change-or-add-accrediting-agencies-updated-sept-26-2022.

Cannot Become a Race to the Bottom."[33] She described SB 7044 as "confusing to institutions" and "hav[ing] a chilling effect on accrediting agencies as they seek to effectively do their job." Through the three guidance documents, she explained, "[t]he Department aims to protect against a race to the bottom and ensure that accreditation remains a voluntary process . . . and that institutions are not forced to switch against their will."

104.    As of the filing of this complaint, several Florida institutions have taken concrete steps toward changing accrediting agencies and even formally requested the Department approve a change.

105.    The Department responded by requesting these institutions confirm whether SB 7044 was the cause of their decision to switch accreditors for the purpose of determining whether the institutions had "reasonable cause" to change.

106.    In a letter to Florida Polytechnic University (Florida Poly), the Department went so far as to request communications between Florida Poly and the Florida Board of Governors regarding Florida Poly's plans to change accrediting agencies. Ex. 2. The letter specifically cites the July 19, 2022 guidance documents as the impetus for requesting this information. Ex. 2.

107.    As it stands, state law requires over half of Florida's public colleges and universities to change accreditors in the next two years. Their ability to do so is

---

[33] Antoinette Flores, *Postsecondary Accreditation Cannot Become a Race to the Bottom*, U.S. Dep't of Ed. (July, 19, 2022), https://blog.ed.gov/2022/07/postsecondary-accreditation-cannot-become-a-race-to-the-bottom/.

substantially burdened, if not entirely prevented, by federal laws that violate the Constitution and federal policies that violate the APA.

108.    Further, Florida's elected representatives have exhibited a desire for greater involvement in the governance of state institutions, including creating new programs on campus, improving accountability for taxpayer funds, and ensuring institutions stay true to the missions of their charters and focused on the academic success of their students. *See* Ch. 2023-82, Laws. of Fla.

109.    SACS's current policies stand opposed to those goals. All the while, the HEA enables SACS to curb the State's governance of public institutions, hold hostage billions of dollars in federal funds, and evade input from the public.

110.    To prevent further harm, Florida seeks relief from this Court.

## CLAIMS

## <u>COUNT 1</u>

### Violation of the Private Non-Delegation Doctrine

111.    Florida repeats and incorporates by reference ¶¶ 1–110.

112.    "A cardinal constitutional principle is that federal power can be wielded only by the federal government. Private entities may do so only if they are subordinate to an agency." *Nat'l Horsemen's*, 53 F.4th at 872.

113.    The HEA defies this principle in two ways. First, it delegates the power to set eligibility standards for federal funds to private accrediting agencies, subject to limited oversight by the Department. *See* ¶¶ 41–51. Second, it delegates the power to

31

apply those eligibility standards to those same agencies, subject to limited judicial review. *See* ¶¶ 52–57.

114.   The power to determine eligibility for federal grant programs is an exercise of Congress's regulatory power because it has a "coercive effect" on private conduct. *Amtrak II*, 575 U.S. at 59 (Alito, J., concurring) (citing *Bennett*, 520 U.S. at 169); *see also Buckley*, 424 U.S. at 140 (characterizing "determinations of eligibility for funds" as "legislative" in nature); *Dierckman*, 201 F.3d at 922 (describing exercise of Congress's spending power as "indirect regulation"); *Haight*, 763 F.3d at 568–69 (describing Congress's spending power as States "receiving federal funds in return for allowing Congress to regulate where it otherwise could not").

115.   Indeed, the Fourth Circuit has described the power accreditors have over institutions as "life and death power." *Pro. Massage Training Ctr.*, 781 F.3d at 170. "An institution denied accreditation is likely to 'promptly [go] out of business—as very few people [are] willing [or able] to pay' tuition out of their own pockets." *Id.* (quoting *Chi. Sch. of Automatic Transmissions*, 44 F.3d at 448) (alterations in original).

116.   The private non-delegation doctrine prohibits private entities from exercising such regulatory power "[i]f the private entity does not function subordinately to the supervising agency." *Nat'l Horsemen's*, 53 F.4th at 881.

117.   The HEA squarely violates that doctrine, prohibiting the Department from "exercis[ing] any direction, supervision, or control . . . over any accrediting agency or association." 20 U.S.C. § 3403(b).

118.   Thus, Congress has empowered private entities to regulate state conduct and shielded those entities from supervision by a government agency. *See Nat'l Horsemen's*, 53 F.4th at 884. "Such a delegation of legislative power is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress." *Schechter Poultry*, 295 U.S. at 537.

