## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

STATE OF FLORIDA,

               Plaintiff,

v.                                                    No. 0:23-cv-61188

MIGUEL CARDONA, in his official
capacity as Secretary of Education, *et al.*,

               Defendants.

### DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants hereby move to dismiss Plaintiff's Complaint, *see* ECF No. 1, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). As further detailed in the attached memorandum of law, Plaintiff's Complaint fails for threshold reasons, including failure to state a claim on Plaintiff's constitutional claims, and lack of subject-matter jurisdiction and failure to state a claim on Plaintiff's claims under the Administrative Procedure Act. Defendants respectfully submit that the Complaint should be dismissed in its entirety.

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................................2

I.      The History and Evolution of Private Accreditation.........................................................2

II.     Federal Statutory and Regulatory Framework ..................................................................5

III.    Florida's Reliance on Federally Recognized Accrediting Associations ...........................7

IV.     July 2022 Letters ..............................................................................................................9

V.      This Litigation .................................................................................................................11

LEGAL STANDARDS.................................................................................................................11

ARGUMENT.................................................................................................................................12

I.      The Department's reliance on private accreditors' decisions does not violate the
        private-nondelegation doctrine because setting substantive educational standards is
        not a federal function.....................................................................................................12

II.     The heads of accrediting agencies are private actors not subject to the Appoinments
        Clause. ............................................................................................................................19

III.    Title IV does not violate Congress's power under the Spending Clause.......................21

IV.     The Letters Are Not Final Agency Action Subject to Judicial Review. ........................26

V.      The Letters Were Not Required to Undergo Notice and Comment. ..............................28

VI.     The Letters Do Not Violate the APA's Substantive Requirements. ..............................29

## TABLE OF AUTHORIES

**CASES**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................11

*Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*,
  721 F.3d 666 (D.C. Cir. 2013) ...............................................................................16

*Auburn Univ. v. S. Ass'n of Colls. & Schs., Inc.*,
  489 F. Supp. 2d 1362 (N.D. Ga. 2002) ...................................................................21

*Auffmordt v. Hedden*,
  137 U.S. 310 (1890) ................................................................................................19

*Bell v. New Jersey*,
  461 U.S. 773 (1983) ................................................................................................28

*Bennett v. Ky. Dep't of Educ.*,
  470 U.S. 656 (1985) ................................................................................................24

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................26

*Boerschig v. Trans-Pecos Pipeline*,
  872 F.3d 701 (5th Cir. 2017) ..................................................................................12

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .............................................................................................14, 16

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936) ................................................................................................13

*Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. of Career Schs. & Colls.*,
  44 F.3d 447 (7th Cir. 1994) ....................................................................................17

*City of San Diego v. Whitman*,
  242 F.3d 1097 (9th Cir. 2001) ................................................................................27

*Clayton County v. Federal Aviation Administration*,
  887 F.3d 1262 (2018) ..............................................................................................28

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ...........................................................................................23, 24

*Dep't of Transp. v. Ass'n of Am. R.R.s*,
  575 U.S. 43 (2015) .......................................................................................14, 16, 17

*Eubank v. Richmond,*
   226 U.S. 137 (1912) ..................................................................................................12

*Fin. Oversight Mgmt. Bd. for P.R. v. Aurelius Inv., LLC,*
   140 S. Ct. 1649 (2020) ............................................................................................20

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ............................................................................................ 26, 27

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.,*
   561 U.S. 477 (2010) ................................................................................................21

*Fullilove v. Klutznick,*
   448 U.S. 448 (1980) ................................................................................................23

*Haight v. Thompson,*
   763 F.3d 554 (6th Cir. 2014) ...................................................................................17

*Hoctor v. USDA,*
   82 F.3d 165 (7th Cir. 1996) .....................................................................................29

*Indep. Equip. Dealers Ass'n v. EPA,*
   372 F.3d 420 (D.C. Cir. 2004) .................................................................................26

*Kamau v. Slate,*
   No. 4:21-cv-279, 2022 WL 511211 (N.D. Fla. Jan. 31, 2022) ...............................12

*Lebron v. Nat'l R.R. Passenger Corp.,*
   513 U.S. 374 (1995) ................................................................................................21

*Luminant Generation Co. v. U.S. EPA,*
   757 F.3d 439 (5th Cir. 2014) ...................................................................................27

*Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.,*
   817 F.2d 1310 (8th Cir. 1987) .................................................................................20

*Media Gen. Operations, Inc. v. Herman,*
   152 F. Supp. 2d 1368 (S.D. Ga. 2001) ....................................................................27

*Metcalf & Eddy v. Mitchell,*
   269 U.S. 514 (1926) ............................................................................................ 19, 20

*National Horsemen's Benevolent & Protective Ass'n v. Black,*
   53 F.4th 869 (5th Cir. 2022) .............................................................................13, 14, 16

*Nat'l Fed'n of Indep. Business v. Sebelius,*
   567 U.S. 519 (2012) ..........................................................................................21, 22, 23

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*,
  -- F. Supp.3d --, 2023 WL 3293298 (N.D. Tex. May 4, 2023) ............................................................20

*Nat'l Parks Conservation Ass'n v. Norton*,
  324 F.3d 1229 (11th Cir. 2003) ............................................................................................ 12, 26

*New York v. United States*,
  505 U.S. 144 (1992) ......................................................................................................................23

*Oklahoma v. U.S. Civ. Serv. Comm'n*,
  330 U.S. 127 (1947) ......................................................................................................................23

*Oklahoma v. United States*,
  62 F.4th 221 (6th Cir. 2023),
  *reh'g en banc denied,* No. 22-5487, 2023 WL 3815095 (6th Cir. May 18, 2023) ......................14

*Pennhurst State School & Hosp. v. Halderman*,
  451 U.S. 1 (1981) .................................................................................................................... 22, 23

*Peoples Nat'l Bank v. Off. of Comptroller of Currency of the U.S.*,
  362 F.3d 333 (5th Cir. 2004) ........................................................................................................26

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ........................................................................................................................29

*Riley v. St. Luke's Episcopal Hosp.*,
  252 F.3d 749 (5th Cir. 2001) .................................................................................................. 19, 20

*Riverkeeper v. U.S. EPA*,
  806 F.3d 1079 (11th Cir. 2015) .............................................................................................. 28, 30

*Scarfo v. Ginsberg*,
  175 F.3d 957 (11th Cir. 1999) ......................................................................................................27

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ...........................................................................................................22, 23, 25

*Steward Mach. Co. v. Davis*,
  301 U.S. 548 (1937) ......................................................................................................................23

*Sunshine Anthracite Coal Co. v. Adkins*,
  310 U.S. 381 (1940) .................................................................................................................. 13, 14

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) ........................................................................................................28

*Thomas Cusack Co. v. City of Chicago*,
  242 U.S. 526 (1917) ......................................................................................................................12

*United States v. Dierckman,*
    201 F.3d 915 (7th Cir. 2000) ....................................................................................17

*United States v. Germaine,*
    99 U.S. 508 (1878) ....................................................................................................19

*United States v. Hartwell,*
    73 U.S. (6 Wall.) 385 (1867) ...................................................................................20

*United States v. Rivera,*
    613 F.3d 1046 (11th Cir. 2010) ...............................................................................11

*W. Va. ex rel. Morrissey v. U.S. Dep't of Treasury,*
    59 F.4th 1124 (11th Cir. 2023) ...............................................................................23

*Warshauer v. Solis,*
    577 F.3d 1330 (11th Cir. 2009) ...............................................................................29

*Washington ex rel. Seattle Title Tr. Co. v. Roberge,*
    278 U.S. 116 (1928) ............................................................................ 12, 13, 15, 16

## FEDERAL STATUTES

5 U.S.C. § 553 .........................................................................................................29

5 U.S.C. § 704 .........................................................................................................26

5 U.S.C. § 706 ....................................................................................................11, 12

20 U.S.C. § 1001 ........................................................................................................5

20 U.S.C. § 1002 ........................................................................................................5

20 U.S.C. § 1011c .......................................................................................................6

20 U.S.C. § 1070 *et seq.* ...........................................................................................5

20 U.S.C. § 1087a *et seq.* .........................................................................................5

20 U.S.C. § 1087*ll* ....................................................................................................5

20 U.S.C. § 1094 ......................................................................................................17

20 U.S.C. § 1099b ...............................................................................................*passim*

20 U.S.C. § 1099c ......................................................................................................5

20 U.S.C. § 3403 ........................................................................................................7

Veterans' Readjustment Assistance Act of 1952,
   Pub. L. No. 82-550, 66 Stat. 663 .................................................................................3

Higher Education Act of 1965,
   Pub. L. No. 89-329, 79 Stat. 1219. ............................................................................3

