## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

### Case No. 23-61188-civ-SMITH

STATE OF FLORIDA,

     Plaintiff,

     v.

MIGUEL CARDONA, in his official
capacity as Secretary of Education, et al.,

     Defendants.

_____

### <u>FLORIDA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS</u>

James Madison called the power to spend "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people . . . for carrying into effect every just and salutary measure." *The Federalist* No. 58. Yet, in the context of higher education, the federal government has taken that weapon out of the hands of the people and given it to unelected and unaccountable accrediting agencies. Admitting as much, the government's motion to dismiss disclaims any supervision over these agencies, instead attempting to minimize the power accreditors wield and its impact on state institutions. Doc. 12-2 at 10–11, 23–25. It is no surprise then that Defendants' attempts to defeat Florida's claims fall short.

As explained in Florida's complaint, Congress has delegated unsupervised power to private accrediting agencies. Doc. 1 ¶¶ 41–57. Specifically, the Higher Education Act (HEA) empowers accreditors to set the standards by which institutions qualify for federal funding programs and to determine whether institutions meet those standards—all without

1

supervision by the government. This type of unchecked delegation is incompatible with the Constitution. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("Our Constitution permits only the federal government to exercise federal power."). And because the heads of accrediting agencies exercise "significant authority" on behalf of the federal government on a continuing basis, they are subject to the Appointments Clause. *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018); *see also Buckley v. Valeo*, 424 U.S. 1, 140–41 (1976).

Because the HEA does not itself define the terms of participation in Title IV programs, it also violates the Spending Clause and Tenth Amendment. Conditions like those in the HEA, which are unknown at the time of acceptance and subject to change at the whims of private parties, are not "ascertainable." *See West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1143 (11th Cir. 2023) ("A law must 'unambiguously' link its conditions to the receipt of federal funds and define those conditions clearly enough for the states to make an informed choice." (quotations omitted)). And the sheer impact of Title IV programs ensures that state institutions have no choice but to participate. *See Prof'l Massage Training Cntr. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 170 (4th Cir. 2015) (describing the power to withhold accreditation, and thereby Title IV funding, as "life and death power" for institutions).

Finally, the Department's actions modifying the accreditation process and taking aim at Florida's recent law change, *see* Doc. 1 ¶¶ 99–105, are contrary to the plain meaning of the HEA, are arbitrary and capricious, and were issued without requisite notice and comment.

Defendants and Florida do agree on one thing: the federal government should not be establishing national education standards. Doc. 12-2 at 10. Acknowledging as much, Florida's requested relief does not result in the federal government's taking over accreditation.

2

That would require rewriting federal law, something this Court cannot do. *See Albritton v. Cagle's, Inc.*, 508 F.3d 1012, 1017 (11th Cir. 2007) ("We are not empowered to rewrite statutes.").

Florida instead seeks an injunction prohibiting the application of Title IV's accreditation requirements against its institutions. Doc. 1 at 40. That would leave only the requirements that institutions have "legal authority to operate within a State" and demonstrate "administrative capability and financial responsibility." 20 U.S.C. § 1099c(a); 20 U.S.C. § 1001(a); Doc. 1 ¶ 42. Far from "ensur[ing]" that "the Department take on the mantle of determining educational standards," Doc. 12-2 at 28, Florida's claims, if successful, place responsibility for regulating education back where it belongs: with the States.

## LEGAL STANDARD

When deciding a motion to dismiss, a court must take all "factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Dismissal under Rule 12(b)(6) is only warranted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

### I.     The HEA unconstitutionally delegates government power to private parties.

Under our Constitution, "a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Nat'l Horsemen's Benevolent & Protective Ass'n*, 53 F.4th at 881; *accord Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (explaining that "a private entity may not be the principal

decisionmaker in the use of federal power"). Defendants appear to concede that they do not supervise accrediting agencies—indeed, doing so would seem to violate federal law, *see* 20 U.S.C. § 3403(b). Defendants instead argue that the setting and enforcing of standards by private accrediting agencies is not an exercise of government power at all. Doc. 12-2 at 21. Defendants are wrong because setting conditions for participation in Title IV and enforcing those conditions are both exercises of government power. *See* Doc. 1 ¶¶ 41–57.

