**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

Case No. 23-61188-civ-SMITH

STATE OF FLORIDA,
*Plaintiff*,

v.

MIGUEL CARDONA, in his official
capacity as Secretary of Education, et al.,
*Defendants*.

# AMICUS BRIEF OF THE NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION AND THE CENTER FOR AMERICAN RIGHTS

## INTEREST OF AMICI

The National Horsemen's Benevolent and Protective Association is a nationwide trade association representing owners and trainers in the thoroughbred horseracing industry. Through its state and local affiliates, the HBPA speaks for nearly 30,000 horsemen committed to caring for their animals and their industry.

The Center for American Rights is a non-profit, non-partisan national law firm that defends and protects Americans' most

1

fundamental constitutional rights, with a particular priority placed on free speech, free enterprise, and parental freedom in education.

The Center represents the National Horsemen's Benevolent and Protective Association *pro bono* in its challenge to the federal Horseracing Integrity and Safety Act (15 U.S.C. §§ 3051-58). The NHBPA and the Center argue that the Act unconstitutionally hands governmental functions over to the Horseracing Integrity and Safety Authority, and that the Authority runs and regulates the industry without sufficient oversight and control by the Federal Trade Commission. In November 2022, the U.S. Court of Appeals for the Fifth Circuit agreed, issuing the second decision in eighty years where a federal appellate court struck down an act of Congress under the private nondelegation doctrine. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022) (the other was *Ass'n of Am. R.R. v. United States DOT*, 721 F.3d 666, 671 (D.C. Cir. 2013) (*Amtrak I*), vacated by 575 U.S. 43 (2015)). Congress then tweaked the law, and the Center and NHBPA are now back in the Fifth Circuit pressing their attack on the fundamental structural flaws in the Act. No. 23-10520 (argued Oct. 4, 2023).

The NHBPA and the Center thus share both a deep expertise in the private non-delegation doctrine and a strong interest in advocating for a robust and accurate interpretation of the doctrine in cases where it arises, including this one.

## INTRODUCTION

The private nondelegation doctrine serves an important function in our constitutional system. It ensures that Congress or federal agencies cannot "evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *See Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374, 397 (1995). Congress and federal agencies may rely on private organizations for advice and expertise. *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004); *Consumers' Rsch. v. FCC*, 67 F.4th 773, 795 (6th Cir. 2023). They may hire them to perform ministerial functions under government contracts. *Id.* But whenever a private corporation is empowered to do something on behalf of the government, three constitutional rules apply:

1. Private organizations cannot perform necessarily governmental functions (e.g., regulate, enforce, tax, sanction, etc.). These roles are exclusively reserved to government officials who are subject to safeguards like the Appointments Clause, the Appropriations Clause, the Impeachment Clause, etc.

2. Private organizations performing ministerial or support functions must act under the pervasive supervision and control of a responsible government agency/official.

3. Private organizations run by self-interested industry participants may not regulate or investigate or control industry competitors.

These three principles, synthesized from precedential decisions of the U.S. Supreme Court and several federal courts of appeals, embody the modern private non-delegation doctrine. And though the college accreditation cartel may not perform a necessarily governmental function, it does act without sufficient supervision and through self-interested industry competitors. This Court should therefore reject the United States' motion to dismiss.

## ARGUMENT

The private non-delegation doctrine is rooted in three constitutional principles: the vesting clauses, the due process clauses, and the protections for civil liberty. First, the Constitution only authorizes three branches of government: the Congress to legislate, the President as the executive, and the courts to hold the judicial power. There is no fourth branch for private industry regulatory authorities. Governmental power is vested in and must be held in one of those three branches. *Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). This ensures democratic accountability for the exercise of governmental powers: Congress and the President (and through him, his appointees) are ultimately responsible to the voters for the decisions they make. *Black*, 53 F.4th at 880. A private organization that selects its own self-perpetuating board is not democratically accountable and does not have the same standards for transparency to the voters (private organizations with delegated roles are not subject to the Freedom of Information Act, the Federal Advisory Committees Act, the Government in the Sunshine Act, etc.).

