# Exhibit 1

Unopposed Brief of *Amici Curiae in Opposition to Defendant's Motion to Dismiss*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| STATE OF FLORIDA. | Case No. 23:cv-61188-RS |
| *Plaintiff,* | |
| v. | JUDGE RODNEY SMITH |
| MIGUEL CARDONA ET AL., | |
| *Defendants.* | |

**BRIEF OF *AMICI CURIAE***

**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**Table of Contents**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

I.    The Guidance Improperly Diminished Florida's Role in the Title IV Program
Integrity Triad .................................................................................................... 2

II.    The Guidance is Subject to Judicial Review Under the APA ............................ 4

A.    The Department Lacks Statutory Authority To Require Institutions To
Obtain Agency Approval Before Changing Accreditors Absent A Failure To
Show Reasonable Cause. .................................................................................... 6

B.    The Department Has No Statutory Authority to Demand More than
"Reasonable Cause" from Postsecondary Institutions Seeking to Change
Accreditors ......................................................................................................... 9

C.    Schools Complying with SB 7044 Are "Voluntary" Members of Accrediting
Agencies Within the Meaning of Section 1099b(a). ....................................... 11

III.    The Complaint Adequately States a Claim that the Gudiance Required
Negotiated Rulemaking and Public Notice and Comment ............................. 13

IV.    The Complaint Adequately States a Claim that the Guidance Violates the
APA. .................................................................................................................. 14

V.    The Department's Organization Act Bars it from Undermining Florida's
Accreditation Reform. ...................................................................................... 16

CONCLUSION .............................................................................................................. 18

TABLE OF AUTHORITIES

**Cases**

*Ams. For Prosperity Found. v. Bonta,*
141 S. Ct. 2373, 2386-87 (2021).................................................................................... 10

*Clayton Cty. v. FAA,*
887 F.3d 1262,1267 (11th Cir. 2018)............................................................................... 5

*Indep.t Petroleum Ass'n of Am. v. Babbitt,*
35 F.3d 588, 594 (D.C. Cir. 2001) ................................................................................... 5

*Nat'l Parks Conservation Ass'n v. Norton,*
324 F.3d 1229, 1236 (11th Cir. 2003 ............................................................................... 5

*United States Army Corps of Eng'rs Hawkes Co,*
136 S. Ct.1807 (2016)....................................................................................................... 5

**Statutes**

5 U.S.C. § 553(b). ........................................................................................................... 14

5 U.S.C. § 704 ................................................................................................................... 4

20 U.S.C. § 1070 ............................................................................................................... 3

20 U.S.C. § 1099b.................................................................................................... passim

20 U.S.C. § 3401 ............................................................................................................. 16

20 U.S.C. § 3403(a) ........................................................................................................ 17

20 U.S.C. § 3403(b) ........................................................................................................ 17

Ch. 2022-70, § 4, at 7, Laws of Fla ................................................................................. 1

Ch. 2023-82, § 11, at 14, Laws of Fla ............................................................................. 1

N.C. GEN. STAT. § 116-11.4 ............................................................................................ 4

P.L. 117-286 ................................................................................................ 2, 3

P.L. 89-329 ..................................................................................................... 3

P.L. 96-88, 93 Stat. 668 ................................................................................. 2

SB7044 ................................................................................................... passim

W. VA. CODE § 18B-4-7a ............................................................................... 4

**Other Authorities**

ALEXANDRA HEGJI, CONG. RSCH. SERV., R43826 AN OVERVIEW OF ACCREDITATION OF
    HIGHER EDUCATION IN THE UNITED STATES, (2020). ................................................. 3

DCL ID GEN-22-10, Guidance for Instituions Seeking Approval of a Request to
    Change or Add Accrediting Agencies (July 19, 2022) ............................................... 1

DCL ID GEN-22–11, Procedures for Instituions Seeking Approval of a Request to
    Change or Add Accrediting Agencies (updated Sept. 26, 2022) ................... passim