119.   This problem is not merely academic. One of the concerns with private delegations is that private entities—unencumbered by the traditional "accountability checkpoints" accompanying government action, *Amtrak II*, 575 U.S. at 61 (Alito, J., concurring)—might seek to do what government actors would not dare.

120.   Florida's accreditor, for example, takes the position that university "[g]overning boards are the ones that are responsible for ensuring the well-being of the institution, not the governor, not legislators, not Jane and John Citizen." *See* ¶ 92.[34]

121.   For all these reasons, the HEA violates the private non-delegation doctrine.

---

[34] Not only is it unlikely that the federal government would attempt such an intrusion into state sovereignty, such an intrusion would likely be subject to legal challenge. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018) (explaining that it is "not easy to imagine" a "more direct affront to state sovereignty" than attempting to "dictate[] what a state legislature may and may not do").

## COUNT 2

### Violation of the Tenth Amendment and the Spending Clause

122.  Florida repeats and incorporates by reference ¶¶ 1–110.

123.  The Spending Clause authorizes Congress to "lay and collect Taxes, . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

124.  "[T]o pass constitutional muster, . . . (1) the expenditure must 'advance the general welfare'; (2) any attached condition must be 'unambiguous[]'; (3) conditions must relate 'to the federal interest in particular national projects or programs'; (4) conditions cannot violate another constitutional provision; and (5) conditions cannot 'be so coercive . . . [that] pressure turns into compulsion.'" *West Virginia*, 59 F.4th at 1141 (quoting *Dole*, 483 U.S. at 207–11).

125.  The HEA violates the Spending Clause because it does not provide Florida institutions fair notice of the conditions that will be attached to receipt of funds made available under the HEA and exerts undue influence over States by conditioning continued receipt of those funds on acceptance of new conditions.

126.  Florida's obligations under the HEA are not ascertainable in at least two ways.

127.  First, the standards of accreditation—the conditions for receiving federal funds—are not contained in the HEA or any promulgated regulations. *See West Virginia*, 59 F.4th at 1143 (looking to statutory text to assess a spending condition's ascertainability); *accord Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291,

296 (2006) ("In considering whether the [statute] provides clear notice, we begin with the text."). In fact, the HEA forbids the Secretary from establishing such criteria. 20 U.S.C. § 1099b(g), (o). And the HEA expressly allows accrediting agencies to "adopt[] additional standards not provided for" in the HEA. 20 U.S.C. § 1099b(g); *accord id.* § 1099b(p); 34 C.F.R. § 602.16(f). "States cannot knowingly accept conditions of which they are 'unaware.'" *Arlington Cent. Sch.*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17).

128.     Second, the HEA permits accrediting agencies to change the standards for accreditation. It merely requires that accrediting agencies have standards and apply them consistently. 20 U.S.C. § 1099b(a)(4). Thus, state institutions cannot "know what rules they must follow and 'what sort of penalties might be on the table.'" *West Virginia*, 59 F.4th at 1143 (quoting *Kentucky*, 54 F.4th at 348).

129.     Further, the HEA is unduly coercive. The HEA allows accreditors to impose new standards long after Florida has been certified eligible for federal funding. If a Florida institution does not comply with these new accreditation standards, it risks losing eligibility for all Title IV federal funding.

130.     Indeed, accrediting agencies often invoke this risk as a threat when they want to influence institutional behaviors. *See* ¶¶ 86–91. And state institutions are locked into working with the same accreditors if they cannot show "reasonable cause" to change—a bar that the Department treats as incredibly difficult to meet. *See* ¶¶ 53, 99–105. Given the extent to which students today rely on federal assistance to finance their college educations, a state like Florida could not as a practical matter operate any

competitive colleges or universities if students at those institutions were denied all access to federal assistance.

131.   Thus, the HEA gives the Department the power to "penalize States that choose not to participate" in new accreditation standards "by taking away their existing . . . funding." *NFIB*, 567 U.S. at 585.

132.   Congress is not free to do so.

## COUNT 3

### Violation of the Appointments Clause

133.   Florida repeats and incorporates by reference ¶¶ 1–110.

134.   The Appointments Clause of the Constitution requires that officers of the United States be appointed by prescribed methods. *See* U.S. Const. art. II, § 2; *supra* ¶¶ 68–70.

135.   Someone who "exercis[es] significant authority pursuant to the laws of the United States" on a "continuing" basis is an "Officer." *Lucia*, 138 S. Ct. at 2051 (2018) (quoting *Buckley*, 424 U.S. at 126). If that officer exercises the "significant authority" without supervision or review by another officer, he is a principal officer. *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1983 (2021); *Edmond*, 520 U.S. at 663.