**STATE STATUTES**

2023 Fla. Sess. Law Serv. ch. 2023-82, amending Fla. Stat. Ann. § 1008.47 ...........................1

Fla. St. Ann. § 250.10 ...............................................................................................8

Fla. St. Ann. § 381.915 .............................................................................................8

Fla. St. Ann. § 468.1155 ...........................................................................................8

Fla. St. Ann. § 491.005 .............................................................................................8

Fla. St. Ann. § 943.22 ...............................................................................................8

Fla. St. Ann. § 1005.01 .............................................................................................8

Fla. St. Ann. § 1005.02 .............................................................................................8

Fla. St. Ann. § 1009.8962 .........................................................................................8

Fla. St. Bar Rule 20-2.1 ............................................................................................8

**REGULATIONS**

34 C.F.R. Part 600 ..................................................................................................17

34 C.F.R. Part 668 ..................................................................................................24

34 C.F.R. pt. 602 .......................................................................................................6

34 C.F.R. § 600.11 ............................................................................................*passim*

34 C.F.R. § 602.1 .......................................................................................................6

34 C.F.R. § 602.3 .......................................................................................................6

34 C.F.R. § 602.14 ...............................................................................................9, 27

34 C.F.R. § 602.31 .....................................................................................................6

34 C.F.R. § 602.32 .....................................................................................................6

34 C.F.R. § 602.34 .....................................................................................................6

34 C.F.R. § 602.35 ................................................................................................................6

34 C.F.R. § 602.36 ................................................................................................................6

34 C.F.R. § 602.37 ................................................................................................................6

34 C.F.R. § 668.82 ..............................................................................................................24

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 1 .........................................................................................................21

U.S. Const. art. II, § 2.........................................................................................................19

**OTHER AUTHORITIES**

Accreditor Letter,
      https://www2.ed.gov/admins/finaid/accred/letter-to-institutional-accreditors.pdf......................10

*An Overview of Accreditation of Higher Education in the United States,*
      Congressional Research Service, Oct. 16, 2020................................................................. 2, 3, 4

Database of Accredited Postsecondary Institutions and Programs,
      https://ope.ed.gov/dapip/#/agency-list ..............................................................................15

DCL ID Gen 22-10, Guidance for Institutions Seeking to Change or Add Accrediting Agencies
      (July 19, 2022),
      https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-
      19/guidance-institutions-seeking-change-or-add-accrediting-agencies ................................................9

DCL ID: Gen-22-11, Procedures for Institutions Seeking Approval of a Request to Change or Add
      Accrediting Agencies (updated Sept. 26, 2022)
      https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-
      19/procedures-institutions-seeking-approval-request-change-or-add-accrediting-agencies-
      updated-sept-26-2022.......................................................................................................10

Expert Views of U.S. Accreditation, Government Accountability Office, GAO-18-5,
      December 2017
      https://perma.cc/4MQU-ZF3G .........................................................................................5

https://nces.ed.gov/fastfacts/display.asp?id=1122#:~:text=Response%3A,2%2C270%20
      private%20for%2Dprofit%20institutions...............................................................................25

Jane V. Wellman, *Recognition of Accreditation Organizations: A Comparison of Policy & Practice of Voluntary
      Accreditation and The United States Department of Education*, COUNCIL FOR HIGHER EDUCATION
      ACCREDITATION (January 1998),
      https://www.chea.org/recognition-accreditation-organizations..................................................... 2, 3, 4

U.S. Department of Education, Federal Student Loan Portfolio,
    https://studentaid.gov/data-center/student/portfolio ........................................................................5

For more than fifty years, since the infancy of the financial-aid system for students pursuing higher education, federal law has required the Department of Education to rely on the decisions of private accrediting agencies—voluntary peer-review associations that set standards for educational programs—to ensure that loans and grants issued to students are used to purchase a quality education. Postsecondary schools, including private and public colleges and universities but also vocational, trade, and technical schools, have maintained accreditation through recognized private agencies and, by so doing, ensured that their students could access federal student loans and grants.

By its own telling, Florida has been embroiled in several disputes with the agency that long has accredited the state's public colleges and universities. Florida responded by passing a law requiring its public postsecondary institutions to switch to a new accreditor. *See* 2023 Fla. Sess. Law Serv. ch. 2023-82, § 11 ("SB 7044") (amending Fla. Stat. Ann. § 1008.47(2)(a)). Five Florida public universities are in the process of pursuing new accreditation, as required by state law, and have submitted materials to the Department of Education to seek approval for the change, 34 C.F.R. § 600.11(a). Thus far two Florida schools have received approval to change accreditors and *no* schools have been denied approval. Ex. A, Decl. of Christopher Miller, at 1-2.

Unsatisfied with requiring its own institutions to switch accreditors, Florida filed the instant complaint charging the accreditor with purported abuses but naming the federal government, not the accreditor, as defendant. Florida challenges *writ large* the constitutionality of the accreditation system that has existed for decades and seeks sweeping relief that would mandate the federalization of education standards. But each of Florida's constitutional claims fails at the outset and should be dismissed. First, Florida alleges that accreditors violate the so-called private nondelegation doctrine and the Appointments Clause by wielding government authority. But those claims rest on the same flawed premise: that establishing and enforcing substantive educational standards is the role of the federal government. That has never been the case, and private accreditors simply are not exercising

1

federal regulatory power. Equally meritless is Florida's contention that the system of accreditation violates the Spending Clause. Student-aid programs do not operate as a conditional funding grant to the states, so they are not subject to the constraints Florida asks this Court to apply. Finally, Florida's thinly pleaded claim that three "Dear Colleague" letters issued by the Department of Education violate the Administrative Procedure Act fails because the letters are not final agency action subject to judicial review, and because they merely reiterate existing statutory obligations and impose no new obligations.

BACKGROUND

I.   The History and Evolution of Private Accreditation

Overseeing the quality of instruction at institutions of higher education has never been a federal function. A system of private accreditors developed organically in the late 19th century, "at a time when it was becoming problematic that no single point of control or central body existed to set educational standards." *An Overview of Accreditation of Higher Education in the United States*, Congressional Research Service at 1, Oct. 16, 2020 ("CRS Report"). These voluntary associations began to develop educational standards, guidelines, and peer-review procedures to ensure the quality of postsecondary programs and to differentiate those offerings from high-school curricula. *Id.* at 1-2. Over time, postsecondary institutions formed voluntary regional associations that developed accrediting bodies to set standards with which institutions had to comply in order to gain membership. *Id.* at 2. Because "the United States does not have a centralized authority exercising singular national control over" higher education, accreditation developed "to serve as a marker of a level of acceptable quality." *Id.* By about 1970, nearly all degree-granting institutions of higher education either were accredited or seeking accreditation. *Id.*

The federal government's reliance on private accreditation began in 1952. Jane V. Wellman, *Recognition of Accreditation Organizations: A Comparison of Policy & Practice of Voluntary Accreditation and The United States Department of Education*, COUNCIL FOR HIGHER EDUCATION ACCREDITATION 4 (January

1998) ("CHEA Paper").[1] The first GI Bill, which provided educational benefits for veterans of World War II, had catalyzed a surge in the number of new colleges and universities, some of which "were of dubious quality." *Id.* When Congress reauthorized the legislation for Korean War veterans, Veterans' Readjustment Assistance Act of 1952, Pub. L. No. 82-550, 66 Stat. 663, it sought to ensure that taxpayer funding would be used to purchase a quality education—but without federalizing any sort of uniform national educational standards—and thus limited use of GI funds to institutions accredited by a federally recognized private accreditor. *Id.*; *see also* CRS Report at 7. Similarly, in 1958 Congress conditioned use of federal funds available through the precursor to the need-based Perkins Loan program on attendance at a school accredited by a federally recognized private agency or association. CRS Report at 7.

Private agencies' accrediting decisions likewise were incorporated in the eligibility standards for new, nonveteran student-aid programs created under the Higher Education Act of 1965 ("HEA" or "the Act"), Pub. L. No. 89-329, 79 Stat. 1219. CRS Report at 7. Under the Act, the U.S. Commissioner of Education published a list of federally recognized accrediting agencies, but it was the responsibility of those private organizations to perform peer reviews, set substantive standards, and generally to ensure that member institutions provide quality educational services. *Id.* Congress has amended the HEA several times in past decades; as relevant here, it has granted the Department a greater role, through the recognition process, in ensuring that accreditors exercise actual oversight over their member institutions. CRS Report 7.