As to setting conditions, the HEA requires accrediting agencies to set standards of performance for participating institutions. *See* 20 U.S.C. § 1099b(a)(5). That determination opens and closes the "spigot" to billions of dollars in federal funds, *Chi. Sch. of Auto. Trans. v. Accreditation All. of Career Schs.*, 44 F.3d 447, 449 (7th Cir. 1994) (Easterbrook, J.), which is plainly an exercise of government power.

Incident to Congress's power to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, is the power to "attach conditions on the receipt of federal funds," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). That authority is a legislative and regulatory act of the government subject to constitutional limits. *See United States v. Dierckman*, 201 F.3d 915, 922 (7th Cir. 2000) (describing exercise of Congress's spending power as "indirect regulation"); *Haight v. Thompson*, 763 F.3d 554, 569 (6th Cir. 2014) (describing the spending power as States "receiving federal funds in return for allowing Congress to regulate where it otherwise could not").

Countless authorities recognize that the power to set conditions for federal funding is an exercise of government power. In fact, under Eleventh Circuit precedent, that power belongs to Congress *alone* and may not even be delegated to the Executive Branch. *See West*

*Virginia*, 59 F.4th at 1147 (explaining that "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare" (quotations omitted)); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (holding that it violates the separation of powers for the Executive Branch to "withhold properly appropriated funds in order to effectuate its own policy goals").

In short, every educational standard set by an accrediting agency is a condition that an institution must meet to be eligible to participate in Title IV programs, and thus is an improper exercise of legislative power by a private entity. *See Dep't of Transp. v. Ass'n of Am. Railroads* (*Amtrak II*), 575 U.S. 43, 89 (2015) (Thomas, J., concurring in the judgment) (observing that "decid[ing] the applicability of standards that provide content to generally applicable rules of private conduct" is an "exercise of legislative power"); *accord id.* at 58–59 (Alito, J., concurring) (explaining that the power to issue metrics and standards for private rail carriers is "obviously regulatory" because it has a "coercive effect" on private conduct).[1]

As to enforcing those standards, the HEA empowers accrediting agencies to determine when an institution meets its requirements. *See* 20 U.S.C. § 1099b(a)(6). In other words,

---

[1] Defendants are of course correct that the concurrences in *Amtrak II* are not binding. Doc. 12-2 at 26. In that case, the D.C. Circuit held that Amtrak's structure violated the private non-delegation doctrine, *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.* (*Amtrak I*), 721 F.3d 666, 674 (D.C. Cir. 2013), *rev'd on other grounds Amtrak II*, 575 U.S. 43, and the Supreme Court reversed by concluding that Amtrak was in fact a government agency. The majority thus did not reach the private non-delegation question, and lower courts have treated the concurrences as persuasive. *See, e.g.*, *Nat'l Horsemen's Benevolent & Protective Ass'n*, 53 F.4th at 880; *De Niz Robles v. Lynch*, 803 F.3d 1165, 1171 (10th Cir. 2015) (Gorsuch, J.). Further, the analysis in Justice Alito's concurrence drew heavily on the D.C. Circuit's opinion below, *see, e.g.*, *Amtrak II*, 575 U.S. at 59 (Alito, J., concurring), and on remand, the D.C. Circuit maintained that it "st[ood] by [the private non-delegation] analysis" from its original opinion, *see Ass'n of Am. R.R.s v. U.S. Dep't of Transp.* (*Amtrak III*), 821 F.3d 19, 37 (D.C. Cir. 2016).

accrediting agencies set the terms by which institutions may receive federal funds *and* determine whether those standards have been met. The latter, like the former, is an exercise of government power.

The Supreme Court treats "determinations of eligibility for funds" as involving "significant governmental duty" such that this function must be performed by an officer of the United States. *Buckley*, 424 U.S. at 140–41. Indeed, multiple courts of appeals have described the power accreditors wield in enforcing their standards as "delegated" government power. *See Thomas M. Cooley L. Sch. v. ABA*, 459 F.3d 705, 712 (6th Cir. 2006); *Prof'l Massage Training Cntr.*, 781 F.3d at 170. As with setting accreditation standards, enforcing those standards opens and closes the "spigot" to billions of dollars in federal funds and is thus an exercise of government power. *Chi. Sch. of Auto. Trans.*, 44 F.3d at 449; *Buckley*, 424 U.S. at 140–41.