Second is due process: a core component of due process is that decisions will be made by fair, impartial, and open-minded reviewers, *Gagnon v. Scarpelli*, 411 US 778, 786 (1975), a task we entrust to sworn government officials because we pay their salaries to ensure their independence. When a self-interested industry participant exercises government power over their own industry, it violates this promise of due process for everyone else in the industry. *Carter v. Carter Coal Co.*, 298 U.S. 238, 310-11 (1936).[1]

Third is the protection of civil liberties. Private corporations, even though delegated important roles by government, are not necessarily subject to the Constitution. Officials of a college accreditation commission do not need to show a neutral magistrate evidence of a rules violation before conducting an unannounced search-and-seizure operation against a member school. *See, e.g.*, Accrediting Commission of Career Schools and Colleges, *Standards of Accreditation* (July 1, 2022), 18 (providing for unannounced inspection visits).[2] Indeed, several federal courts have found that the Financial Industry Regulatory

---

[1] It also potentially creates an antitrust issue. *See State Bd. of Dental Examiners v. FTC*, 574 US 494 (2015).
[2] https://www.accsc.org/UploadedDocuments/standards%20and%20alerts/ACCSC-Standards-of-Accreditation-and-Bylaws-070122.pdf.

Authority (FINRA), a private delegate of the Securities and Exchange Commission, can run its private police department over the securities industry without following constitutional principles like the Fourth Amendment. *See, e.g., Bahr v. National Ass'n of Securities Dealers, Inc.*, 763 F. Supp. 584, 589 (S.D.Fla. 1991). Courts cannot allow Congress to legislate around citizens' constitutional protections by simply relying on private corporations to do its dirty work rather than federal agencies. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 713 n.28 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

Thus, contra the position of the United States, Motion to Dismiss at 12, the private nondelegation doctrine has its roots in three different constitutional principles, all of which come into play when a court considers the law governing such situations.

These three principles form the basis for the three rules that courts have developed to govern delegations to private actors.

1. Governmental functions must be done by government officials.

Though the three branches may delegate their powers, there are limits. Congress, for instance, may only delegate its rulemaking power to executive agencies by first providing an intelligible principle to guide

the rulemaking, and Congress alone must decide the "major questions" of national policy. *Mistretta v. United States*, 488 US 361, 372 (1989); *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022). In the same sense, the government cannot delegate a necessarily governmental function to a nongovernmental actor. *Carter*, 298 U.S. at 310-11 (regulation could not be delegated because it "is necessarily a governmental function"). The Fourth Circuit laid this principle out in *Pittston Co. v. United States*: "Congress may employ private entities for ministerial or advisory roles, but it may not give these entities governmental power over others." 368 F.3d at 395 (citing *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989)).

Traditionally, setting policy and the regulation of private actors have been necessarily governmental functions, while social welfare benefits programs can be handed off to private corporations as program administrators. *Compare Black,* 53 F.4th 869 (policy-setting and regulation of thoroughbred horseracing industry); *Amtrak I,* 721 F.3d 666 (regulation of railroad track usage) *with Pittston Co.,* 368 F.3d 385 (government-mandated health benefit for coal miners may be administered by private corporation under Social Security

8

Administration supervision); *Consumers' Rsch.,* 67 F.4th 773 (government-mandated fee funding for infrastructure expansion may be administered by private corporation under Federal Communications Commission supervision); *and Frame*, 885 F.2d 1119 (government-mandated fee funding for agricultural marketing may be administered by private corporation under Department of Agriculture supervision). *See also Lebron,* 513 U.S. at 387-91 (listing quasi-governmental corporations set up to administer government programs like home loans and infrastructure construction). The power to legislate and regulate, at its core, is the power to make policy, and that power is reserved by the Constitution to democratically accountable actors in the Congress and executive branch. *See Fullilove v. Klutznick*, 448 U.S. 448, 502 (1980).