Federal Student Aid, Guidance for Schools Seeking New Accreditation (August 5,
    2016) ...................................................................................................... 8, 13

*Postsecondary Accreditation Cannot Become a Race to the Bottom*, Dep't. of Educ.
    Blog (July 19, 2022), ................................................................................. 15

U.S. Dept. of Educ. *Letter to Institutional Accrediting Agencies*, (July 19, 2022)..... 12

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................... 13

**Regulations**

34 C.F.R. § 600 ............................................................................................ 4

iv

34 C.F.R. § 603 ................................................................................................... 4

34 C.F.R. § 600.11 ............................................................................................. 9

34 C.F.R. Section 600.11(a)(1) ......................................................................... 7

34 C.F.R. § 600.11(a)(ii) .................................................................................. 10

34 C.F.R. § 602.14(a) ................................................................................. 11, 12

34 C.F.R. § 602.1(a) ........................................................................................ 16

34 C.F.R. § 602.11 ........................................................................................... 13

34 C.F.R. § 668 ................................................................................................. 4

34 C.F.R. § 682 ................................................................................................. 4

34 C.F.R. § 685 ................................................................................................. 4

34 C.F.R. § 690 ................................................................................................. 4

34 C.F.R. § 686 ................................................................................................. 4

34 C.F.R. § 691 ................................................................................................. 4

Sections 600.11(a)(1)(i) .................................................................................... 7

Sections 600.11(a)(1)(ii) ................................................................................... 7

## INTRODUCTION

After Governor Ron DeSantis signed SB7044 Ch. 2022-70, § 4, at 7, Laws of Fla; *see also* Ch. 2023-82, § 11, at 14, Laws of Fla. (amending SB 7044) on March 9, 2022, the bureaucratic machinery of the U.S. Department of Education (the "Department") quickly went to work to undermine the law by inventing new requirements that exceed its statutory authorization and mark a stark departure from its prior administration of the federal student aid program.  SB7044 seeks to ensure that students enrolled in Florida's state-supported universities and colleges receive a quality education by breaking up the monopoly exercised by a single accreditation agency, the Southern Association of Colleges and Schools Commission, over the accreditation of Florida's state-supported postsecondary institutions.  The law is a critical reform that challenges the status quo in higher education and the comfortable sinecures favored by the Department.

Within months of the enactment of SB7044[1] and hoping to discourage compliance with the law, the Department ignored notice-and-comment rulemaking requirements and rushed to use its favored policy-making vehicles: "rule by letter" and a blog. On July 19, 2022, the agency issued two Dear Colleague Letters to institutions of higher education, GEN-22-11 and GEN-22-10 ("DCLs"), as well as a letter to institutional accreditation agencies ("Accreditors Letter") and a blog post ("Post")(collectively, "Guidance").  As explained more fully below, the Guidance

---

[1] As originally enacted, the statute required schools to change accreditors every five years, but a 2023 amendment limited this to a one-time change.  Ch. 2022-70, § 4, at 7, Laws of Fla; *see also* Ch. 2023-82, § 11, at 14, Laws of Fla. (amending SB 7044)

1

violates the Higher Education Act, as amended ("HEA"), P.L. 117-286 (amending P.L. 89-329, 79 Stat. 1219), and ignores basic rulemaking requirements imposed by the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.  By attacking Florida's reform, the Department also violates the Department of Education Organization Act's ("DEOA"), P.L. 96-88, 93 Stat. 668  prohibitions against the agency directing and interfering with Florida's administration of its state universities and colleges.

## ARGUMENT

This Court has jurisdiction to hear Florida's APA claims, and the Complaint properly pleads a challenge under the APA to the Department's "rule by letter."  With the Guidance, the Department assumes a new role as gatekeeper of accreditation decisions made by Florida and other states in their capacity as sovereigns responsible for the education of their citizens.  Amici maintain that this is a significant policy shift for the Department — one that improperly seeks to diminish Florida as an equal member of the HEA program integrity triad, increases the Department's authority beyond its statutory limits, and ignores the procedural requirements of the APA.