136.   The heads of accrediting agencies wield significant authority of the United States because they set standards and determine eligibility for billions of dollars of federal funds. *See Buckley*, 424 U.S. at 140 (finding a commission which made "determinations of eligibility for funds" subject to the Appointments Clause); *Pro.*

*Massage Training Ctr.*, 781 F.3d at 170 (describing the power accrediting agencies have over institutions as "life and death power").

137.    No head of any accrediting agency recognized by the Department has been appointed by the President or confirmed by the Senate.

138.    Likewise, the HEA does not provide an alternative method for appointment that complies with the Appointments Clause.

139.    For these reasons, the HEA violates the Appointments Clause.

## COUNT 4

### Violation of the Administrative Procedure Act

140.    Florida repeats and incorporates by reference ¶¶ 1–110.

141.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

142.    The Department's July 19, 2022 dear colleague letters and letter to accrediting agencies (the guidance documents), *see* ¶¶ 99–105, are contrary to law and arbitrary and capricious and were promulgated without notice and comment.

143.    While the Department claims to be issuing only "guidance," the guidance documents are being "applied . . . in a way that indicates [they are] binding." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Indeed, Department officials cite these documents as the basis for requesting further information and documents from Florida institutions. Ex. 2. They are therefore reviewable.

144.    The guidance documents are contrary to law because they misapply the HEA's requirement that accrediting agencies have "voluntary membership of institutions of higher education."  20 U.S.C. § 1099b(a)(2)(A).

145.    The HEA requires that accrediting agencies have "a voluntary membership." 20 U.S.C. § 1099b(a)(2). The guidance documents assume that this requirement means that Florida cannot tell the institutions it owns and operates to switch accreditors. *See* ¶¶ 99–105.

146.    But the "voluntary membership" requirement merely makes clear that neither the federal government nor accrediting agencies may force institutions to participate—not that States are prohibited from running their own institutions. *See* 20 U.S.C. § 1099b(a) (listing "voluntary membership" as a requirement for accrediting agencies not institutions).

147.    The Department's reading would allow the federal government to dictate how the States administer education—something the Department is expressly forbidden from doing. *See* 20 U.S.C. § 3403; *see also Bond v. United States*, 572 U.S. 844, 862 (2014) (explaining that courts apply a presumption that Congress "preserves the constitutional balance between the National Government and the States" (quotations omitted)). And even if that commandeering were permissible under the Spending Clause, any such requirement would require a clear statement of Congress's intent. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815–16 (11th Cir. 2022) (en banc).

148.    Additionally, the guidance documents are arbitrary and capricious because they fail to "articulate a satisfactory explanation for" the Department's actions

"including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted).

149. At a minimum, the guidance documents are arbitrary and capricious because they fail to account for state sovereign prerogatives, *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015) (calling costs to the States "a centrally relevant factor when deciding whether to regulate"), and fail to explain departure from past practice, *see DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

150. Further, the Department's explanation that allowing institutions to freely switch accreditors would create a "race to the bottom" is plainly nonsensical. The Department may only approve accreditors it believes are "reliable authorities." *See* 20 U.S.C. § 1099b(a).

151. Finally, the guidance documents were promulgated without notice and comment.

152. The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

153. The documents "affect individual rights and obligations" because they add requirements for institutions that wish to change accreditors and obligate accrediting agencies to police those requirements. Thus, notice and comment was required.

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Declare unconstitutional, facially and as applied to Florida, the accreditation requirements in 20 U.S.C. § 1001(a) and § 1099c(a).

b) Permanently enjoin Defendants from enforcing the accreditation requirements in 20 U.S.C. § 1001(a) and § 1099c(a) against Florida and sever those provisions from the remainder of the statute.

c) In the alternative, if the Court denies (a), declare unconstitutional, facially and as applied to Florida, the limits on changing accreditors in 20 U.S.C. § 1099b(h).

d) In the alternative, if the Court denies (b), permanently enjoin Defendants from enforcing the limits on changing accreditors in 20 U.S.C. § 1099b(h) against Florida and sever those provisions from the remainder of the statute.

e) In the alternative, if the Court denies (a)–(d), hold unlawful and set aside the "guidance documents" issued July 19, 2022, under the APA.

f) Award Florida costs and reasonable attorney's fees.

g) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

*/s/ Natalie P. Christmas*
NATALIE P. CHRISTMAS (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com

*Counsel for Florida*