Postsecondary schools in the United States "are permitted to operate with considerable independence and autonomy," so accreditors serve a necessary role in providing "a marker of a level of acceptable quality" both for individual schools and particular educational programs. *Id.* at 2. Modern accreditors are nongovernmental agencies that use a peer-review process to evaluate the quality of

---

[1] *Available at* https://www.chea.org/recognition-accreditation-organizations.

academic programs; to ensure postsecondary schools meet minimum educational standards; to set educational standards necessary for professional licensing and certifications; and to help member institutions assess and self-improve their educational offerings. *Id.*; *see also* CHEA Paper at 3. Colleges and universities seek accreditation for several purposes apart from access to federal-student-aid funds: Some states, like Florida, *infra* § III, incorporate accreditation decisions for oversight purposes under state law; professional licensing examinations and requirements often turn on accreditation (*e.g.*, the requirement that an applicant to the bar graduate from an American Bar Association-accredited law school); federal grant funding often is available only to accredited institutions; schools use accreditation to determine whether to accept transfer credits from other schools; and schools tout their status as a marker of quality in competing for students, faculty, and funds, and in helping graduates secure employment. CHEA Paper at 3.

Different types of accreditors oversee different types of institutions and programs. Programmatic accrediting agencies have the expertise required to set standards for and review individual professional programs, such as law, medicine, and allied healthcare—fields of study in which professional licensure often requires graduation from programs accredited by a specific agency; often these programs are housed within a broader institution with separate accreditation. CRS Report at 4. Certain accrediting agencies review particular categories of vocational and technical schools, as well as faith-based or religiously affiliated institutions, and may set standards for programs preparing students to work as cosmetologists, nurses, massage therapists, or, in the case of faith-based programs, as ministers. *Id.* at 3-4. And, most relevant here, institutional accreditors oversee entire institutions, including nonprofit and public four-year colleges and universities. *Id.* at 3. The nonpartisan Government Accountability Office analyzed the accreditation system and found that a "key strength[]" of its current structure is that reliance on "nongovernmental accrediting agencies" allows for the development of standards that "are tailored to various school types, from medical to

cosmetology schools." Expert Views of U.S. Accreditation, Government Accountability Office, GAO-18-5, December 2017.[2] Broadly speaking, schools select accreditors that align with their educational mission, and member institutions themselves determine accrediting standards and ensure that those standards, which are enforced by peers, reflect broadly held educational values. *See generally* GAO Analysis at 11-14.

II.     Federal Statutory and Regulatory Framework

Under Title IV of the HEA, 20 U.S.C. § 1070 *et seq.*, the Department of Education ("the Department" or "the Secretary") provides billions of dollars every year through loan and grant programs to help students pay tuition for postsecondary education. Pursuant to the Act, the Department enters into agreements with institutions of higher education to permit students to receive federal grants and loans to pay the cost of attendance. The William D. Ford Federal Direct Loan Program, the largest student-loan program, *see* 20 U.S.C. § 1087a *et seq.*, allows students to apply for and receive direct loans from the federal government to pay their educational and living expenses at qualifying schools. *Id.* § 1087*ll*. As of the end of calendar year 2022, the Department held more than $1.6 trillion in outstanding student loans.[3]

To be eligible to participate in the Title IV programs, an institution of higher education must meet certain requirements, including maintaining accreditation by a nationally recognized accrediting agency. *See* 20 U.S.C. § 1002(a) (incorporating 20 U.S.C. § 1001(a)); *see also id.* § 1099c. In other words, an institution must maintain accreditation for students to spend their federal-aid dollars on attendance. As noted above, accrediting agencies set standards governing educational quality and assess and monitor compliance with those standards. *See, e.g.*, 20 U.S.C. § 1099b(a), (c).

---

[2] https://perma.cc/4MQU-ZF3G.
[3] *See* U.S. Department of Education, Federal Student Loan Portfolio, https://studentaid.gov/data-center/student/portfolio, click "Federal Student Aid Portfolio Summary."

Not all accrediting agencies are recognized by the Department. The Secretary determines which are "reliable authorities regarding the quality of education or training offered by the institutions or programs they accredit," 34 C.F.R. § 602.1; *see also id.* § 602.3, and thus should be recognized for purposes of the HEA, 20 U.S.C. § 1099b; 34 C.F.R. § 602.1. An accrediting agency seeking recognition must demonstrate compliance with specific statutory and regulatory criteria, 20 U.S.C. § 1099b(a); *see also* 34 C.F.R. pt. 602, Subpart B, and must renew its recognition at least every five years, *see* 20 U.S.C. § 1099b(d). An agency must have standards and policies in place that comport with regulatory requirements and must be able to prove the effectiveness of those policies and procedures in evaluating institutions. *See, e.g.,* 20 U.S.C. § 1099b(1)(1); 34 C.F.R. §§ 602.31(a)(2), 602.32(c), 602.36.[4]

Congress struck a balance in the HEA between recognizing and protecting the independence of private accrediting agencies while ensuring that the Department relies only on the decisions of those deemed to be "a reliable authority as to the quality of education or training offered." *See* 20 U.S.C. § 1099b(a). As to the first goal, Congress codified its judgment that substantive control of educational standards should not be federalized: In a provision entitled "Relationship with States," the Act prohibits the Secretary from "exercis[ing] any direction, supervision, or control over the curriculum,

---

[4] The HEA and its implementing regulations create an extensive administrative process governing recognition. *See generally* 34 C.F.R. pt. 602, Subpart C. Department Staff first consider petitions for federal recognition by reviewing written submissions from the agency, performing site visits, considering public comments, and reviewing complaints. *See id.* § 602.32(b). The Staff then prepare a draft analysis, identifying any potential deficiencies, and allow the agency to respond. *Id.* § 602.32(f). The Staff then issue a recommended decision. *Id.* That recommendation and the then-existing record is sent to the National Advisory Committee on Institutional Quality and Integrity, a statutorily created federal advisory committee that advises the Secretary. *Id.* § 602.34(c); *see generally* 20 U.S.C. § 1011c. The Committee holds a public meeting at which the accrediting agency, Department Staff, and members of the public make presentations. 34 C.F.R. § 602.34(e). The Advisory Committee votes and its recommendation is forwarded to a Senior Department Official. *Id.* § 602.34(g). Within ten days, the accrediting agency and Department staff may submit comments regarding the Committee's recommendation. 34 C.F.R. § 602.35(a). The Senior Department Official reviews the complete record, *id.* § 602.36(a), and may grant or continue recognition, *id.* § 602.36(a),(e). But where the agency is found noncompliant with required criteria, the Official has discretion to: (1) deny, limit, suspend, or terminate recognition, or (2) continue it for a set period if the noncompliant agency will achieve compliance within 12 months. *Id.* § 602.36(e)(2)-(3); *see also* 20 U.S.C. § 1099b(l). Absent further appeal to the Secretary, 34 C.F.R. § 602.37(a), that decision is final, *see id.* § 602.36(j).

program of instruction, administration, or personnel" of any school; "over any accrediting agency or association"; or over educational content, except where explicitly authorized by statute. 20 U.S.C. § 3403(b). It also prohibits the Secretary from "establish[ing] any criteria that specifies, defines, or prescribes the standards that accrediting agencies … use to assess" a school's "success with respect to student achievement," 20 U.S.C. § 1099b(g), or from "promulgat[ing] any regulation with respect to the standards of an accreditation agency," *id.* § 1099b(o). But alongside these restrictions maintaining accreditors' historic independence, Congress sought to protect students and taxpayers by granting the Secretary authority to oversee the competence of accreditors serving as gatekeepers through the recognition process described above. Through that process, for example, the accreditor must demonstrate, *inter alia*, that it "consistently applies and enforces standards that respect the stated mission of the institution … including religious missions," "ensure that the courses or programs of … study … are of sufficient quality to achieve … the stated objective for which the courses" are offered, and that its accreditation standards assess each institution's "success with respect to student achievement," curricula, faculty, fiscal soundness, recruiting and admissions practices, program length, student complaints, and facilities, equipment, and supplies. 20 U.S.C. § 1099b(a). While the Department ensures that accreditors demonstrate effectiveness in these areas, the *content* of the underlying standards is up to the accreditors (and determined by member institutions). This balance, whereby substantive criteria are set and enforced by nongovernmental parties, but the competence of those parties to act as gatekeepers to federal funds is overseen by the Department of Education, has been the status quo for decades.

III.   Florida's Reliance on Federally Recognized Accrediting Associations

Florida schools' reliance on accreditation through a federally recognized association is not only important for its students' access to Title IV funds. Florida's legislature has codified its approval of, and reliance on, private accrediting associations in numerous ways throughout the state's statutes. In

provisions governing nonpublic institutions, "[t]he Legislature further recognizes the role of federally recognized accrediting associations in setting standards for independent postsecondary educational institutions and encourages the use of recognized accreditation standards as general guidelines for the licensure of independent postsecondary educational institutions." Fla. St. Ann. § 1005.01; *id.* § 1005.02 (defining accreditation to mean status "awarded to an institution by an accrediting agency or association that is recognized by the [U.S.] Department of Education").