Finally, Defendants rely on the fact that Florida's institutions are members of accreditation agencies. Doc. 12-2 at 24–25. But that same structure was present in *Carter Coal*, the seminal case on the private non-delegation doctrine. *Carter v. Carter Coal Co.*, 298 U.S. 238, 310–11 (1936). There, the challenged statute gave a group of producers and miners "the power to regulate the affairs of an unwilling minority." *Id.* at 311. Even though the "dissentient minority" in *Carter Coal* may have had an opportunity to influence the decisions of the body, they were subject to private exercise of public power. *Id.* Further, that majority was a preexisting group of producers and miners, *id.*, not a "congressionally chartered private entity" or one "created by Congress," Doc. 12-2 at 23–24.

Accrediting agencies are delegated the power to make final determinations as to what standards qualify institutions to participate in federal programs and as to whether those

standards have been met. *See* Doc. 1 ¶¶ 41–57. The Department has no power to override those standards or determinations. Doc. 1 ¶¶ 47–50, 52 (citing 20 U.S.C. § 1099b(e), (g), (n)(3), (o), (p)). Thus, accrediting agencies remain the "principal decisionmaker in the use of federal power" and "create federal law." *Oklahoma*, 62 F.4th at 229; *accord Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940) (upholding a federal statute where industry members "function[ed] subordinately to" a federal agency).

## II.    The HEA's structure violates the Appointments Clause.

Someone who "exercis[es] significant authority pursuant to the laws of the United States" on a continuing basis is an "Officer" who must be appointed in a manner consistent with the Appointments Clause. *Lucia*, 138 S. Ct. at 2051; *Buckley*, 424 U.S. at 126. As explained above, *see infra* section I, accrediting agencies exercise government power by setting conditions for the receipt of federal funds and determining eligibility for those funds. *Buckley* tells us that this power is legislative in nature, 424 U.S. at 140–41, so any person exercising it on a continuing basis is an officer of the United States.

Defendants resist this conclusion based on the fact that heads of accrediting agencies do not hold public office. Doc. 12-2 at 28–30. But that argument is circular and misunderstands the significant authority test.

The Appointments Clause requires that the federal government's "legitimacy and accountability to the public" be maintained "through 'a clear and effective chain of command' down from the President." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021). The "significant authority" test implements that principle by ensuring that those who control significant functions of the government be within that chain of command. As such, granting significant authority to a *private* person is, if anything, more anathema to the Appointments

Clause than granting it to a non-officer federal employee, because federal employees at least operate within the chain of command.

Moreover, Defendants' position is not supported by precedent and is contrary to the position of the Department of Justice's Office of Legal Counsel (OLC). As OLC has explained, Supreme Court precedent does not "hold or state that a private actor cannot be an officer." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 121 (2007); *accord Licensing Marijuana Cultivation in Compliance with the Single Convention on Narcotic Drugs*, 42 Op. O.L.C. __, 2018 WL 11201272, at *9–10 (June 6, 2018) (explaining that officials in a division of the University of Mississippi that was "not an extension of the federal government" still could, if exercising significant federal authority, be officers of the United States). Defendants' brief, although filed by the Department of Justice, does not even appear to accurately state the Department of Justice's own views.

Further, the cases cited by Defendants analyze formal employment as *evidence* that a person has a "continuous" relationship with the federal government, not as a *precondition* to officer status. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th Cir. 2001) (applying *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) (requiring "continuous duties" to establish a constitutional office), and *United States v. Germaine*, 99 U.S. 508, 511–12 (1878) (requiring a "continuing and permanent" duties to establish a constitutional office)); *see also United States v. Dozinger*, 38 F.4th 290, 297 (2d Cir. 2022) (considering employment status as indicative of whether a position is "transient or fleeting"). And there can be no dispute that accrediting agencies' duties are "continuous."[2]

---

[2] This understanding of the Appointments Clause traces to Chief Justice Marshall's seminal opinion in *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1923) (No. 15,747), in which he explained that the delegation of duties could create a constitutional office "if those