Thus, as an initial matter, the government's decision how to run its higher education scholarship programs is more like the benefit programs than the regulatory schemes. However, at a certain point the government crosses a constitutional line when it uses its spending power to essentially compel regulation. *See South Dakota v. Dole,* 483 U.S. 203 (1987). If program participants no longer have a free choice about whether to participate, but essentially face a death sentence if

9

program participation is withdrawn, then the voluntary subsidy standard is really a rule. *Nat. Fedn. of Indep. Business v. Sebelius*, 132 S.Ct. 2566, 2605 (2012) ("The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion.").

Higher education certainly borders on this precipice, at least for many institutions. The accreditation commission is the "primary gatekeeper for Title IV federal student aid."[3] Federal loans constitute approximately nine percent of the average college's overall budget, similar to the Medicaid numbers considered by the Court in *NFIB*.[4] That is especially true for schools that serve low-income and first-generation student populations, whose students rely more on federal loans.[5] In such circumstances, a standard imposed by an accreditor has

---

[3] U.S. Dep't of Educ., FAQs, https://www2.ed.gov/admins/finaid/accred/faqs-accrediting-agencies.pdf.
[4] "In 2018, federal money made up only 14% of all college revenue. . . . The federal government directed 65% of its $149 billion investments to federal student aid which covers scholarships, work-study and loans given to students for their educational expenses." https://usafacts.org/articles/what-do-universities-do-with-the-billions-they-receive-from-the-government/ (March 28, 2023). 65% of 14% is 9%.
[5] National Center for Education Statistics, Fast Facts: Student Debt (2020), https://nces.ed.gov/fastfacts/display.asp?id=900.

the effect of a command, because the withdrawal of federal loans would kill the college.

A large research university like the University of Florida or Florida State University has strong alumni support, state taxpayer support, major research grants, patent revenue, athletics, and an endowment. But the State of Florida also represents ten other regional universities, including a historically black college (Florida A&M University), and a score of technical and community colleges. Many of these schools have little to no endowment, lack D1 athletics, and focus on classroom teaching over laboratory research. For these schools, the withdrawal of accreditation and subsequent loss of federal loan eligibility would be devastating.

At minimum, the Plaintiffs deserve the opportunity to prove through evidence that it would be devastating, and should at least survive at the motion-to-dismiss stage. Because if the loss of federal loans would be devastating, then the policy-making and regulatory decisions of the accreditor are essentially compulsory commands, and those policy choices should be made by democratically accountable

public officials at the Department of Education, not unaccountable employees of an unaccountable private nonprofit organization.

2. The government must exercise extensive, regular supervision and control over its delegates to ensure they respect rights and government policy.

In those instances where the government may legitimately authorize a private organization to perform a function on its behalf (to offer expertise or execute a ministerial task), the government must then exercise "pervasive surveillance and authority" over the delegate to ensure it sticks to its role, respects the rights of those it interacts with, and follows government policy. *Adkins*, 310 U.S. at 388; *Black*, 53 F.4th at 881; *Frame*, 885 F.3d at 1129.

What does "pervasive surveillance and authority" look like? While there is no magic formula or number of boxes to check, the Third Circuit in *Frame* gives a good summary:

> Board members are appointed by the Secretary, while members of both the Board and the Operating Committee may be removed "if the Secretary determines that the person's continued service would be detrimental to the purposes of the Act." The Board, as well as the Operating Committee, must give the Secretary notice of its meetings "in order that the Secretary or his representative may attend such meetings." In addition, the Board and the Committee

12

> are required to prepare an annual report to be made public, and the Board is required to submit to the Secretary for each fiscal period an audit of its activities. Furthermore, all budgets, plans or projects approved by the Board become effective only upon final approval by the Secretary. Similarly, no contracts for the implementation of any plans may be entered into without the Secretary's approval.

*Frame*, 885 F.3d at 1129.