## I.   THE GUIDANCE IMPROPERLY DIMINISHES FLORIDA'S  ROLE IN THE TITLE IV PROGRAM INTEGRITY TRIAD.

As a sovereign state, Florida is an equal member of the Title IV "program integrity triad" established by Congress in the HEA, alongside (and not subject to) the Department and the accreditation agencies.  Amici are gravely concerned that the Department aims to use the Guidance to leverage its oversight of accreditation agencies  and  management  of  the  federal  student  aid  program  in  a  way  that

improperly reduces the role of the states in the accountability triad so as to undermine needed reforms in higher education.

State authority within the triad provides a balance within the federal scheme to assure students of the quality of postsecondary institutions eligible to receive financial aid under Title IV of the HEA. 20 U.S.C. § 1070 *et seq.*  This statutorily mandated balance is intended to ensure that the Department does not become the ultimate arbiter over how public and private postsecondary institutions are managed and run for the benefit of students, parents, and taxpayers.  As one authority has explained, "The United States does not have a centralized authority exercising singular national control over postsecondary educational institutions." *See* ALEXANDRA HEGJI, CONG. RSCH. SERV., R43826 AN OVERVIEW OF ACCREDITATION OF HIGHER EDUCATION IN THE UNITED STATES (2020).

Congress was clear about the Department's two primary responsibilities in the HEA program integrity triad: to ensure the "administrative capacity and financial responsibility" of participating Title IV institutions and the quality of independent higher education accreditors. Higher Education Act of 1965, P.L. 89-329, (as amended through P.L. 117-286).  The Guidance far exceeds this authority and is an affront to the balanced triad envisioned by Congress.

In issuing the Guidance, the Department acts as though Florida and other states have ceded their authority to unelected officials within the federal government for the management and quality of their states' public postsecondary institutions. The Department has no authority to question or circumscribe Florida's decision to

3

dictate the timing of the process that its colleges and universities use to obtain and maintain accreditation.

Florida is not an outlier.  States across the country have issued a variety of accreditation-related mandates for their state-supported postsecondary institutions, perhaps ironically in large measure due to pressure from the Department for states to take a stronger role in the HEA program integrity triad.  *See, e.g.,* N.C. GEN. STAT. § 116-11.4 (prohibiting University of North Carolina constituent institutions from maintaining consecutive membership with accreditation agencies) and W. VA. CODE § 18B-4-7a (removing the requirement that West Virginia institutions seek accreditation only from the North Central Association and freeing them to seek accreditation from any Department-recognized accreditation agency).  Indeed, the Department published regulations on October 29, 2010, requiring states to take a more active role as members of the triad.  *See* 34 C.F.R. §§ 600-03, 682, 685-86,  668, 690-91(Oct. 29, 2010).  The Department's capricious targeting of SB 7044, passed by a democratically-elected legislature and signed by a democratically-elected governor, ventures well beyond any statutory authority and sets a dangerous precedent for the Department to undermine state authority by picking winners and losers based on whether the current administration favors a state's valid policy choices and political climate.

## II.    THE GUIDANCE IS SUBJECT TO REVIEW UNDER THE APA.

Federal courts cannot review an administrative action that is not "final" within the meaning of 5 U.S.C. § 704.  *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d

1229, 1236 (11th Cir. 2003); *Indep.t Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001). "The core question [in determining finality] is whether the agency has completed its decisionmaking process and whether the result of that process is one that will directly affect the parties." *Norton*, 324 F.3d at 1236. "By contrast, the Supreme Court has defined a non-final agency order as one that 'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *Id.* at 1237.