The state awards research dollars through the Casey DeSantis Cancer Research Act, but eligibility is limited to "an institution accredited by an accrediting agency or association recognized by" the Department. Fla. St. Ann. § 381.915. The state requires that applicants for licensure in certain professional fields have obtained a diploma from a program accredited by a federally recognized accreditor or its overseas equivalent. *E.g.*, *id.* § 491.005(1)(b) (social workers); *id.* § 468.1155 (speech-language pathologists); Fla. St. Bar Rule 20-2.1 (approved paralegal programs require accreditation through nationally recognized agency). To access a fund for nursing education, private nursing programs must be accredited by a Department-recognized accreditor. Fla. St. Ann. § 1009.8962(3)(b). Law-enforcement officers receive salary incentives for completing certain educational programs at an accredited school. *Id.* § 943.22. Through the state-funded Educational Dollars for Duty program, National Guard members can receive funding for "an authorized course of study" if enrolled at an accredited public or private postsecondary institution. *Id.* § 250.10(7).

Through these and numerous other provisions, Florida's legislature has recognized the importance of ensuring the quality of higher education through accreditation by a federally recognized accreditor. Florida schools, meanwhile, must maintain that status to receive a host of benefits under state law, independent of their students' access to federal Title IV funds.

IV.    July 2022 Letters

In July 2022, in response to outreach from the accrediting agencies, the Department issued three "Dear Colleague" letters ("the Letters"). First, the Department issued an "Institution Letter"[5] with the purpose "to reiterate the statutory and regulatory standards and to provide examples of factors [it] may consider in" reviewing applications to change accreditors. The Letter reminded participating institutions that, under 20 U.S.C. § 1099b(h), the Secretary is barred from recognizing any school's accreditation if it "is in the process of changing its accrediting agency … unless the eligible institution submits to the Secretary all materials relating to the prior accreditation, including materials demonstrating reasonable cause for changing the accrediting agency or association." The Institution Letter explained that this statutory prerequisite "helps prevent an erosion of accrediting agency standards and provides critical protections for students and taxpayers by ensuring that institutions do not switch accrediting agencies simply to evade accountability, avoid open inquiries, or seek approval from an agency with less rigorous" standards. *Id.* It then reminded schools that the Department will not determine a school to have reasonable cause to change if its accreditation was withdrawn, revoked, or otherwise terminated during the past 2 years or it had been placed on probation within 2 years. *Id.* (citing 34 C.F.R. § 600.11). Finally, the Letter explained the flexible criteria used to evaluate whether an institution seeking to change accreditors has demonstrated reasonable cause, including the school's "stated reason for the proposed change"; whether it "is seeking … to lessen oversight or rigor, evade inquiries or sanctions"; whether the change "would strengthen institutional quality"; whether the new accreditor is "more closely aligned with the institution's mission"; the accreditor's standing with the Department; and whether the proposed change is voluntary, as required by longstanding regulations. *Id.* (citing 34 C.F.R. § 602.14(a)).

---

[5] DCL ID Gen 22-10, Guidance for Institutions Seeking to Change or Add Accrediting Agencies (July 19, 2022), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-19/guidance-institutions-seeking-change-or-add-accrediting-agencies.

Second, the Department wrote to accrediting agencies to clarify the importance and meaning of an existing statutory requirement that schools' membership in associations be *voluntary*. "Accreditor Letter."[6] It noted that Congress had recognized the value of institutions maintaining voluntary membership for decades, and that "a voluntary association for quality assurance, as opposed to a compelled one, or even one centralized through or by the federal government, is one of the unique features of American higher education" that fosters cooperation and improves the quality of education. *Id.* at 1. The Accreditor Letter otherwise reiterated much content from the Institution Letter, but noted that, since agencies can only be recognized if they maintain a voluntary membership, requests by institutions to change accreditor will be reviewed to determine whether they "support a finding that … membership in the new accrediting agency would be voluntary." *Id.* at 2. It also advised accreditors to independently evaluate new accreditation applications to ensure that, should a new institution join the association, that relationship would be voluntary. *Id.*

The Department's third "Dear Colleague" letter was titled Procedures for Institutions Seeking Approval of a Request to Change or Add Accrediting Agencies ("Procedures Letter").[7] Longstanding regulations establish that, with certain exceptions, "the Secretary does not recognize the accreditation … of an otherwise eligible institution if [it] is in the process of changing its accrediting agency, unless the institution provides" specified materials showing its prior accreditation is in good standing, demonstrates reasonable cause to change agencies, and receives approval from the Secretary for the change. 34 C.F.R. § 600.11(a). In the Procedures Letter, the Department instructed institutions to provide these materials to obtain Department approval *before* applying to the new accrediting agency, to avoid "an inadvertent loss of Title IV eligibility" since submission of these materials to the Secretary

---

[6] https://www2.ed.gov/admins/finaid/accred/letter-to-institutional-accreditors.pdf
[7] DCL ID: Gen-22-11, Procedures for Institutions Seeking Approval of a Request to Change or Add Accrediting Agencies (updated Sept. 26, 2022) https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-19/procedures-institutions-seeking-approval-request-change-or-add-accrediting-agencies-updated-sept-26-2022.

*after* applying to the new accreditor could trigger § 600.11(a)'s finding that the institution "is in the process of changing its accrediting agency." The Letter thus advised institutions to seek and obtain approval to change before beginning the process, to ensure continued Title IV eligibility, under regulations that have been in place for more than thirty years.

V.   This Litigation

Florida alleges that accreditors wield governmental power in violation of the private-non-delegation doctrine, Compl. ¶¶ 111-21; that the heads of accrediting agencies are Officers of the United States selected in a manner inconsistent with the Appointments Clause, *id.* ¶¶ 133-39; that the HEA violates the Spending Clause by placing unclear and coercive conditions on states' receipt of federal funds, *id.* ¶¶ 122-32; and that the July 2022 Letters violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), *id.* ¶¶ 140-53, because, it claims, the documents constitute "rules" that were issued in a procedurally defective manner, exceed the Department's statutory authority, and are arbitrary and capricious.

LEGAL STANDARDS

To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Mere "labels and conclusions" and "naked assertion[s] devoid of further factual enhancement" are not sufficient. *Id.* (citation omitted). Rather, a court must disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and determine whether the remaining "well-pleaded factual allegations … plausibly give rise to an entitlement to relief." *Id.* at 679.

"Federal courts are courts of limited jurisdiction[,]" meaning they "possess only that power authorized by [the] Constitution and statute." *United States v. Rivera*, 613 F.3d 1046, 1049 (11th Cir. 2010) (citation omitted). Accordingly, "a federal court cannot consider the merits of a case unless and

until it is assured of its subject-matter jurisdiction." *Kamau v. Slate*, No. 4:21-cv-279, 2022 WL 511211, at *1 (N.D. Fla. Jan. 31, 2022). In this circuit, a court lacks jurisdiction under the APA unless there is "final agency action" within the meaning of 5 U.S.C. § 706(2). *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003).

ARGUMENT

I.   <u>The Department's reliance on private accreditors' decisions does not violate the private-nondelegation doctrine because setting substantive educational standards is not a federal function.</u>

Florida alleges that the decades-old system of private accreditation violates the so-called private non-delegation doctrine by "empower[ing] private entities to regulate state conduct [while] shield[ing] those entities from supervision by a government agency." Compl. ¶ 118. Florida's claim fails as a matter of law and should be dismissed, however, because accrediting institutions of higher education is neither an exercise of "legislative power," *id.*, nor a federal function whatsoever.

a. Despite its name, "the private nondelegation doctrine is rooted" in "substantive due process," rather than the vesting clauses of the Constitution. *Boerschig v. Trans-Pecos Pipeline*, 872 F.3d 701, 709 (5th Cir. 2017). Its earliest applications concerned ordinances that allowed homeowners to set zoning requirements for their neighborhoods. *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 120-22 (1928); *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 530 (1917); *Eubank v. Richmond*, 226 U.S. 137, 143-44 (1912). Such ordinances were unconstitutional because they "confer[ed] the power on some property holders to virtually control and dispose of the property rights of others," without setting any standard to prevent the private owners from making public policy "solely for their own interest, or even capriciously," *Eubank*, 226 U.S. at 143-44, and consistently were held unlawful where they conferred upon private parties the power to make decisions carrying the force of law, *Thomas Cusack Co.*, 242 U.S. at 531. The "delegation of power so attempted [was] repugnant to the due process clause of the Fourteenth Amendment" precisely because the legislature

12

had delegated its own police power into the hands of private parties not "bound by any official duty." *Roberge*, 278 U.S. at 121-22.