Finally, Defendants' reliance on cases finding accrediting agencies not to be *state actors* likewise misses the point. *See* Doc. 12-2 at 29–30. Those cases recognize that accrediting agencies are *private, non-governmental* entities. *See Auburn Univ. v. S. Ass'n of Colls. & Schs.*, 489 F. Supp. 2d 1362, 1371 n.5 (N.D. Ga. 2002) (collecting cases); *William Loveland Coll. v. Distance Ed. Accreditation Comm'n*, 347 F. Supp. 3d 1, 12–13 nn.11–12 (D.D.C. 2018) (same).[3] But of course they are; that is the whole point of Florida's challenge. The HEA has improperly given government authority to a non-officer who is not accountable to the public. That is the very error the Appointments Clause was designed to prevent. *See Edmond v. United States*, 520 U.S. 651, 663 (1997) (observing that the Appointment Clause was "designed to preserve political accountability relative to important Government assignments").

### III.   The HEA's conditions on States' participation in federal funding programs are coercive and not ascertainable.

Defendants argue that the HEA's conditions on state participation in Title IV programs do not implicate the Spending Clause because the funds go to students rather than state institutions and because private institutions also participate. Doc. 12-2 at 30, 32–34.[4] Both arguments as wrong.

---

duties continue, though the person be changed." Chief Justice Marshall did say that "an office is 'an employment,'" but it is clear in context that by employment he meant engagement "to do an act, or perform a service," irrespective of whether the duties derived from a formal employment contract. *Id.* "[I]f a duty be a continuing one," he said, even though it "is defined by rules prescribed by the government, and not by contract, . . . it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer." *Id.*

[3] Some of these cases even disclaim any constitutional implications to their rulings. *See, e.g.*, *Chi. Sch. of Auto. Trans.*, 44 F.3d at 449 n.1 (warning against "reading into our opinion" any constitutional holding because no constitutional argument was made).

[4] To the extent Defendants contend that there is a relevant distinction between the State and state institutions, *see* Doc. 12-2 at 24 (arguing that "federal funds . . . [do] not [flow] directly to states"), that argument has been robustly rejected by the Supreme Court. *See Biden v.*

First, it does not matter that Title IV provides funds to students because the States must enter a contract with the federal government to participate in Title IV programs—the critical point of analysis under the Spending Clause. *NFIB v. Sebelius*, 567 U.S. 519, 576–77 (2012) ("The legitimacy of Congress's exercise of the spending power 'thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" (quotations omitted)); *accord West Virginia*, 59 F.4th at 1142–43. State institutions enter into a "Program Participation Agreement" with the Department in which they specifically agree to maintain accreditation as a condition of participation in Title IV programs. 34 C.F.R. § 668.14(b)(23) ("By entering into a program participation agreement, an institution agrees . . . [i]t will meet the requirements established pursuant to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies."); Doc. 1 ¶ 42. The resulting benefit to the school is access to billions of dollars for its students—funds that for the most part end up going to the institution through tuition and other student expenditures. *See* Types of Financial Aid: Loans, Grants, and Work-Study Programs, U.S. Dep't of Ed., https://studentaid.gov/understand-aid/types (last visited Oct. 10, 2023) (listing tuition as one expense federal financial aid can be used for).

Indeed, in *NFIB*, the Court found the Affordable Care Act's Medicaid expansion requirement coercive on States even though a large portion of Medicaid funds reimburse medical costs of individual patients. 42 U.S.C § 1396c (authorizing Secretary to withhold Medicaid payments to States), *ruled unconstitutional in NFIB*, 567 U.S. at 581; 42 U.S.C. § 1396b(a)(1) (including "medical assistance" as a portion of Medicaid payment to

---

*Nebraska*, 143 S. Ct. 2355, 2366–67 (2023) (summarizing precedent holding that harm to a state university is harm to the State).

States); 42 U.S.C § 1396d(a) (defining "medical assistance" as costs for the care and services of eligible individuals). Like Medicaid, Title IV funds depend on both individual eligibility and institutional eligibility. *See, e.g.*, 20 U.S.C. § 1087a (authorizing provisions of direct student loans to students at participating institutions of higher education). That does not render the Spending Clause inapplicable.