Quite simply, few if any of these factors describe the U.S. Department of Education's relationship with college accreditors. Initial recognition is granted based primarily on a paper application that demonstrates an accrediting agency's internal policies, procedures, competence, and organization. Renewal is required once every five years. 34 C.F.R. § 602.31(a). Again, this is primarily a paper-application process that reviews an accrediting agency's internal policies, procedures, competence, and organization. 34 CFR § 602.32. Within the five-year window between renewals, the Department does not conduct oversight or surveillance unless it receives a credible complaint that an agency is failing in its duties. 34 C.F.R. § 602.33(a). Though evidence and expert reports are not necessary on a motion to dismiss, both the U.S. Department of Education's Office of Inspector General and the Center for American Progress, a DC-based think tank, have issued

13

reports in recent years faulting the lack of effective oversight by the Department on the accreditation commissions.[6]

Review of a paper application using cherry-picked examples conducted once every five years is not pervasive surveillance and control when compared with the standard set in *Frame*.

3. Self-interested industry participants cannot regulate their industry competitors.

Because impartiality is a core component of due process, *Morrissey v. Brewer*, 408 US 471, 489 (1972), self-interested industry participants cannot wield the powers of government over their industry competitors. *Carter Coal*, 298 U.S. at 311 ("obnoxious" to delegate power "to private persons whose interests may be and often are adverse to the interests of others in the same business"). They can offer advice and insight and recommendations that affect their industry competitors, but they cannot actively regulate their industry competitors. *Adkins*, 310 U.S. at 388.

---

[6] *U.S. Department of Education's Recognition and Oversight of Accrediting Agencies*, U.S. Dep't of Educ. Office of Inspector General (June 27, 2018), https://oig.ed.gov/sites/default/files/reports/2023-10/a09r0003.pdf; Antoinette Flores, *The Unwatched Watchdogs*, Center for American Progress (Sept. 19, 2019), https://www.americanprogress.org/article/the-unwatched-watchdogs/.

The college accreditation system is built upon peer review. As the United States acknowledges in its brief, "accreditors' substantive standards are developed with the participation of member schools, and those standards are enforced by decision-making bodies comprised of peers." Motion to Dismiss at 15. If those industry competitors fail a college they are reviewing, it can be the death knell for that institution, as indicated above, because of the incredible power the government has granted to the private accreditation organizations. *See supra* pg. 10. This power granted by the government to industry competitors "whose interests may be and often are adverse to the interests of others in the same business" is incompatible with due process.

## CONCLUSION

The college accreditation cartel wields enormous power for one reason: they are the "gatekeepers" of federal financial aid, "prox[ies] for the federal department whose spigot [they] open[] and close[]." *Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. of Career Schs. & Colls.*, 44 F.3d 447, 449 (7th Cir. 1994).

For many schools, including public universities in Florida, the question of accreditation is a matter of life-and-death because of the laws, rules, and policy decisions of the United States to grant power to these accreditors. The Department of Education leverages its near-monopoly market power on financial aid to regulate *sub rosa* by trusting a small cartel of higher ed insiders to review and regulate their competitors. The result is widespread uniformity across the higher ed industry, as innovators and disruptors are squelched by the defenders of the status quo, who hold the purse strings on behalf of the federal government.

Florida has alleged facts sufficient to show that this cozy relationship between the Department of Education and the college accreditors amounts of a violation of the private nondelegation doctrine, which is a vital safeguard for transparency, democratic accountability, and constitutional rights.

Respectfully submitted,

/s/ *Edward M. Wenger*
Edward M. Wenger
    *Counsel of Record*
Fla. Bar No. 85568
Holtzman Vogel Baran
Torchinsky & Josefiak, PLLC
2300 N Street NW,
Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
emwenger@holtzmanvogel.com

Daniel R. Suhr[7]
Center for American Rights
747 N. LaSalle St., Suite 210
Chicago, IL 60654
dsuhr@americanrights.org

---

[7] *See* U.S. S.Ct. R. 34(f).

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 12th day of October, 2023, a true copy of the foregoing was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will which will serve it on all counsel of record.

/s/ *Edward M. Wenger*
Edward M. Wenger