Whether the Guidance established a new interpretation or merely restated the Department's earlier interpretation matters because a final, reviewable agency action is "one by which rights or obligations have been determined, or from which legal consequences will flow." *United States Army Corps of Eng'rs Hawkes Co*, 136 S. Ct.1807, 1813 (2016) (quotation marks omitted). "An agency's restatement of an already-existing policy or interpretation does not, on its own, determine any rights or obligations and imposes no legal consequences." *Clayton Cty. v. FAA*, 887 F.3d 1262,1267 (11th Cir. 2018).

The Guidance clearly constitutes final administrative action under Section 704. The Guidance is not "preliminary" or "tentative." The Department is clear that adverse administrative actions will result from any failure to comply with the terms of the Guidance, whatever Florida law might require. Proof of the agency's intentions is the explicit requirement in DCL GEN-22–11 that universities transitioning to new accreditors when the Department issued the DCL "immediately" inform the Department. This language underscores an abrupt shift in the Department's

5

interpretation of the applicable authorities and the guidance it gave in 2016  no longer governs.  GEN-22-11  Moreover, rather than "merely restat[ing] existing obligations," as the Department asserts, Defendant's Motion to Dismiss at 26, the Guidance revamps the process for changing accreditors in at least three significant ways, as discussed *infra*.

Due to the enormous risk to institutions arising from a loss of institutional eligibility to participate in the Title IV student loan program, the Guidance is already having its calculated effect.  Florida's public educational institutions are left asking for the Department's approval to switch accreditors in the face of SB 7044, which requires that they switch accreditors whatever the Department's view.  Failure to obtain the Department's approval places the institution's Title IV eligibility at risk; ignoring SB 7044 risks violating state legal requirements for public universities and colleges.

As the Department knows, Florida educational institutions cannot risk the adverse actions threatened in the Guidance; the prospect of losing federal funding is sufficiently grave that schools must accede to the Department's wishes in the Guidance.  This chilling effect is why Florida seeks  relief now and demonstrates that the case is ripe for judicial review.

> ### A. The Department Lacks Statutory Authority To Require Institutions To Obtain Agency Approval Before Changing Accreditors Absent A Failure To Show Reasonable Cause.

"[R]evok[ing] and supersed[ing]" guidance the Department provided in 2016 (the "2016 Guidance"), DCL GEN 22-11 "**updates** the procedures [under Section

1099b(h)] by requiring an institution to submit the required documentation to the Department **prior to** submitting an application to a new accrediting agency." GEN-222-11 (emphasis added)] DCL-GEN 22-11 advises that "institutions [which] have begun the process of changing or adding an accrediting agency and relied on the 2016 [Guidance] . . . must immediately inform the Department consistent with the procedures described" in it. *Id.*

From July 1992, when it first promulgated regulations governing a change in accreditors under 20 U.S.C. Section 1099b(h) the Department understood this to impose a requirement for institutions to notify the Department upon seeking a change of accreditors. The Department, accreditation agencies, states, and institutions each understood this for the simple reason that nowhere does Section 1099b(h) authorize the Department to "pre-approve: a change in accreditors. Section 1099b(h) merely instructs schools seeking to move from one accreditation agency to another to "submit[] to the Secretary all materials relating to the prior accreditation, including materials demonstrating reasonable cause for changing the accrediting agency or association." Echoing Section 1099b(h), 34 C.F.R. Section 600.11(a)(1) directs schools to send the Secretary "[a]ll materials related to its prior accreditation" and "[m]aterials demonstrating reasonable cause for changing its accrediting agency." Sections 600.11(a)(1)(i), (ii).