The Supreme Court applied that doctrine to the federal government in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936). In *Carter Coal*, the Court held unlawful a federal statute that allowed the producers of more than two-thirds of the coal in any given district to set wages and hours for all other producers, unconstrained by public agency review. *Id.* at 281-83. That "obnoxious" delegation "to private persons whose interests may be and often are adverse to the interests of others in the same business" was "clearly arbitrary" and violated Fifth Amendment due-process rights. *Id.* at 311.

After *Carter Coal*, Congress enacted a new statute under which local boards consisting of private coal producers would "operate as an aid to the [federally created] Commission but subject to its pervasive surveillance and authority." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). The new statute allowed the boards to "propose minimum prices pursuant to prescribed statutory standards," which then "may be approved, disapproved, or modified by the Commission." *Id.* In reviewing this revised scheme, the Court determined it to be "a valid delegation of authority" to the Commission and held that no constitutional problem arose from involving private industry in the regulatory scheme because they remained subordinate to the agency. *Id.* at 398. Because the federal agency, not private industry, determined statutory prices, "law-making is not entrusted to the industry" and the "statutory scheme is unquestionably valid." *Id.* at 399.

Based on these decisions, "courts have distilled the principle that a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 881 (5th Cir. 2022) (collecting cases). For instance, the Fifth Circuit in *National Horsemen's* found unconstitutional a scheme in which Congress created a "private, independent, self-regulatory, nonprofit corporation" and granted it authority to promulgate binding, industry-wide rules without oversight by the relevant

federal agency. *Id.* at 873, 887-88. But after Congress amended the relevant statute to permit the Federal Trade Commission to "abrogate, add to, and modify the rules" proposed by the private corporation as the agency "deems necessary or appropriate," the Sixth Circuit held the revised scheme constitutional because it gave the agency "ultimate discretion over the content of" governing rules, with the private corporation "subordinate" to federal decisionmakers. *Oklahoma v. United States*, 62 F.4th 221, 229-231 (6th Cir. 2023) (citation omitted), r*eh'g en banc denied,* No. 22-5487, 2023 WL 3815095 (6th Cir. May 18, 2023).

b.  Relying on these principles, Florida contends that the HEA unconstitutionally "delegates the power to set eligibility standards for federal funds to private accrediting agencies" and grants those agencies "the power to apply those eligibility standards." Compl. ¶ 113. But that portrayal rests on a deeply flawed premise: Contrary to Florida's contentions, Congress has not granted the accreditors any federal power whatsoever. True, the Secretary *relies upon* certain private accreditors' expertise to ensure the quality of educational programs on which *students*—the actual recipients of federal-student-aid funds—can spend federal dollars. That does not change the fact that the power accreditors exercise has *never* been a federal function and that accreditors are not exercising any delegated "legislative power" whatsoever. *See Buckley v. Valeo*, 424 U.S. 1, 139 (1976) (quotation omitted) (defining legislative power as "the authority to make laws").

Indeed, private accreditors bear no resemblance to the types of entities that courts have found to be exercising delegated legislative authority. The system of private accreditation first was developed by colleges and universities themselves, and pre-dates Congress's creation of the federal-student-aid programs. *See supra* Background § I. Rather than one congressionally chartered private entity making decisions for a particular industry, as found in statutory schemes reviewed for delegation concerns, *see, e.g.*, *Adkins*, 310 U.S. at 387-88, *Dep't of Transp. v. Ass'n of Am. R.R.s* ("*Amtrak II*"), 575 U.S. 43, 45 (2015), *Nat'l Horsemen's*, 53 F.4th at 873-74, there currently exist 62 accreditors recognized by the

Department,[8] none of which were created by Congress, none of which exercise monopoly power over their member institutions, and all of which operate as *voluntary* membership organizations, *see* 20 U.S.C. § 1099b(a)(2)(A). Nor is this a situation in which a legislature has delegated its police powers to allow a private entity to control the rights and obligations of others, *contra Roberge*, 278 U.S. at 121-22.

Although accreditation may serve as the "gatekeeper[]" for institutions to *accept* federal student aid, *see* Compl. ¶ 41, the fact remains that those federal funds flow to *students*—not directly to schools, and certainly not directly to states—and the determinations of accreditors are relied upon by the Department for the separate purpose of ensuring that individual institutions provide an acceptable educational quality to warrant the investment of taxpayer funds. No case on which Florida relies dealt with a remotely analogous statutory scheme. No accreditor receives congressional appropriations; rather, all are funded through dues paid from member institutions. Far from the authoritarian-like entities that Florida portrays, Compl. ¶¶ 41-57, accreditors' substantive standards are developed with the participation of member schools, and those standards are enforced by decisionmaking bodies comprised of peers. *See supra* Background § I. Moreover, accreditation standards determine the metrics by which schools and educational programs are evaluated for quality control—they do not operate directly to "regulate state conduct," *contra* Compl. ¶ 118, even if the state chooses to operate public colleges and universities.

Most importantly, private accreditors simply do not exercise regulatory power. It has never been the function of the federal government to devise educational standards for the postsecondary programs that educate veterinarians, cosmetologists, doctors, engineers, physicists, and lawyers, and the "authority" to do so does not rest on a delegation from Congress. And while meeting the standards set by accreditors carries significant consequences in terms of eligibility to accept as payment for

---

[8] *See* Database of Accredited Postsecondary Institutions and Programs, *available at* https://ope.ed.gov/dapip/#/agency-list. Twelve of those agencies are institutional accreditors.

tuition the student-aid dollars *loaned to students*, that does not transform accreditors' standards into federal "regulations." Administrative and instructional quality-control standards are wholly unlike the schemes that have been held to unconstitutionally delegate governmental power. *See, e.g.*, *Roberge*, 278 U.S. at 121-23; *Nat'l Horsemen's*, 53 F.4th at 880-90; *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*, 721 F.3d 666, 674-77 (D.C. Cir. 2013) (abrogated on other grounds). And the fact remains that, if an institution is dissatisfied with the standards of its accreditor, it may work with its peers and the accreditor to modify the standards it finds problematic or change accreditors if irreconcilable disputes remain.[9]

c.  Florida seems to recognize that its portrayal of accreditors as exercising "delegated" federal power finds no analogue in private-nondelegation precedents; it thus seeks to create a new test for what constitutes "regulatory power" from language cobbled together from inapposite cases. None of the authorities on which Florida relies support its framing of accreditors as "regulat[ing] state conduct," Compl. ¶ 118.

For instance, Florida cites *Buckley*, 424 U.S. at 140, for the proposition that "determinations of eligibility for funds" are "legislative" in nature. *See* Compl. ¶ 61. But that language comes from an Appointments Clause analysis in which the Court observed that such functions are "usually performed by independent regulatory agencies or by some department in the Executive Branch under the direction of an Act of Congress," *Buckley*, 424 U.S. at 141. Regardless, *Buckley*[10] has no relevance to the question here, since private accrediting agencies do not determine eligibility for federal funds. The Department awards federal funds *to students* and determines which postsecondary institutions are eligible to accept those funds as payment, based on multiple factors, one of which is maintaining

---

[9] Florida makes much of the requirement that institutions demonstrate reasonable cause to change accreditors, Compl. ¶ 130. But as explained more fully *infra*, that provision exists to ensure that institutions do not run to more-lenient accreditors when they are found to be noncompliant. Regardless, Florida does not allege that the Department has prevented any of its public universities from changing accreditors, and two Florida universities recently have received approval. *See* Ex. A.

[10] Florida's reliance on *Amtrak II*, 575 U.S. at 59 (Alito, J., concurring), for this same argument fails for identical reasons.

accreditation through a recognized agency. But that does not mean any accreditor is itself making eligibility determinations. After all, "[a] governmental body may rely on the decisions of a private association without turning that association into 'the government' itself." *Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. of Career Schs. & Colls.*, 44 F.3d 447, 449 n.1 (7th Cir. 1994) (citation omitted). The Department's reliance on private accreditors' evaluations to ensure the quality of educational programs does not transform their role into a governmental one. Accreditors may serve a gatekeeping function, but they certainly are not vested with final decisionmaking authority regarding the eligibility of institutions.[11] And the fact remains that there are numerous accreditors through which schools can seek accreditation, and each of those accreditors must submit to a stringent recognition process by the Department.