Second, it also does not matter that some Title IV funds go to private institutions. The relevant inquiry under the Spending Clause is whether Congress has created a contract with a State. *See West Virginia*, 59 F.4th at 1142 (applying Spending Clause limitations where "Congress, the offeror, has contracted with the States, the offeree"). For example, the Eleventh Circuit has applied Spending Clause limitations to Title IX, legislation enacted under Congress's spending power that applies to both public and private schools that accept federal funds. *Adams v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791, 816 (2022) (en banc). Similarly, Medicaid payments, like those at issue in *NFIB*, go to private hospitals and state healthcare providers alike, but that fact does not diminish the coercive effect on the States. *NFIB*, 567 U.S. at 582.

This principle is only heightened here where the federal program regulates a core state function like higher education. *See Kreipke v. Wayne State Univ.*, 807 F.3d 768, 779 (6th Cir. 2015) ("[A]ll of the cases that we have reviewed hold that higher education is a function within the traditional purview of state government."); *Nebraska*, 143 S. Ct. at 2366 (similar); Art. IX, Fla. Const. (entrusting administration of public colleges and universities to the State). In fact, public institutions account for over half of the federal funds disbursed under Title IV. *See* Title IV Program Volume Reports: Award Year Summary by School Type (July 2023), https://studentaid.gov/data-center/student/title-iv (reporting that public institutions

accounted for 51.6% of grant and loan disbursements in the 2022–23 school year). It is simply disingenuous to suggest that States have merely "opted" to offer higher education as a service "alongside private institutions." Doc. 12-2 at 31.

Because the Spending Clause applies, the conditions imposed by the HEA must be both ascertainable and non-coercive. *See West Virginia*, 59 F.4th at 1141. The HEA is neither. As to ascertainability, the HEA requires that institutions be "accredited" without any indication of what conditions they may have to comply with. 20 U.S.C. § 1001(a)(5); *see Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("States cannot knowingly accept conditions of which they are unaware." (quotations omitted)). And the HEA permits accrediting agencies to change the conditions of accreditation midstream while institutions must agree to comply with rules without "know[ing] what rules they must follow and 'what sort of penalties might be on the table.'" *West Virginia*, 59 F.4th at 1143 (quoting *Kentucky v. Yellen*, 54 F.4th 325, 348 (6th Cir. 2022)).

As to coerciveness, the ubiquity of federal student aid and sheer volume of students receiving aid acts as a gun to the head for state institutions. An institution "denied accreditation is likely to promptly go out of business—as very few people are willing or able to pay tuition out of their own pockets." *Prof'l Massage Training Cntr.*, 781 F.3d at 170 (quotations omitted). In the 2015–16 school year, 67.7% of full-time students at public universities received some amount of federal aid. *See* Aid status and sources of aid for full-time and part-time undergraduates, by control and level of institution: 2011–12 and 2015–16, Nat'l Cntr. Ed. Stat. (July 2018), https://nces.ed.gov/programs/digest/d20/tables/dt20_331.50.asp. To lose nearly 70% of the student body would decimate Florida's institutions, leaving the State with "no real option but to acquiesce." *NFIB*, 567 U.S. at 582.

"'Your money or your life' is a coercive proposition, whether you have a single dollar in your pocket or $500." *Id.* at 582 n.12. Were all that not enough, accrediting agencies may also change standards midstream, giving them power to withdraw existing funding for failure to comply with new requirements. That is coercion. *See id.* at 585 ("What Congress is not free to do is to penalize States that choose not to participate in that new program by taking away their existing . . . funding.").

### IV.   The guidance documents are reviewable and violate the APA.

In addition to challenging provisions of the HEA on constitutional grounds, Florida challenges three "guidance documents" issued simultaneously by the Department on July 19, 2022.[5] Doc. 1 ¶¶ 99–105. First, the "Institution Letter" informed institutions of new standards the Department would use to determine whether an institution has "reasonable cause" to change accreditors under 20 U.S.C. § 1099b. Doc. 1 ¶ 100.[6] Second, the "Accreditor Letter" informed accrediting agencies that they were independently obligated to assess whether an institution's desire to change accreditors was "voluntary" under 20 U.S.C. § 1099b. Doc. 1 ¶ 101.[7] Third, the "Procedures Letter" "updates the procedures for submitting

---

[5] Because only Florida's constitutional claims would afford complete relief, Florida challenges the guidance documents in the alternative. *See* Doc. 1 at 40.