The Department confirmed this understanding in its "Guidance for Schools Seeking New Accreditation," which "remind[ed]" postsecondary institutions "how to apply to the Department" to change accreditors. Federal Student Aid, Guidance for

Schools Seeking New Accreditation (August 5, 2016), https://tinyurl.com/fkf2jwva. The 2016 Guidance was the procedural process institutions were required to undertake when seeking new accreditors. *Id.* The Department advised schools "to notify [it] in writing . . . as soon as possible when the institution begins the process of obtaining a new accrediting agency" and, with its notification, provide "documentation of its current accreditation" and "demonstrate a reasonable cause for changing its accrediting agency." *Id.* The 2016 Guidance stated that the institution was also required to notify the Department later after securing accreditation with the new agency. *Id.*

The 2016 Guidance said nothing about needing Department approval before an institution could change accreditors, which is not surprising because Section 1099b(h) requires no such thing. The statute anticipates that an institution will already have begun the process of changing accreditors at the time it provides notice by requiring documentation of their "**prior** accreditation." Similarly, the 2016 Guidance stated that notice need only be provided "as soon as possible when" – that is, **after** – the school has applied to the new accreditor. *Id.*

In 2016, the Department recognized that providing notice and documentation under Section 1099b(h) was a relatively mundane procedure, not a high hurdle to discourage a change of accreditors. The Guidance expressly "revoke[] and supersede[]" the 2016 Guidance, representing an unmistakable shift in Department policy. GEN-DCL 22-11 at 1. And in a clear shot across the bow of states like Florida that contemplate accreditation reform, the Guidance warns that following the

Department's new directions "will help protect institutions from an inadvertent loss of Title IV eligibility." GEN-DCL 22-11, at 2

Nonetheless, the Department contends that pre-approval is nothing new "since the underlying regulation already made clear that the Secretary does not recognize the accreditation of an institution that is **in the process of changing**, unless it provides materials showing reasonable cause **and receives approval**, 34 C.F.R. § 600.11.  DCL GEN-22-11 thus implemented this existing requirement." Defendant's Motion to Dismiss at  n.18 at 30 (emphasis original).  As alleged in the Complaint, this would be a change in practice by the Department. *See, e.g.* Complaint ¶ 102, at 29.

## B. The Department Has No Statutory Authority to Demand More than "Reasonable Cause" from Postsecondary Institutions Seeking to Change Accreditors.

The Department's demand in DCL GEN-22-11 for information and documentation from postsecondary institutions as part of the pre-approval process for accreditor changes exceeds its authority under 20 U.S.C. § 1099b(h), which merely requires that when a postsecondary institution changes accreditors, it must notify the Secretary and submit documentation demonstrating "reasonable cause" for the change.  Exercising its sovereign authority and as a co-equal member of the HEA's program integrity triad, Florida has directed its public postsecondary institutions to change accreditors once.  This directive is itself "reasonable cause" within the terms of 20 U.S.C. § 1099b(h) for colleges and universities to change accreditors. The Department's regulations identify two situations where cause cannot be "reasonable,"

and both concern institutions trying to avoid sanctions by their accreditors. *See* 34 C.F.R. § 600.11(a)(ii).  Neither has any relevance to SB7044, which requires only a one-time change for all Florida public institutions.  Thus, reasonable cause should exist presumptively, at the least, for changes under SB7044, and there is no valid purpose for holding up the entire process waiting for the Department.

The Department further exceeds its Section 1099b(h) authority by erecting new hurdles to a showing of "reasonable cause."  For example, requiring that a postsecondary institution submit "any substantive correspondence or other communications with the new accrediting agency, including any substantive correspondence or other communications with the agency relating to the institution's planned application," DCL GEN 22-11 has nothing to do with the terms of the statute, which simply directs institutions to send information on their prior accreditation and reasonable cause for changing.  There is no basis in the statutory text for the Department to launch a fishing expedition through an institution's communications with a new accreditor to see whether some possible impropriety may have occurred.[2]

Similarly, "reasonable cause" should not depend on "[w]hether the proposed change of agencies or multiple accreditations[3] would strengthen institutional quality" or "[w]hether the institution is seeking to change agencies or seeking multiple accreditations because the new agency and its standards are more closely aligned with the institution's mission than the current accrediting agency," which

---

[2] The Supreme Court has frowned upon this kind of regulatory voyeurism as infringing upon constitutional rights.  *See Ams. For Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386-87 (2021).