Florida's observation that the Spending Clause allows Congress to regulate indirectly, even in areas the Commerce Clause would not, is wholly irrelevant. *See* Compl. ¶¶ 61; 114 (citing *United States v. Dierckman*, 201 F.3d 915, 922 (7th Cir. 2000) and *Haight v. Thompson*, 763 F.3d 554, 568-69 (6th Cir. 2014)). That principle provides no support for Florida's characterization of accreditors as exercising delegated legislative power.

Equally unhelpful is Florida's cherry-picking of isolated remarks from two, single-justice writings. Compl. ¶¶ 60-61. In a lengthy concurrence advocating the abandonment of the intelligible-principle doctrine—a view that has not garnered a majority—Justice Thomas lamented that: "*Under the original understanding of the legislative and executive power*, Amtrak's role in the creation of metrics and standards requires an exercise of legislative power because it … decide[s] the applicability of standards that provide content to generally applicable rules of private conduct." *Amtrak II*, 575 U.S. at 88-89 (Thomas, J., concurring) (emphasis added). Justice Alito, also writing only for himself, likewise called

---

[11] On the contrary, schools must satisfy a host of obligations apart from accreditation to maintain Title IV eligibility; compliance is determined by the Department. *E.g.*, 20 U.S.C. § 1094(a); 34 C.F.R. Part 600.

"obviously regulatory" a scheme where Amtrak, a congressionally chartered and federally controlled corporation, had been granted power to set metrics and standards which its competitors at times were "required by federal law to include … in their contracts." *Id.* at 58-59.

Florida does not cite, and undersigned counsel has been unable to locate, any majority opinion adopting these formulations to define what constitutes legislative or regulatory power; for that reason alone, they have little relevance here. But even taking the Justices' concurrences at face value, they do not aid Florida's argument. Accreditors do not "formulat[e] [ ] generally applicable rules of private conduct," *id.* at 70 (Thomas, J., concurring); indeed, virtually every aspect of the accreditation scheme is voluntary in important aspects. Postsecondary institutions select their accreditor; accreditors may only be recognized by the Department if they maintain *voluntary* membership; accreditation standards are determined and modified through a collaborative process with the input of member institutions; standards are enforced through peer review; and institutions can change accreditors, albeit through a process that ensures the change is not motivated by a desire to escape accountability. Moreover, private accreditors do not "create legally binding rules … giv[ing] content to … [a] statutory duty," *id.* at 91; institutions are under no statutory duty to comply with any accreditors' standards. True, institutions may be *motivated* to meet the standards of *some* recognized accreditor to gain the benefit of accepting federal funds as payment for tuition. But that does not transform substantive instructional standards—which, again, have never been set by federal law—into "legally binding rules," *see id.* at 77. As Justice Thomas explained, "the core of the legislative power … is the power to make 'law' in the Blackstonian sense of generally applicable rules of private conduct," *id.* at 76. Florida's insistence that the educational standards of the more than 60 federally recognized accreditors qualify as Blackstonian sources of law is meritless.

Were Florida correct that accreditors unlawfully exercise delegated regulatory authority, the upshot would be that that power originates with and should revert to the federal government. But

nowhere in its Complaint does Florida suggest that its goal is to ensure that, instead of private accreditors, the Department take on the mantle of determining educational standards for doctors, lawyers, teachers, electricians, and beauticians. Such a role for the federal government would be unimaginable—because the authority accreditors exercise is not a federal function.

II.    The heads of accrediting agencies are private actors not subject to the Appointments Clause.

Florida alleges that the manner of selection for the heads of private accrediting agencies violates the U.S. Constitution's Appointments Clause, *see* Compl. ¶¶ 133-39. This claim fails because accrediting agency heads are private individuals, not "Officers of the United States," and thus are not subject to the Clause in the first place.

The Appointments Clause requires that all "Officers of the United States" be appointed by the President subject to "the Advice and Consent of the Senate," although "Congress may by Law vest the Appointment of [ ] inferior Officers … in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. "Supreme Court precedent has" interpreted this constitutional text to "establish[] that the constitutional definition of an 'officer' encompasses, at a minimum, a continuing and formalized relationship of employment *with the United States Government*," *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc) (emphasis added) (citing *Auffmordt v. Hedden*, 137 U.S. 310, 327-28 (1890), and *United States v. Germaine*, 99 U.S. 508, 511-12 (1878)). To be deemed an *officer*, an individual must hold some form of public *office*, meaning "a public station conferred by the appointment of government," with "essential elements" including that the position is "permanent in character, created by law, [with] incidents and duties," tenure, and compensation "prescribed by law." *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 520 (1926); *see also United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393-94 (1867); *Riley*, 252 F.3d at 758 (noting that private parties were not officers, in part because they "do not draw a government salary and are not required to establish their fitness for public employment").

19

The Appointments Clause thus has no relevance whatsoever to the officers of a private entity, just as it places no limitation on the appointment of officers of a state or territory. *See, e.g., Fin. Oversight Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658 (2020) ("If they are not officers of the United States, but instead are some other type of officer, the Appointments Clause says nothing about them."). This ends the matter, for it is beyond reasonable doubt that accrediting agencies are nongovernmental entities. Congress did not create any accreditor; they operate instead as private nonprofits organized pursuant to state law. *See Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, -- F. Supp.3d --, 2023 WL 3293298, at *13-14 (N.D. Tex. May 4, 2023) ("[T]o be considered a government entity for constitutional purposes, a corporation must be created by the government."), *appeal filed*, No. 23-10520 (5th Cir. May 19, 2023). Accrediting agency heads do not receive public funds as compensation; their duties are not prescribed by statute; the federal government has no involvement in their selection; their positions have no permanent tenure; and they may be replaced or removed at any time without governmental involvement. *See Metcalf & Eddy*, 269 U.S. at 519-20 (individuals did not "occup[y] any official position" in state government because "[t]hey took no oath of office; they were free to accept any other concurrent employment; none of their engagements was for work of a permanent or continuous character" and "[t]heir duties were prescribed by their contracts," not by statute); *see also Hartwell*, 73 U.S. at 393.

It is thus unsurprising that courts specifically have held that accrediting agencies are not governmental actors and their decisions are not attributable to the federal government. *See, e.g., Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d 1310, 1312-14 (8th Cir. 1987) (rejecting argument that accreditors are "determining eligibility for federal funds," since "[w]hat is at issue are private actions to which the government responds" by determining ultimate eligibility); *Auburn Univ. v. S. Ass'n of Colls. & Schs., Inc.*, 489 F. Supp. 2d 1362, 1371 n.5 (N.D. Ga. 2002) (collecting cases agreeing that accreditors are not state actors). Accreditors have none of the features that courts

typically identify with a government entity—namely, government creation and government control. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995); *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 484-85 (2010) (contrasting "private self-regulatory organizations in the securities industry—such as the New York Stock Exchange—that investigate and discipline their own members subject to [agency] oversight" with the "Government-created, Government-appointed" Public Company Accounting Oversight Board). The Appointments Clause has nothing to say about the leadership of dozens of privately created, nonprofit membership associations with *no* governmental appointees.

III.   <u>Title IV does not violate Congress's power under the Spending Clause.</u>

The state contends that the HEA exceeds Congress's power to enact Spending Clause legislation because conditions placed on the receipt of federal funds are not sufficiently ascertainable and because accreditors' power to modify educational standards is unduly coercive. *See* Compl. ¶¶ 122-32. But that portrayal ignores that the recipients of federal student aid funds are *students*, not states, and that the precedents on which Florida relies are inapplicable because Title IV funds are not a conditional grant of funding to states.

The Spending Clause conveys to Congress power "to pay the Debts and provide for the … general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1. The Supreme Court has long recognized that "Congress may use this power to grant federal funds to the States, and may condition such a grant upon" recipient states' agreement to take certain steps, including in areas that Congress otherwise would be powerless to regulate. *Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519, 576 (2012) ("*NFIB*"). In so doing, Congress can influence state policy and regulation by imposing conditions that ensure federal funds are used to achieve legislative purposes. *Id.*; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (recognizing that Congress may "further broad policy objectives by

conditioning receipt of federal moneys upon compliance … with federal statutory … directives") (citation omitted).

Although broad, that power is not without limits. Federal funding grants under the Spending Clause are "much in the nature of a contract"; conditions on the receipt of federal funds must be unambiguous, such that "the State voluntarily and knowingly accepts the terms of the 'contract,'" *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Conditions placed on state receipt of funding grants must not "be so coercive" that "pressure turns into compulsion." *Dole*, 483 U.S. at 211 (citation omitted). These limits are critical to protecting the independent sovereignty of states, since allowing Congress to commandeer them into implementing federal policy "would threaten the political accountability key to our federal system." *NFIB*, 567 U.S. at 577-78.