[6] GEN-22-10, Guidance for Institutions Seeking to Change or Add Accrediting Agencies, U.S. Dep't of Ed. (July 19, 2022), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-19/guidance-institutions-seeking-change-or-add-accrediting-agencies.

[7] Letter from Herman Bounds Jr., Dir., Accreditation Group, to Institutional Accrediting Agencies (July 19, 2022), https://www2.ed.gov/admins/finaid/accred/letter-to-institutional-accreditors.pdf.

documentation" to change accrediting agencies and "revokes" prior guidance on the issue. Doc. 1 ¶ 102.[8]

These documents were not simply "clarify[ing]" existing requirements. *See* Accreditor Letter, *supra* note 7 at 1–3. They were a coordinated effort to change agency policy in response to Florida's new law. In a blog post released the same day as the documents, the Department said they took a "fresh look" at these issues in response to "a new law in Florida that mandates public institutions to switch accrediting agencies" and instituted "changes" to ensure "that institutions are not forced to switch against their will."[9] While the Department understandably tries to backtrack now, Doc. 12-2 at 39, it is clear that these documents were part of a concerted effort to override the will of Florida voters. *See* Doc. 1-1 at 3 (Letter from Defendant Kvaal to Governor DeSantis regarding SB 7044 raising the prospect of "potential conflicts with Federal law" and "loss of eligibility for Federal financial aid programs").

> A.  *The guidance documents are final agency action.*

Defendants argue that the guidance documents are not final agency action because the Department has not issued final decisions approving or denying every Florida institution's decision to switch accreditors and because, they say, no legal consequences flow to Florida from the documents. Doc. 12-2 at 35–36. But the guidance documents, which explicitly

---

[8] GEN-22-11, Procedures for Institutions Seeking Approval of a Request to Change or Add Accrediting Agencies (July 19, 2022) (updated Sept. 26, 2022), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-19/procedures-institutions-seeking-approval-request-change-or-add-accrediting-agencies-updated-sept-26-2022.

[9] Antoinette Flores, *Postsecondary Accreditation Cannot Become a Race to the Bottom*, U.S. Dep't of Ed. (July 19, 2022), https://blog.ed.gov/2022/07/postsecondary-accreditation-cannot-become-a-race-to-the-bottom/.

change Department policy and establish new internal norms for reasonable cause determinations, are clearly subject to judicial review.

Courts find "final agency action" under the APA where the government "has completed its decisionmaking process," *Canal A Media Holding, LLC v. USCIS*, 964 F.3d 1250, 1255 (11th Cir. 2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)), and the action determines "rights or obligations" or has "legal consequences," *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Both are present here.

First, the guidance documents mark the consummation of the Department's decisionmaking process because they communicate the Department's "final view on the matter[s]," *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021), leaving nothing but the application of those views to specific cases. The Department published all three documents on its website on the same day and published a blog post describing the actions together, *see* Doc. 1 ¶¶ 99–103, which reflects a coordinated effort to "communicate[] the agency's settled position." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786. Agency officials are not "free to change their minds" on the positions taken by these letters. *Id.* For example, the Institution Letter states that "in making a reasonable cause determination, [the Department] *must* review the specific circumstances of the institution." *See* Institution Letter, *supra* note 6 (emphasis added).

And the letters certainly "tread . . . new ground" because they "implement[], interpret[], or prescrib[e] . . . policy." Doc. 12-2 at 35 (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004)). On its face, the Procedures Letter purports to "update[] the procedures" that apply to institutions seeking to change accreditors and "revokes and supersedes" prior guidance on the issue. *See* Procedures Letter, *supra* note 8.

15

Likewise, the Accreditor Letter notes that it is opining on something that the Department "ha[d] not previously had reason to further consider." *See* Accreditor Letter, *supra* note 7 at 2. It makes no difference that many Florida institutions still face an application process because the documents reflect the final word from the agency giving notice how it intends to apply the statute. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599–600 (2016) (affirming finality of interpretive document that "would have effect only if and when a particular action was brought" (quotations omitted)).