[3] Although schools are allowed to become accredited by more than one agency, the overwhelming majority do not.  In any event, multiple accreditation is not relevant to a change under SB 7044.

10

DCL GEN-22-10 sets forth as factors the Department will now consider under Section 1099b(h).   Such considerations have no statutory basis, and simply increase the Department's ability to exercise discretion that the statute does not give it.

### C.  Schools Complying with SB 7044 Are "Voluntary" Members of Accrediting Agencies Within the Meaning of Section 1099b(a).

Under 20 U.S.C. § 1099b(a)(2) and 34 C.F.R. Section 602.14(a), the Department recognizes only accreditation agencies with "voluntary membership" of schools. The Guidance sets forth a new understanding of "voluntariness" and signals that the Department intends to withdraw recognition from accreditors accepting requests from Florida schools complying with SB 7044. A one-time change pursuant to state statute does not cause the relationship between accreditor and postsecondary institution to somehow become "involuntary," especially given that accreditation is hardly voluntary as a practical matter.

Moreover, as the Complaint alleges, the "voluntary membership" requirement "merely makes clear that neither the federal government nor accrediting agencies may force institutions to participate – not that States are prohibited from running their own institutions.  *See* 20 U.S.C. § 1099b(a) (listing 'voluntary membership' as a requirement for accrediting agencies, not institutions)," Complaint, ¶ 146, at 38; *see also id.* ¶ 100, at 28-29; that is, under the HEA, schools could not be forced by the Department or agencies to be accredited in order to operate.  The requirement has nothing to do with complying with state law.

Unlawfully expanding its statutory role, the Department now makes a specific finding of "voluntariness" a prerequisite for institutions to change accreditors under

Section 1099b(h), when it should only be a prerequisite to recognition of an accreditor under Section 1099b(a).

Purporting to clarify Section 602.14(a), the Accreditors Letter states that a "voluntary association is intended to engender a willing and cooperative environment for the review and improvement of educational programs at American institutions of higher education." U.S. Dept. of Educ. *Letter to Institutional Accrediting Agencies*, (July 19, 2022), https://tinyurl.com/4t9w8xjt   at 1 (citing 20 U.S.C. § 1099b(a)(2) (1994)). The Accreditors Letter then accuses Florida's SB 7044 of "potentially undermin[ing] the voluntary nature of the relationship and the independent roles of the various actors in the triad." *Id*, at 2. In light of the new Florida law, the Department states, it "has **reexamined** the issue of voluntary membership in two circumstances: [1] when institutions seek to change accrediting agencies (or seek multiple accreditation) and [2] when the Department reviews accrediting agencies as part of its recognition process." *Id.* (emphasis added).  Although it had traditionally considered "voluntary membership" only in the latter circumstance, the Department will now do so in the former as well.

Furthermore, the Accreditors Letter states that even when the Department finds reasonable cause to change, accrediting agencies still must **"conduct their own independent evaluation of whether an institutional change of accrediting agencies (or multiple accreditation) is voluntary"** to determine "whether accrediting an institution will compromise the voluntary nature of their

membership **prior to** approving a membership application." *Id.* at 2 (emphasis in original)

SB 7044 merely requires that Florida's public colleges and universities change accreditors once, and the choice of which agency it will apply to for accreditation belongs entirely to the institution.  If the accreditation process were "voluntary" in the way that the Guidance means, then how could the Department have restricted schools from accreditation by agencies outside their geographic regions, as it did for years before the 2019 amendments to 34 C.F.R. § 602.11?[4]  The Guidance cannot define as "involuntary" compliance with state statutes that the Department dislikes, while finding that compliance with federal law (at least, as pronounced by the Department) is "voluntary."