It is thus unsurprising that the common thread in precedents examining compliance with the Spending Clause is legislation bestowing federal funds *to states*, conditioned on *state action* implementing preferred federal policy. The *Pennhurst* Court, for example, reviewed "a federal-state grant program whereby the Federal Government provides financial assistance to participating States to aid them in creating programs to care for … the developmentally disabled." 451 U.S. at 11. "Like other federal-state cooperative programs," it was "voluntary" and gave states "the choice of complying with the conditions set forth," which included, *inter alia*, submitting for approval a state plan outlining how the state would spend its allotment of federal dollars, "or forgoing the benefits of federal funding." *Id.* It was against this backdrop that the Court explained that Congress must unambiguously state the contract terms created through conditional funding grants to the states, so recipients may "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 17; *id.* at 18.

Likewise, in *Dole* the Court upheld a statute to create a uniform national minimum drinking age by withholding certain federal highway funds from states that allowed under-21s to purchase alcoholic beverages, explaining that "[t]he offer of benefits *to a state* by the United States dependent

upon cooperation by the state with federal plans … is not unusual." 483 U.S. at 205, 210 (citation

omitted). And in *NFIB*, in which the Court struck down an exercise of Congress's spending power as

unduly coercive for the first time, *see* 567 U.S. at 625 (Ginsburg, J., concurring in part), at issue was an

unprecedented expansion of Medicaid, "which gives funds to the States on the condition that they

provide specified health care to all citizens whose income falls below a certain threshold." *Id.* at 531.

Other Spending Clause precedents follow the pattern of *Pennhurst*, *Dole*, and *NFIB*.[12]

      Florida's challenge fails for the simple reason that Title IV is not a funding grant to the states.

It does not seek to create a "federal-state cooperative program[]," *Pennhurst*, 451 U.S. at 11, it does not

effect an "offer of benefits to a state" conditioned on "cooperation … with federal plans," *Dole*, 483

U.S. at 210 (citation omitted), and its purpose is not to "encourage a State to regulate in a particular

way" or "influenc[e]" state "policy choices," *NFIB*, 567 U.S. at 576 (citation omitted). Title IV does

not create a "contract" between the federal government and states, *Pennhurst*, 451 U.S. at 17, nor does

it "offer[] federal funds in exchange for states establishing preferred programs or enacting favored

laws," *W. Va. ex rel. Morrisey*, 59 F.4th at 1131. On the contrary, Title IV provides federal funds *to*

*students* to pursue higher education—often in the form of loans which students are personally liable to

repay. The *recipients* are students who select an eligible institution of higher education at which to spend

their own allocation of federal dollars. Title IV funding simply does not operate as a grant paid directly

to states in exchange for the provision of educational services. This distinguishes the programs created

---

12 *See, e.g.*, *Fullilove v. Klutznick*, 448 U.S. 448, 473-75 (1980) (rejecting challenge to federal grant program requiring certain funds be spent with minority-owned businesses); *New York v. United States*, 505 U.S. 144, 166-69 (1992) (reviewing legislation providing financial incentives to states to dispose of nuclear waste according to federal guidelines); *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639-41 (1999) (analyzing conditions imposed on state recipients of Title IX education funds); *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937) (upholding provision of Social Security Act granting funds conditioned on state creation of unemployment compensation); *Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 141-44 (1947) (affirming Congress's power to impose Hatch Act on certain state employees as condition on "money allotments to states"); *W. Va. ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1141 (11th Cir. 2023) (analyzing prohibition on states using federal funds to offset net state tax revenue).

under it from other federal educational programs in which federal dollars *do* flow directly to states and which are subject to Spending Clause constraints. *See Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665-66 (1985) (upholding as sufficiently specific conditions placed on Title I funds for educating disadvantaged children); *Davis*, 526 U.S. at 639-41 (analyzing conditions purportedly placed on "a recipient of federal education funding" under Title IX).

It certainly is true that postsecondary institutions eligible to accept Title IV funds benefit from their students' federal funding. It also is true that, to maintain eligibility to accept student loans as payment, institutions are subject to a range of conditions, including maintaining accreditation. But that does not render those institutions "grant recipients" under Title IV. Rather, schools are considered "participating institution[s]" that are required "at all times [to] act with the competency and integrity necessary to qualify as a fiduciary" of the Title IV programs. 34 C.F.R. § 668.82(a). The conditions placed on institutions to maintain eligibility to participate are designed to protect the enormous federal expenditures on Title IV programs. *See generally* 34 C.F.R. Part 668, Subt. B. But the provision of money to students under Title IV bears no resemblance to the federal-state cooperative or regulatory programs subject to scrutiny under *Pennhurst* and its progeny.

In fact, the statutory scheme does not even require any state involvement. The participation of states is only incidental, through their choice to offer public postsecondary programs, and even then, public institutions account for fewer than *one-third* of all participating Title IV schools.[13] Florida's Spending Clause argument seeks to flip precedent on its head. Rather than an example of a state accepting a grant of federal funds in exchange for implementing some preferred federal policy, here Florida has chosen to enter a marketplace in which its schools stand on equal footing with thousands of other public and private institutions—and on that basis mounts a federalism challenge to a program

---

[13] https://nces.ed.gov/fastfacts/display.asp?id=1122#:~:text=Response%3A,2%2C270%20private%20for%2Dprofit%20institutions.

designed to benefit students, not states. This is akin to Florida opening a chain of grocery stores and then suing the U.S. Department of Agriculture because recipients of supplemental nutrition assistance funds cannot purchase certain food products, or suing the Department of Veterans Affairs to challenge the application of minimum housing requirements for Veterans' mortgage loans to state-owned real estate. Precedent does not support Florida's attempt to apply the federalism principles of *Pennhurst*, *Dole*, and *NFIB* outside the context of funding grants *to states*. Those principles are especially inapposite here, where the federal funding is only used by its direct recipients to purchase services Florida has opted to offer alongside private institutions.[14]

Even if Title IV *were* subject to Spending Clause limitations, Florida fails to identify any constitutional defect. It first characterizes accrediting agencies' substantive educational standards as the relevant "conditions for receiving federal funds," and complains that those standards "are not contained in the HEA or any promulgated regulations." Compl. ¶ 127. But accrediting agencies' standards cannot constitute the conditions placed on receiving federal funds. Even putting aside that individual students "receive" the funds, the HEA is unambiguous in conditioning participation in Title IV on maintaining accreditation—and that would be the relevant condition, if any. Each of the 60+ recognized accreditors' substantive standards do not operate as a unique "condition" on federal funds. Similarly, institutions have clear notice of the "rules they must follow," *contra id.* ¶ 128, since the HEA makes clear that loss of accreditation will result in loss of eligibility but permits institutions to select their accreditor, work to modify its standards, or change accreditors altogether. Equally flawed is Florida's contention that the statute is "unduly coercive" because accreditors can "impose new standards long after Florida has been certified eligible for federal funding." *Id.* ¶ 129. At no point has "Florida" itself been "certified eligible for federal funding" by the Department or an accreditor.

---

[14] Florida alludes to the Tenth Amendment twice, in subject headings, but develops no substantive allegations tied to it. Compl. pp. 20, 34. Regardless, the result under that provision would be the same, since Title IV does not command Florida to do anything. *See Dole*, 483 U.S. at 210.

Regardless, the statute cannot be unduly coercive because it imposes no direct obligation on any state and because Title IV funds do not flow directly to the state.

IV.     The Letters Are Not Final Agency Action Subject to Judicial Review.

The APA limits review to final agency action. 5 U.S.C. § 704. This requirement excludes review of actions that are merely procedural, preliminary, or intermediate. *Id.* That requirement is jurisdictional, such that "federal jurisdiction is [ ] lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704." *Nat'l Parks Conservation Ass'n*, 324 F.3d at 1236. Agency action is "final" when it both (1) marks "the consummation of the agency's decisionmaking process" and (2) determines a party's "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). An agency action that "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" is not final for purposes of this requirement. *Peoples Nat'l Bank v. Off. of Comptroller of Currency of the U.S.*, 362 F.3d 333, 337 (5th Cir. 2004) (citation omitted).