Second, the guidance documents create legal obligations for institutions seeking to change accreditors, accrediting agencies seeking to maintain recognition, and agency officials who make these determinations. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (looking to whether agency action has a binding effect on either the agency or a regulated party).

Under the Procedures Letter, institutions seeking to change accreditors must submit a host of information to the Department and receive approval "**prior to** submitting an application" to a new accrediting agency *See* Procedures Letter, *supra* note 8 (emphasis in original). The prior guidance (August 2016 guidance) only required "notification" when the institution "begins" the process of changing accreditors. *See* (General) Subject: Guidance for Schools Seeking New Accreditation, U.S. Dep't of Ed. (Aug. 5, 2016).[10] This adds a significant hurdle to the process of changing accreditors. The Accreditor Letter appears to acknowledge this change, though it absurdly suggests that the Department merely "clarified" this requirement in the Procedures Letter. *See* Accreditor Letter, *supra* note 7 at 2.

---

[10]    Available    at    https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2016-08-05/general-subject-guidance-schools-seeking-new-accreditation.

Further, under the Accreditor Letter, accrediting agencies must now consider whether an institution's membership is voluntary before they agree to accredit that institution. *See* Accreditor Letter, *supra* note 7 at 2 ("***agencies should conduct their own independent evaluation of whether an institutional change of accrediting agencies . . . is voluntary***" (emphasis in original)). Finally, the guidance documents withdraw agency officials' discretion by rescinding old review procedures and creating new ones and by establishing new factors to evaluate "reasonable cause." Institution Letter, *supra* note 6; Procedures Letter, *supra* note 8; *see Texas v. Biden*, 10 F.4th 538, 550 (5th Cir. 2021) (taking steps to rescind previously applicable guidance was evidence of withdrawal of discretion and creation of legal obligations).

If that were not enough, the Department is clearly treating these documents as binding because it has cited them in letters to Florida institutions as the basis for its comprehensive review of the institutions' change in accreditors. Doc. 1 ¶ 106; *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) ("In assessing whether a particular agency action qualifies as final for purposes of judicial review, this court and the Supreme Court have looked to the way in which the agency subsequently treats the challenged action.").[11]

Defendants make much of the fact that no Florida institution has yet been denied a request to change accreditors. Doc. 12-2 at 35–36. As explained above, however, the finality of the guidance documents does not depend on whether they have been applied or rather will be applied in the future. "So long as the action is one from which 'legal consequences *will*

---

[11] *Clayton County v. FAA*, 887 F.3d 1262, 1267 (11th Cir. 2018), does not hold otherwise. There, the Eleventh Circuit held that the FAA's letter, which only restated a formal policy position taken years earlier, was not final agency action. *Id.* Here, the guidance documents are proactive letters to all regulated parties and purport to "update[] . . . procedures," Procedures Letter, *supra* note 8, and examine issues the Department "has not previously had reason to further consider," Accreditor Letter, *supra* note 7 at 2.

flow,' the action can be considered final." *Alabama v. CMS*, 780 F. Supp. 2d 1219, 1227 (M.D. Ala. 2011) (quoting *Bennett*, 520 U.S. at 178).

Finally, to the extent the Court finds that Defendants have raised a relevant factual dispute regarding finality via their "factual attack," Doc. 12-2 at 36 n.16, that dispute counsels in favor of denying their motion to dismiss so that Florida may conduct further discovery on the issue and probe the contentions in Defendants' declaration. *See Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981) (When considering a factual attack to subject matter jurisdiction, "[a] district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss."); *see also McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (recognizing that discovery is required to resolve factual challenges to subject matter jurisdiction).

B.    *The guidance documents were required to undergo notice and comment.*

The APA "specifies that an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated." *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979) (discussing 5 U.S.C § 553). The APA distinguishes between interpretive rules, which are not subject to notice and comment, and substantive rules, which are. *Id.* at 301–03. A rule is substantive and thus subject to notice and comment if it "affect[s] individual rights and obligations." *Id.* at 302 (quotations omitted).