### III.  THE COMPLAINT ADEQUATELY STATES A CLAIM THAT THE GUIDANCE REQUIRED NEGOTIATED RULEMAKING AND PUBLIC NOTICE AND COMMENT.

The Department demands a level of substantiation and evidence that Federal Rule of Civil Procedure 12(b)(6) does not require. As the case moves forward, Florida can introduce evidence demonstrating the substantial burdens placed on its schools by the Guidance.  For the purpose of the Department's motion to dismiss, the Complaint adequately alleges that the Guidance is not merely interpretive, but a body of substantive, "legislative" rules that ignore the negotiated rulemaking

---

[4] If the Department wants to return to the regional accreditation monopolies it eliminated in its 2019 rulemaking, it must do so through negotiated rulemaking and not make legislative rules by issuing desk edicts through guidance.

requirements of the HEA, and the notice and comment requirements of the APA, 5 U.S.C. § 553(b).

Rather than simply reiterate pre-existing requirements, the Guidance imposes new obligations on schools and their accreditors, aggrandizes the Department in an unauthorized accreditation gatekeeper role, and undermines efforts by Florida and other states to ensure a quality education for students attending public university and college systems.

The Department also lamely asserts that Florida fails to adequately support its allegation that the "reasonable cause" requirements are difficult to satisfy, describing the factual allegations as "vague." Defendant's Motion to Dismiss at 29. However, it is clear from the face of the complaint why notice and comment are required. *See, e.g.,* Complaint ¶ 153, at 39 (the Guidance "'affect[s] individual rights and obligations' because they add requirements for institutions that wish to change accreditors and obligate accrediting agencies to police those requirements").

## IV.   THE COMPLAINT ADEQUATELY STATES A CLAIM THAT THE GUIDANCE VIOLATES THE APA.

Contrary to the Department's contention, *see* Defendant's Motion to Dismiss at 29-30, the Complaint properly states a claim that the Guidance misconstrues the "voluntary membership" requirement for accreditor recognition under Section 1099b(a). The Complaint clearly cites the Department's longstanding interpretation that the purpose of the "voluntariness" requirement under the HEA was to ensure that the Department and accreditors did not force schools to become accredited in order to operate; participation in Title IV programs is not mandatory. *See* Complaint,

¶ 146, at 38.   The evidence will show that prior to the issuance of the Guidance, Department practice was consistent with this interpretation.

Similarly, the Complaint properly alleges that the Guidance is an arbitrary and capricious departure from past Department policy and practice when institutions change accreditors.   Complaint, ¶149, at 39.   The Department complains that it has no idea what "past practice" Florida is referring to but, as alleged in the Complaint, *see, e.g.,* Complaint, ¶¶ 39-40, at 22; *id.,* ¶¶ 100-102, at 28-29, and described in more detail *supra*, the Department's role before the Guidance was much more limited and consistent with Section 1099b(h).

The Complaint also adequately alleges that the entire rationale for the Guidance is arbitrary and capricious.  *See* Complaint ¶ 150, at 39; *see also id.* ¶ 103, at 29-30.   In its Post, "Postsecondary Accreditation Cannot Become a Race to the Bottom," the Department explains that the goal of the Guidance is "to prevent a race to the bottom in quality standards among accrediting agencies and ensure that institutions cannot switch to an accrediting agency with less rigorous standards simply to evade accountability from an accrediting agency that investigates practices or takes corrective action against an institution."   *Postsecondary Accreditation Cannot Become a Race to the Bottom*, Dep't. of Educ. Blog (July 19, 2022), https://tinyurl.com/yc26rhnz . The Post states twice that the purpose of the Guidance is "to ensure that all institutions are held to high standards." *Id.*

Although a clever catchphrase, the notion that the Department seeks to prevent a "race to the bottom" is meaningless because **the Department itself is**