Florida's APA claim[15] fails both prongs. First, the Letters do not mark the "consummation" of any decisionmaking process: They simply restate the preexisting requirements of the HEA and regulations. Since the Letters merely restated existing obligations, they "tread no new ground" and cannot be described as "implementing, interpreting, or prescribing law or policy." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004). "The core question" when it comes to finality "is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). That plainly is not the case for the Letters. As far as Florida's requirement that its schools change accreditors—the crux of its purported dispute with the Department—that decisionmaking process is

---

[15] Florida purports to bring just one APA claim, Compl. ¶¶ 140-53, but it challenges three separate documents, each on three separate grounds (as arbitrary and capricious; issued in excess of statutory authority; and procedurally defective), so its allegations actually present nine separate APA claims.

in its infancy. Only five (out of *eighty-nine*) Florida public schools have even sought approval, the Department has not denied a single request, and in fact has approved two schools' requests. Ex. A, Miller Decl.[16] As those approvals demonstrate, decisions on pending and future requests by Florida institutions will be based on the Department's review according to criteria set forth in the statute and regulations, 20 U.S.C. § 1099b(h),(i); 34 C.F.R. § 600.11(a),(b), not the Letters, so Florida's challenge is unripe. "Where the plaintiff challenges agency action, ripeness essentially turns on whether there has been 'final agency action.'" *Media Gen. Operations, Inc. v. Herman*, 152 F. Supp. 2d 1368, 1373 (S.D. Ga. 2001).

Second, no obligations arise, and no rights accrue, as a result of the Letters; nor do any legal consequences flow therefrom. This is plain from the fact that removal or vacatur of the Letters would have no impact on the Department's ongoing review of Florida institutions' requests. In the absence of the three Letters, Florida public colleges would be under an identical obligation to demonstrate reasonable cause, 34 C.F.R. § 600.11, and accreditors would be under an identical obligation to ensure their membership is voluntary, *id.* § 602.14. There is no final agency action "when an agency merely expresses its view of what the law requires of a party." *Luminant Generation Co. v. U.S. EPA*, 757 F.3d 439, 442 n.7 (5th Cir. 2014) (citation omitted). Here, the Letters merely remind the public of existing requirements, and it is *those* obligations that will govern any institution's request. *See City of San Diego v. Whitman*, 242 F.3d 1097, 1101-02 (9th Cir. 2001) (letter advising regulated entity of how agency would apply statute to forthcoming application was nonreviewable; decisionmaking process would not even begin until entity submitted application for agency review).

The outcome here is determined by *Clayton County v. Federal Aviation Administration*, in which the Eleventh Circuit lacked jurisdiction to review a letter conveying an existing "policy or

---

[16] The Department raises a factual attack on subject-matter jurisdiction. This Court can consider the Miller Declaration and exhibits thereto, since "matters outside the pleadings" can be considered and weighed in resolving such a challenge. *See Scarfo v. Ginsberg*, 175 F.3d 957, 960-61 (11th Cir. 1999).

interpretation." 887 F.3d 1262, 1266-70 (2018). Although Florida makes much of the Accreditor Letter's passing reference to SB 7044 "potentially undermin[ing] the voluntary nature of the relationship" between schools and accreditors, *see* Compl. ¶ 101, the *Clayton County* court explained that, even when an agency goes much farther and affirmatively opines that "a party's practices may potentially" violate statutory requirements, such a tentative opinion "does not necessarily mark the culmination of the agency's decisionmaking process." *Id.* at 1268. Review of a tentative opinion, before any final determination on concrete facts had been made, would "mean that regulated parties could bring lawsuits whenever an agency advises … of its already-existing obligations," which would "harm regulated parties" by muzzling communications. *Id.* at 1269. Allowing review of nonfinal opinions also would "force the agency to litigate over what may be a preliminary conclusion made without a full grasp of the relevant facts." *Id.* at 1269; *Riverkeeper v. U.S. EPA*, 806 F.3d 1079, 1080-84 (11th Cir. 2015) (interim communication "express[ing] 'significant concerns about'" a state's compliance with statute was not reviewable final action, despite "use of strong language" including "an admonition" to correct problems) (citation omitted); *Bell v. New Jersey*, 461 U.S. 773, 779 (1983).[17]

V.     The Letters Were Not Required to Undergo Notice and Comment.

Florida contends that the Letters constitute a "rule" that was improperly issued without notice-and-comment rulemaking. Compl. ¶¶ 152-53. But only substantive, or "legislative," rules are required to undergo notice and comment; such rules impose binding obligations and have the "force and effect of law." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citation omitted). As demonstrated above,

---

[17] The Letters thus stand in stark contrast to other guidance-type documents that courts have found reviewable. *See* Compl. ¶ 143 (relying on *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019)). In *Texas*, the Fifth Circuit held that an EEOC guidance document concerning the consideration of prior criminal convictions in hiring decisions constituted final agency action where the agency conceded that the guidance bound EEOC staff "to an analytical method in conducting … investigations and directs their decisions about which employers to refer for" enforcement. 933 F.3d at 443. Here, no such obligations are present; nothing in the Letters purports to effect any binding (or even substantive) change on the Department's evaluation of requests to change accreditors, nor do they impact the Department's analytical method to determine whether institutions have shown reasonable cause.

the Letters impose no such obligations. Even if the Letters could be considered final agency action, however, they still would be exempt from the APA's notice and comment requirements, 5 U.S.C. § 553(b)(A), because they are quintessential "interpretive" rules.

"[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez*, 575 U.S. at 97 (citation omitted); *Warshauer v. Solis*, 577 F.3d 1330, 1337-38 (11th Cir. 2009). An agency charged with superintending a complicated statutory scheme, such as the HEA, must interpret those provisions. *Hoctor v. USDA*, 82 F.3d 165, 167 (7th Cir. 1996).

The Letters have no binding effect. Far from "add[ing] requirements for institutions that wish to change accreditors," *id.* ¶ 153, the Letters do not purport to add any hurdles, but instead reiterate preexisting requirements. Tellingly, Florida neglects to mention precisely what "requirements" it thinks the Letters add. Rather than identify any, the state vaguely asserts "that the Department treats" the reasonable-cause requirement "as incredibly difficult to meet," Compl. ¶ 130—without identifying *any* basis to support that accusation—and that the Letters "assume … Florida cannot tell the institutions it owns and operates to switch accreditors," *id.* ¶ 145—again without pointing to any support. Florida cannot state a procedural APA claim merely by asserting, without substantiation, that the communications say things they do not. *See* Compl. ¶ 153.

VI.     The Letters Do Not Violate the APA's Substantive Requirements.

Florida also fails to state a claim that the Letters violate the APA's substantive requirements. Compl. ¶¶ 141-50. Florida first contends that the Letters are contrary to statute "because they misapply the HEA's requirement that accrediting agencies" maintain a voluntary membership by "assum[ing]" that this requirement means that Florida cannot tell the institutions it owns and operates to switch accreditors." Compl. ¶¶ 144-45. As "support," Florida argues that the Institution Letter "fails to acknowledge" that the statute "does not prevent the sovereign States from running the institutions

they own and govern." *Id.* ¶ 100. But the Department was under no obligation, in writing to schools, to "acknowledge" the self-evident fact that states can run public schools. The Letter accurately states that the HEA requires accreditors to maintain a voluntary membership and explains that this requires the Department to ensure that new institution-accreditor relationships are voluntary. Nor do the Letters opine that Florida cannot require its public institutions to change accreditors, *contra id.* ¶ 146. Besides, Florida's fear that "their ability to do so is substantially burdened, if not entirely prevented," Compl. ¶ 107, is baseless speculation and unripe.

Florida's arbitrary-and-capricious allegations are even more threadbare. The state alleges that the Letters "fail to account for state sovereign prerogatives … and explain departure from past practice." Compl. ¶ 149. But there is no reason (and Florida identifies none) why a communication from an agency to its regulated entities needed to account for "state sovereign prerogatives," especially when it reminded recipients about *preexisting* requirements that the agency did not alter. And while it is true that the Accreditor Letter mentioned that SB 7044 could "potentially undermine[] the voluntary nature of the relationship," that viewpoint in no way denied Florida's ability to enforce its law nor modified the existing statutory reasonable-cause requirement. *See, e.g.*, *Riverkeeper*, 806 F.3d at 1080-84. Florida's only other charge—that the agency failed to explain its change from past practice—flounders because the state neglected to identify any "change" allegedly effected.[18] Compl. ¶ 140. Regardless, comparison of the Letters to the statute reveals that there has been no change in substantive requirements and thus nothing to explain.

---

[18] Perhaps Florida will respond that it meant to point to the Procedure Letter's instruction that institutions should request approval before applying to the new accreditor. That argument would fail regardless, since the underlying regulation already made clear that the Secretary does not recognize the accreditation of an institution that is *in the process of changing*, unless it provides materials showing reasonable cause *and receives approval*, 34 C.F.R. § 600.11. The Procedure Letter thus implemented this existing requirement.

Dated:  September 15, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Kate Talmor*
KATE TALMOR (Md. Bar)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-5267
kate.talmor@usdoj.gov

*Counsel for Defendants*