For the same reasons the guidance documents are final agency action, they are substantive rules subject to notice and comment. The guidance documents create new submission requirements for institutions changing accreditors, establish obligations for accrediting agencies evaluating new institutions, and withdraw discretion from agency

officials who oversee accreditation. *See supra* section IV.A. While the agency may purport to merely "clarify" requirements, *see* Accreditor Letter, *supra* note 7 at 1, an agency's self-serving description of an action is not dispositive. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) ("[C]ourts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply."). The documents mark significant changes to the normal course of business, particularly the requirement that an institution "obtain the Department's approval **prior to** submitting an application to a new accrediting agency." *See* Procedures Letter, *supra* note 8 (emphasis in original). In fact, the changes are so significant that the Department published a blog post explaining the "changes" the same day it released the documents. *See* Flores, *supra* note 9.

It is understandable that the Department wishes to avoid notice and comment rulemaking for accreditation rules. Under 20 U.S.C. § 1098a, all Title IV rules must be made through a process called "negotiated rulemaking," which is a more cumbersome and administratively difficult process than typical rulemaking. *See* Maeve P. Carey, Cong. Rsch. Serv., R46756, Negotiated Rulemaking: In Brief 6–7 (Apr. 12, 2021) (discussing practical problems with negotiated rulemaking including resource-intensiveness and perceived lack of influence by policymakers). In the accreditation space, negotiated rulemaking has been at times a death sentence for administration policy changes. *See generally* Mark L. Pelesh, *Regulations Under the Higher Education Amendments of 1992: A Case Study in Negotiated Rulemaking*, 57 Law & Contemp. Probs. 151 (1994) (recounting the challenges of negotiated rulemaking following the 1992 amendments to the HEA). But the law requires notice and comment for rules that "affect[] individual rights and obligations," and the guidance documents do just that. *Chrysler Corp.*, 441 U.S. at 302.

C.    *The guidance documents are contrary to law.*

Defendants do not meaningfully engage with Florida's statutory arguments. Doc. 1 ¶¶ 145–47. This is not surprising because the Department's interpretation of 20 U.S.C. § 1099b is indefensible. In the Accreditor Letter, the Department takes the position that a State Legislature deciding that the State's institutions should change accrediting agencies makes the institutions' membership involuntary. *See* Accreditor Letter, *supra* note 7 at 2; Flores, *supra* note 9. But as explained in Florida's complaint, Doc. 1 ¶ 100, 144–47, 20 U.S.C. § 1099b ensures that neither the Department nor an accrediting agency may force an institution to be accredited. *See* 20 U.S.C. § 1099b(a)(2) (listing "voluntary membership" as a requirement for accrediting agencies not institutions). It does not purport to prevent the State from supervising its own institutions. And the very fact that an institution is requesting a change in accrediting agency should be indication enough that its membership is voluntary.

Notwithstanding the Department's attempts to play down its active opposition to Florida's SB 7044, Doc. 12-2 at 39, its interpretation is inconsistent with § 1099b and contrary to law.

D.    *The guidance documents are arbitrary and capricious.*

Similarly, Defendants merely reiterate their contention that the guidance documents do not create new requirements or policy changes to address whether they have met the reasongiving requirements of the APA. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (holding that the APA "requires that agency action be reasonable and reasonably explained"). But as explained above, the guidance documents mark a significant shift in agency policy. They explicitly rescind and replace prior guidance governing procedures for institutions changing accreditors and purport to examine legal issues never considered by the

Department before. *See* Procedures Letter, *supra* note 8 ("[T]his communication revokes and supersedes the Aug. 5, 2016, announcement."); Accreditor Letter, *supra* note 7 at 2 ("[T]he Department has not previously had reason to further consider the [voluntariness] requirement."). Indeed, in a blog post summarizing the documents, an agency representative described them as "changes." *See* Flores, *supra* note 9. The Department cannot sneak substantive changes in agency policy into guidance documents without explaining the changes. *See FCC v. Fox Television, Inc.*, 556 U.S 502, 515 (2009) (an agency may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books").

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry Whitaker (FBN 1031175)
SOLICITOR GENERAL

*/s/ Natalie Christmas*
Natalie Christmas (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Anita J. Patel (FBN 0070214)
ASSISTANT BUREAU CHIEF

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF SERVICE

I certify that on October 10, 2023, a true and correct copy of the foregoing was filed

with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Natalie Christmas*
Counselor to the Attorney General