**responsible** for recognizing accreditors as "reliable authorit[ies] as to the quality of education or training offered" by postsecondary institutions in order to receive federal funding under Section 1099b(a); *see also* 34 C.F.R. § 602.1(a)   (Department "recognizes accrediting agencies to ensure that these agencies are . . . for . . . Federal purposes, reliable authorities regarding the quality of education or training offered by the institutions or programs they accredit").   To the extent an accreditor is "racing to the bottom" in order to attract schools, the Department can simply exercise its oversight authority granted by Congress to limit, suspend, or terminate recognition of recalcitrant accreditation agencies.   Where an institution demonstrates "reasonable cause," the applicable authorities only require notification to the Department, not its approval.   The approval requirement imposed by the Guidance is  not legally supported by Section 1099b(h).

## V.   THE DEPARTMENT'S ORGANIZATION ACT BARS IT FROM UNDERMINING FLORIDA'S  ACCREDITATION REFORM.

In addition to HEA and APA deficiencies, the Guidance also violates the Department of Education Organization Act (the "DEOA"), 20 U.S.C. § 3401 *et seq.* (Pub. L. 96-88, Oct. 17, 1979), which established the Department in 1979.

The DEOA expresses Congress's clear intention to circumscribe the Department's power to prevent it from interfering with a state's lawful exercise of policymaking in education:

> It is the intention of the Congress in the establishment of the Department to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies and administration of programs and to strengthen and improve the control of such governments and institutions over their own educational programs and policies. The

> establishment of the Department of Education **shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States** and the local school systems and other instrumentalities of the States.

20 U.S.C. § 3403(a) (emphasis added).

Along with this express reservation of authority to state and local government, the DEOA establishes affirmative boundaries on the Department's power:

> No provision of a program administered by the Secretary . . . shall be construed to authorize the Secretary . . . **to exercise any direction, supervision, or control over the . . . administration . . . of any educational institution, school, or school system, [or] over any accrediting agency or association** . . . except to the extent authorized by law.

20 U.S.C. § 3403(b) (emphasis added).

By attacking Florida's efforts to improve its public colleges and universities by reforming the process through which they are accredited, the Department ignores the clear legislative mandate that it wield federal power only in support of state and local policymaking authority and "to strengthen and improve" state control over educational programs and policies. The Department's interference with Florida's authority over its public higher education system is unlawful and portends a much more muscular agency approach to undermining state higher education policy with which the current Administration disagrees, notwithstanding the limits on federal authority set forth in the DEOA.

By threatening accreditors with withdrawal of federal recognition if they fail to carry out the Department's priorities in opposing SB 7044, the Department similarly violates the DEOA's prohibition on supervising or controlling the administration of accrediting agencies or associations. In its desire to hamstring the

17

implementation of the Florida law, the Department trespasses on the authority of the other two co-equal members of the program integrity triad:  the states and accrediting agencies. This overreach by the Department in the Guidance violates the DEOA.

## CONCLUSION

Amici respectfully request that this Court deny the motion to dismiss.

Dated: October 13, 2023                    Respectfully submitted,

/s/ *David R. Osborne*
David R. Osborne
Fla. Bar ID #70186
Email: dosborne@goldsteinlp.com
GOLDSTEIN LAW PARTNERS, LLC
4651 Salisbury Road, Suite 400
Jacksonville, FL 32256
Telephone: 610-949-0444
Facsimile: 215-257-1910

*Counsel for Proposed* Amici

/s/ *Donald A. Daugherty, Jr.*
Donald A. Daugherty, Jr.*
1455 Pennsylvania Avenue, N.W.
Suite 400
Washington, DC  20004
Telephone:  (414) 559-6902
Email:  Don.Daugherty@dfipolicy.org

/s/ *Martha Angelique Astor*
Martha A. Astor (Fl. Bar #1039011)*
323 S. Washington Avenue
Suite 9
Titusville, FL 32796
Telephone: (321) 390-2707
 Email: Martha.Astor@dfipolicy.org

*Counsel for Proposed* Amici

*Motion to Appear Pro Hac Vice pending

18