IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| STATE OF FLORIDA,<br><br>Plaintiff,<br><br>v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of Education, *et al.*,<br><br>Defendants. | No. 0:23-cv-61188 |

**<u>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

Florida has brought a sweeping challenge asking this Court to declare unconstitutional a key aspect of the Federal student-financial-aid system that has existed for more than fifty years. In its Motion to Dismiss, the U.S. Department of Education established that each of Florida's claims fails as a matter of law and that the Court lacks jurisdiction to consider the state's Administrative Procedure Act ("APA") claim because Florida does not challenge any final agency action. Florida's opposition to the Department's motion fails to engage substantively with either the complex legal framework governing access to Title IV funds or with the specifics of the accreditation system. Its portrayal of higher-education accreditors as usurping state power over education and unconstitutionally wielding federal legislative power finds no support in the statutory and regulatory framework governing that system, and Florida's legal arguments are unmoored from binding authority. Florida's complaint should be dismissed in its entirety.

ARGUMENT

I. There is no delegation of "government power" to higher-education accreditors because their role has always been, and remains, a private function.

The Department's Motion demonstrated that Florida's private nondelegation challenge rests on a fundamental fallacy. Higher education accreditation in the United States has always operated through a network of private, voluntary-membership organizations that use cooperative peer-review processes to ensure educational quality. Defs.' Mot. to Dismiss Pl.'s Compl., ECF No. 12-2, ("Mot."), at 14-16. Because that role has never been a federal one, Congress has not delegated to accreditors any "government power" whatsoever. Florida's response ignores those first principles and fails to cite any authority supporting its argument that Congress can unconstitutionally delegate authority that did not rest with Congress to begin with. What Florida calls a concession by the Department—that it "do[es] not supervise accrediting agencies," *see* Florida's Resp. to Defs.' MTD, ECF No. 19, ("Resp."), at 4—is instead a central feature of the system. Accreditors are not "supervised" by the federal government because they are private actors without any governmental authority, and Congress's

1

instruction that the Department should rely on the decisions of certain private accreditors as one factor in determining Title IV eligibility does not transform that role into an exercise of federal power.

As explained in the Department's motion (12-16), Congress can only delegate power that it first possesses. Florida dismisses the fact that setting substantive educational standards has never been a federal function and contradicts itself by arguing simultaneously that Congress has, in fact, delegated government power to private accreditors (Resp. 3-4) while maintaining that "the federal government should not be establishing national education standards," *id.* at 2. Florida does not explain how it thinks Congress can delegate power that does not originate with the federal government, although it seems to suggest that Congress somehow has usurped state power over higher education by unlawfully delegating *state* power to private actors. *Id.* at 4. This convoluted argument holds no water: Florida fails to identify any analogous authority in which a court found Congress to have unlawfully delegated authority it didn't possess in the first place. It is especially apparent that Congress cannot "delegate" to private parties power that the parties already possessed. Furthermore, incorporation of the decisions of dozens of non-federal accreditors as one aspect in determining Title IV eligibility in no way prevents Florida—or any other state—from regulating state education. *See* 20 U.S.C. § 3403(a), (b) (preserving state authority over education). Besides, as explained in the Department's motion, Florida's legislature has *incorporated* federally recognized accreditation throughout its own educational and professional licensure codes, Mot. 7-8, so its public colleges and universities will need to maintain accreditation for state purposes regardless of the outcome of this case.[1] Florida also ignores the critical fact that its schools can change accreditors or work to modify standards found problematic.

Notwithstanding its framing of accreditors' education standards as a usurpation of state authority, Florida seems to recognize that it can only establish a private nondelegation violation by

---

[1] Florida's response does not dispute—or even acknowledge—that its legislature has recognized the value of accreditation by incorporating the decisions of federally recognized accreditors for a multitude of state purposes.

2

identifying some unlawful grant of *federal* power and, to that end, argues that "setting conditions for participation in Title IV and enforcing those conditions are both exercises of government power." Resp. 4. But Florida has not cited any case standing for the proposition that determining some threshold eligibility metric necessary to participate in a federal program is an inherently federal function. Instead, Florida cherry-picks language from cases that arose in vastly different contexts analyzing distinct legal issues. For instance, Congress's ability to indirectly regulate through the Spending Clause is well established but irrelevant to the question whether private accreditors exercise federal power, yet Florida relies almost exclusively on Spending Clause jurisprudence that has no pertinence to identifying private exercises of regulatory power. *See* Resp. 4-5 (citing *South Dakota v. Dole*, 483 U.S. 203 (1987); *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014); *United States v. Dierckman*, 201 F.3d 915 (7th Cir. 2000); *West Virginia by and through Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018)); *see also* Resp. 6 (relying on inapposite Appointments Clause authority). That Congress *can* regulate through spending says nothing about whether a government agency can incorporate the certification decisions of numerous private groups as one aspect in determining eligibility for a federal program; none of these authorities establish a relevant test for identifying an exercise of legislative authority.[2]

More fundamentally, accreditors simply do not determine eligibility for federal funding. In a case Florida ignores, the Eighth Circuit rejected an argument that private accreditors "determin[e] eligibility for federal funds," explaining that instead "[w]hat is at issue are private actions to which the government responds" by determining ultimate eligibility. *Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d 1310, 1312-14 (8th Cir. 1987). And as shown in the Department's Motion (16-

---

[2] Among cases on which Florida relies, only Justice Thomas's concurrence purports to set forth such a test, and it explains that "the core of the legislative power … is the power to make 'law' in the Blackstonian sense of generally applicable rules of private conduct." *See Dep't of Transp. v. Ass'n of Am. R.R.s* ("*Amtrak II*"), 575 U.S. 43, 76 (2015). The member-determined educational standards of the many dozens of federally recognized accreditors are a far cry from Blackstonian sources of generally applicable law.

3

17), Title IV funds are awarded *to students*, not to schools or to states, and participating institutions must serve as fiduciaries of their students' funds. 34 C.F.R. § 668.82(a). As for eligibility of postsecondary institutions to later accept those funds as payment, schools must satisfy a huge range of substantive obligations apart from accreditation, *see, e.g.*, 20 U.S.C. § 1094(a); 20 U.S.C. §§ 1001-1011l; 20 U.S.C. § 1099c; 34 C.F.R. Part 600; 34 C.F.R. Subpart L; 34 C.F.R. § 668.16, and *the Department* determines compliance with those obligations. Accreditors have no final decisionmaking authority regarding eligibility for federal funds. As recognized explicitly by one of the cases on which Florida relies, "[a] governmental body may rely on the decisions of a private association without turning that association into 'the government' itself," and the Department is the ultimate decisionmaker on eligibility. *Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. of Career Schs. & Colls.*, 44 F.3d 447, 449 n.1 (7th Cir. 1994).[3] And as for accreditation, the only relevant "condition" on eligibility to participate in Title IV is that schools maintain accreditation through their choice of accreditors. Florida's insistence that "every educational standard set by [one of many] accrediting agenc[ies]" constitutes an "improper exercise of legislative power" is specious, *see* Resp. 5, particularly since institutions select the accreditor with which to form a voluntary association.

Contrary to Florida's theory of the case, federal law regularly assigns limited authority to private parties, and there is nothing particularly novel about Title IV's requirement that participating

---

[3] Florida cites dicta from the background of *Chicago School*, describing accreditation as "open[ing] and clos[ing]" the Department's "spigot," and claims this "is plainly an exercise of government power." *See* Resp. 4. That portrayal is contradicted by the context from which Florida plucked its quote since, in the same passage, Judge Easterbrook explained that accreditation functions "as a sort of license or certificate" and that nothing in the opinion should "imply that an accrediting agency is a 'state actor' or 'federal actor.'" 44 F.3d at 449 & n.1. Besides, the discussion was analyzing the choice of law under which to review an accreditor's nonrecognition decision and was not analyzing accreditors' role in the broader Title IV scheme.
Equally unsupported is Florida's assertion that "multiple courts of appeals have described the power accreditors wield in enforcing their standards as 'delegated' government power." Resp. 6 (citing *Thomas M. Cooley L. Sch. v. ABA*, 459 F.3d 705, 712 (6th Cir. 2006) and *Prof'l Massage Training Cntr.*, 781 F.3d at 170). Florida cites what is essentially stray language using "delegate" in common parlance to mean "to entrust to another." *Delegate*, MERRIAM WEBSTER. Neither opinion was analyzing delegated authority in the *constitutional* sense.

institutions maintain accreditation through a recognized agency. Securities brokers and dealers must register with the SEC and maintain membership in a national securities association, 15 U.S.C. § 78o(a)(1), (b)(1); those associations are private entities that establish rules and standards with which members must comply. Numerous federal statutes require private parties to comply with "generally accepted accounting principles," *e.g.*, 20 U.S.C. § 1099c(3)(C); 15 U.S.C. § 78m(b)(2)(B)(ii); 25 U.S.C. § 3304(c)(2)(A); 42 U.S.C. § 300ee-15(b)(4); those principles are not set by the government, but rather "are the official standards adopted by … a private professional association." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 159 n.4 (2d Cir. 2000). Similar grants of authority are found in many other contexts. As the D.C. Circuit observed, "[a]cross a diverse array of commercial and industrial endeavors, from paving roads to building the Internet of Things, private organizations have developed written standards" for various purposes, and "[f]ederal, state, and local governments [] have incorporated by reference thousands of these standards into law." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 440 (D.C. Cir. 2018). Congress explicitly *has encouraged* federal agencies to do so. *See* 15 U.S.C. § 272(b)(3) (urging agencies to use "where possible the use of standards developed by private, consensus organizations"). *See* 15 U.S.C. § 2225(a)(1) (requiring smoke detectors in places of public accommodation be "installed in accordance with National Fire Protection Association Standard 74"); 15 U.S.C. § 2056b(a) (toys must meet safety standard set by American Society of Testing and Materials). Were Florida correct that a nondelegation violation occurs anytime the standards of a private organization are incorporated for some federal purpose, or otherwise used to bind private parties, all of these statutes could be unconstitutional.

Finally, Florida also seeks to analogize the role of private accreditors to that of coal producers in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), *see* Resp. 5-6, but once again its portrayal elides critical aspects of the accreditation scheme. In *Carter Coal*, Congress had granted private industry power to fix prices and maximum labor hours for competitors—a power that infringed directly on private rights

5

and bears no resemblance to accreditors' role in cooperatively determining minimum educational standards. *Id.* at 310-12. The authority at issue in *Carter Coal* derived directly from an act of Congress, whereas private accreditors operated long before Congress created the federal-student-aid programs and accreditation is vital to colleges and universities for reasons unrelated to Title IV eligibility. The producers exercising legislative power in *Carter Coal* had a monopoly over one or more districts and could exercise that power over "an unwilling minority," *id.* at 311, while there are numerous accreditors among which schools can choose, all of which maintain a voluntary membership, and none of which exercise exclusive compulsive power. An "unwilling" institution can change accreditors (or, as Florida has shown, a state can require its institutions to do so—willing or not). Most importantly, perhaps, the actual power granted to private industry in *Carter Coal*, to determine prices and labor-hours, resided with Congress in the first place,[4] whereas it has never been the role of the federal government to superintend the teaching standards for higher education programs, and accreditation standards don't "bind" any school, *contra* Resp. 6. Florida's response does not grapple with any of these facts.[5]

II. <u>The heads of dozens of private, nonprofit entities are not "federal officers" subject to the Appointments Clause.</u>

Florida's Appointments Clause claim is entirely derivative of its private nondelegation claim and fails for the same reason—heads of private accrediting agencies do not wield any federal power, much less "significant authority pursuant to the laws of the United States on a continuing basis," *contra* Resp. 7 (citation omitted). The Department's opening brief demonstrated that this claim fails for the additional, threshold reason that accrediting-agency heads do not hold public office and thus cannot

---

[4] Congress has a long history of imposing price and labor restrictions, *e.g.*, Food and Fuel Control Act (Lever Act), Pub. L. No. 65-41, 40 Stat. 276 (1917); Pub. L. No. 77-421, 56 Stat. 23 (creating Office of Price Administration).

[5] Florida's comparison of private accreditors to Amtrak, Resp. 5, fares just as poorly. "Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit." *Amtrak II*, 575 U.S. at 51-54. It also was granted explicit authority "to create legally binding rules" for an entire industry. *Id.* at 91 (Thomas, J., concurring). Accrediting agencies bear no resemblance to that structure and, once again, Florida does not attempt to address these distinctions.

6

be deemed officers subject to the Appointments Clause. Mot. 19-20.

In response, Florida does not contest "the fact that heads of accrediting agencies do not hold public office." Resp. 7. Rather, Florida claims this is not a requirement. But it is well-established that "the constitutional definition of an 'officer' encompasses, at a minimum, a continuing and formalized relationship of employment *with the United States Government*," *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc) (emphasis added); *see also U.S. ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) (finding position "without tenure, duration, continuing emolument, or continuous duties" "is not an 'officer' within the meaning of the Appointments Clause") (citation omitted). The Department cited numerous binding and persuasive authorities to support the proposition that the Appointments Clause applies only to those holding public office, Mot. 19-20. Florida's only response is to claim that "the cases cited by Defendants analyze formal employment as *evidence* that a person has a 'continuous' relationship with the government, not as a *precondition* to officer status." Resp. 8. But that is incorrect, as evidenced by the Fifth Circuit's *en banc* holding that private parties were not officers because they "do not draw a government salary and are not required to establish their fitness for public employment." *Riley*, 252 F.3d at 758; *accord Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 160 (4th Cir. 2018); *Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1365 (9th Cir. 1986).[6]

Furthermore, Florida incorrectly asserts that "there can be no dispute" that accrediting agencies' heads exercise "continuous" duties, Resp. 8. But the statutory scheme does not depend on any individual accreditor; new accreditors may be recognized by the Department at any time;

---

[6] Florida also points to a 2007 opinion from the Office of Legal Counsel and charges that "Defendants' brief, although filed by the Department of Justice, does not even appear to accurately state the Department of Justice's own views." Resp. 8. Not so; the Department of Justice has presented the *exact same* argument presented here in numerous recent filings. *E.g.*, *Kim v. FINRA, Inc.*, No. 23-cv-2420 (ACR), ECF No. 15, at 12-13 (D.D.C. filed Sept. 20, 2023); *Scottsdale Capital Advisors Corp. v. FINRA, Inc.*, No. 8:22-cv-2347-MSS, ECF No. 55, at 17-18 (M.D. Fla. filed May 15, 2023); *Nat'l Horsemen's Benevolent and Prot. Ass'n v. Black*, No. 5:21-cv-71-H, 2021 WL 2843165, at 19-20 (N.D. Tex. filed Apr. 30, 2021).

recognized agencies, which are reviewed at least every 5 years, may lose recognition; no agency head's position was created by Congress; some accrediting agencies are non-recognized and thus have no role in federal programs; and the number of recognized agencies fluctuates, currently standing at more than 60. It is hard to imagine a scheme with less continuity.

Brushing aside the absence of any public office, Florida briefly suggests that this Court should apply the "significant authority test." Resp. 7-8. But that test, which derives from *Buckley v. Valeo*, is used to determine whether "any appointee," *i.e.*, a federal official, is permitted to exercise such significant authority that the Appointments Clause dictates the manner of appointment. 424 U.S. 1, 125-26 (1976). Florida cites no case in which any court has applied that test to a nongovernmental official. *See* Resp. 7 (citing *United States v. Arthrex, Inc.*, 141 S. Ct. 1979 (2021), which considered the role of congressionally created and agency-employed Administrative Patent Judges). The significant-authority test has no applicability to purely private parties.[7]

III. Restrictions on Congress's spending power *vis-à-vis* states are inapplicable to Title IV funds loaned or granted to students.

Florida's response to the Department's Spending Clause argument is largely nonresponsive. The Department's motion demonstrated that the ascertainable/noncoercive requirements apply to conditional funding grants *to the states*, through which Congress can influence state policy and regulation by inducing a state to adopt preferred federal policy as a condition. Mot. 21-23 (discussing *Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519 (2012) ("*NFIB*"); *South Dakota v. Dole*, 483 U.S. 203 (1987); and *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1 (1981)). Once again Florida declines to engage with the substance of these authorities and instead relies on isolated language, bereft of

---

[7] Indeed, as Florida acknowledges, this test ensures "a clear and effective chain of command down from the President … by ensuring that those who control significant functions of the government be within that chain of command." Resp. 7 (citation omitted). This only evidences how inapposite the significant-authority test is, since it is obvious that private, educational-standard-setting accrediting agencies are not part of the President's "chain of command" and do not "control significant functions of the government."

context, to posit that it "does not matter that Title IV provides funds to students," not states, because schools must sign a Program Participation Agreement (which Florida calls a "contract") to participate in Title IV. Resp. 10. But precedent simply does not support Florida's suggestion that federalism constraints apply any time a federal agency enters any kind of contract with a state entity.

The Department's motion cited nine Supreme Court precedents and one recent Eleventh Circuit precedent to demonstrate "that the common thread in precedents examining compliance with the Spending Clause is legislation bestowing federal funds *to states*, conditioned on *state action* implementing preferred federal policy." Mot. 21-23 & n.12. That context is a necessary prerequisite to application of Spending Clause constraints because, as the Court has explained, the constitutional underpinning is the need to protect state sovereignty from undue commandeering by the federal government, *e.g.*, *NFIB*, 567 U.S. at 577-78. That concern simply is not implicated in other settings, such as where Congress gives federal funds to private individuals, with constraints placed on where those private individuals can spend their own allotment of federal dollars. In other words, the sufficiently ascertainable and noncoercive requirements are inapplicable outside the context of grants *to states* to encourage some type of federal policy. Florida brushes this aside and does not even acknowledge the numerous authorities relied upon by the Department. Resp. 10-11.

Instead, Florida agrees that the recipients of Title IV funds are students, not states, but blithely asserts that the distinction "does not matter" because all institutions, including public colleges and universities, must enter into a "Program Participation Agreement" agreeing to comply with Title IV requirements. Resp. 10. As an initial matter, that Agreement is not a bargained-for exchange creating a "contract," but is instead a regulatory agreement setting forth the terms and conditions of participation in Title IV and memorializing the institution's agreement to comply with statutory and regulatory obligations. 34 C.F.R. § 668.14. But more importantly, the mere existence of a contract between a state entity and the federal government does not raise the same constitutional concerns

9

considered in *NFIB*, *South Dakota*, and *Pennhurst*. True, the Court has recognized that federal funding grants are "much in the nature of a contract," such that states must be able to "voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17 (citation omitted). But those cases did not arise in the context of an actual *contract*, but instead reviewed legislation bestowing federal funds directly to states conditioned on state action implementing preferred federal policy. Mot. 22-23. Read in context, it is clear that the Court analogized to contract law to emphasize that state sovereignty requires that states be given a meaningful and unfettered choice as to whether to accept grants of money conditioned on required state action. Florida's oversimplified view fails because no Spending Clause precedent suggests that federalism constraints apply any time a federal agency simply *enters into a contract* with some state entity. Because Title IV does not create a funding grant to the states, and because federal student loans and grants are not given to states in exchange for enacting federal education policy, Florida's Spending Clause claim fails as a matter of law.

Florida's reliance on Medicaid only proves this point. Although Florida's argument is not entirely clear, the state seems to suggest that *NFIB* does not fit the pattern described above because, in its view, "the Affordable Care Act's Medicaid expansion requirement [was found] coercive on States even though a large portion of Medicaid funds reimburse medical costs of individual patients." Resp. 10. That assertion misrepresents the nature of Medicaid which, as the Supreme Court explained, "gives funds *to the States* on the condition that *they* provide specified health care to all citizens whose income falls below a certain threshold." *NFIB*, 567 U.S. at 531 (emphasis added). That is the exact fact pattern necessary for Spending Clause constraints to apply (and which is absent from Title IV). That "Medicaid payments … [later] go to private hospitals" through the state healthcare programs created with those federal funds, Resp. 11, is irrelevant, just like the fact that some students choose to spend their Title IV funds at state-run schools is irrelevant. What matters is the parameters of the federal expenditure, and Medicaid funds flow to states to implement a federal-state cooperative program,

10

*NFIB*, 567 U.S. at 531, whereas Title IV funds flow to students to fund their education. Florida's similar analogy to Title IX likewise fails, *see* Resp. 11, since state entities are the direct *recipients* of the federal funding grants to which Title IX's nondiscrimination requirement applies. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 639 (1999).

*Even if* Florida were correct that the sufficiently ascertainable and noncoercive requirements somehow applied to funds that are *not* granted to states, Florida's challenge still would fail because the only relevant "condition" placed on schools' participation is that they maintain accreditation through any recognized accreditor. As with its nondelegation challenge, Florida asks this Court to elevate each and every underlying educational standard set by every accreditor to the status of a unique "condition" on federal funds. There is no basis to do so. The statute simply requires that institutions maintain accreditation through one of dozens of recognized agencies, and that requirement is equally ascertainable to other conditions that easily have passed muster. *E.g.*, *Pennhurst*, 451 U.S. at 12-13 (discussing conditions, including that states submit for approval a plan outlining how they will spend federal funds for the benefit of the developmentally disabled and "evaluate the services provided under the Act"); *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 664-66 (1985) (condition permitting federal government to recoup improperly spent funds sufficiently specific: "*Pennhurst* does not suggest that the Federal Government may recover misused *federal* funds only if every improper expenditure has been specifically identified and proscribed in advance"). Florida cites no precedent that supports its attempt to hopscotch over the actual condition placed on Title IV participation—that institutions be "accredited," 20 U.S.C. § 1001(a)(5)—and to instead analyze each accreditors' standards as a unique "condition." *See* Resp. 11-12. Florida would thus fail to state a claim that the statute's conditions are coercive or ambiguous even if those constraints applied.

Finally, two points regarding the accreditation system merit mention. First, Florida's insistence that accreditors can arbitrarily change educational standards at any time and force members to comply,

*e.g.*, Resp. 12, is incorrect as a matter of law. *See* 34 C.F.R. § 602.21(b)-(d) (to change standards, accreditors must undertake notice and comment and "[t]ake into account and be responsive to" member institutions). Second, despite its heated complaints about accreditors' standards purportedly usurping state power, nowhere does Florida identify *any* accreditation standard with which it disagrees. Indeed, Florida never discusses the standards in any way. Those standards are publicly available, however, and current "Accreditation Principles" of the accreditor that historically has accredited all of Florida's institutions explain that "[m]ember institutions develop, amend, and approve accreditation requirements" through a "process" that is "representative, responsive, and appropriate to the types of institutions accredited."[8] It further explains that accreditation "is a form of self-regulation," "based upon a peer review process," and "acknowledges an institution's prerogative to articulate its mission, including a religious mission." *Id.* The substantive standards involve straightforward requirements: *e.g.*, that an "institution has sound financial resources" demonstrated through audited financial statements, *id.* at 29; "provides adequate and appropriate library and learning/information resources," *id.* at 26; "makes available to students and the public current academic calendars, grading policies, cost of attendance, and refund policies," *id.* at 23; that programs "embody a coherent course of study" requiring a minimum number of credit hours, *id.* at 21; and that the school "employs an adequate number of full-time faculty," *id.* at 17. While these standards are not "conditions" on federal funding, they also are not the draconian edicts Florida portrays. Given the importance of accreditation in competing for students and faculty plus the numerous state-law benefits that hinge on it, Mot. 7-8, it is hard to imagine any Florida institution would opt out of accreditation regardless of this suit.

IV. <u>Florida has not rebutted the Department's grounds for dismissal of its APA claim.</u>

Florida's defense of its APA claim is long on rhetoric but short on specifics. It repeatedly

---

[8] SACS COC, *The Principles of Accreditation: Foundations for Quality Enhancement* at 5 (Dec. 2017), https://sacscoc.org/app/uploads/2019/08/2018PrinciplesOfAcreditation.pdf.

claims that the challenged Letters effected substantive changes, *e.g.*, that they "informed institutions of new standards," Resp. 13, "change Department policy," *id.* at 15, "withdraw agency officials' discretion" and "establish[] new factors to evaluate 'reasonable cause,'" *id.* at 17 (citation omitted). But Florida largely neglects to explain *what* new standards the Letters purportedly implemented, *how* they changed Department policy, or *in what way* they withdrew discretion. Indeed, with two exceptions (discussed *infra*), Florida levels these charges without substantiation or citation.

Every action an agency takes is not subject to judicial review, just as every action is not subject to notice-and-comment (or negotiated) rulemaking or to the APA's substantive requirements. Federal jurisdiction is lacking unless an agency action both completes an agency's decisionmaking *and* determines substantive rights and obligations. Mot. 26. Florida contends that these requirements are met because, in its view, the Letters "communicate the Department's 'final view on the matter[s],'" and "reflect[] a coordinated effort to "communicate[] the agency's settled position." Resp. 15 (citations omitted). But these assertions only beg the questions: What matters? On what settled position? Florida does not say. The Department's motion demonstrated that each of the Letters merely reiterated existing statutory and regulatory obligations. Mot. 26-28 ("In the absence of the three Letters, Florida public colleges would be under an identical obligation to demonstrate reasonable cause, 34 C.F.R. § 600.11, and accreditors would be under an identical obligation to ensure their membership is voluntary, *id.* § 602.14."); *see also* 20 U.S.C. §§ 1099b(a)(2), 1099b(h)-(i). Florida's assertions that the Letters convey final, substantive decisions get it nowhere without identification of any decision purportedly made or policy purportedly changed. Florida's only attempt to identify any "decision" is the Institution Letter's statement that, "in making a reasonable cause determination, [the Department] *must* review the specific circumstances of the institution." Resp. 15. But this is nonsensical: Florida does not, and cannot, explain how the Department could possibly evaluate whether the reasonable-cause requirement has been met *without* considering "the specific circumstances" presented. No

13

"decisionmaking process" was necessary (or undertaken) to arrive at this commonsense statement.

Florida next contends that the Letters "tread new ground" and implement policy because the Procedures Letter states that it "updates the procedures for submitting documentation to change or add an accrediting agency" and supersedes an earlier announcement. Resp. 15. But Florida cites no case suggesting that mere procedural tweaks to the way an agency interacts with regulated entities is a substantive action subject to the APA's strictures. *See* Mot. 26-29. Besides, as explained in the Department's motion (30 n.18), regardless what the Procedures Letter says, the underlying regulation already stated that the Secretary does not recognize the accreditation of any institution currently "in the process of changing" accreditors, unless it demonstrates reasonable cause and receives approval, 34 C.F.R. § 600.11; *see also* 20 U.S.C. § 1099b(h). The Procedures Letter could not have "add[ed] a significant hurdle to the process of changing accreditors," Resp. 16, since the underlying requirement already had been codified. Likewise, Florida complains that accreditors now must ensure that their membership remains voluntary, Resp. 17, but that binding obligation also preexists the Letter, 20 U.S.C. § 1099b(a)(2); 34 C.F.R. § 602.14. Finally, Florida insists that the Letters "withdraw agency officials' discretion by rescinding old review procedures … and by establishing new factors to evaluate 'reasonable cause,'" Resp. 17. But Florida did not identify what new factors purportedly were established or explain how discretion was withdrawn, so Florida has waived this argument.

Because the Letters restated preexisting requirements or otherwise contained nonsubstantive instructions on how entities should navigate existing processes, they neither reflect final decisions nor impose rights or obligations. For this same reason, they were not required to undergo rulemaking. *See* Mot. 28-29 (only substantive rules imposing binding obligations subject to procedural requirements).

Florida next charges that "Defendants do not meaningfully engage with Florida's statutory arguments," Resp. 20, but Florida failed to develop such arguments to begin with. Its only claim that the Letters are contrary to law asserts that "the Accreditor Letter … takes the position that a State

14

Legislature deciding that the State's institutions should change accrediting agencies makes the institution's membership involuntary." Resp. 20 (referencing Accreditor Letter 2). But the Letter says no such thing. It contains only one line of any relevance: "Florida law SB 7044, which took effect on July 1, 2022, requires public institutions in Florida to seek new accrediting agencies, which potentially undermines the voluntary nature of the relationship and the independent roles of the various actors in the triad." That passing statement does not take any position on Florida institutions' forthcoming requests to change accreditors or opine that the state legislature cannot dictate such a change. Even aside from the inaccuracy of Florida's contention, an agency's expression of concern that "a party's practices may potentially" violate statutory requirements is not even reviewable final agency action, *Clayton County v. FAA*, 887 F.3d 1262, 1268 (11th Cir. 2018), much less unlawful. Florida makes no other contrary-to-law claim. Florida's assertion that the Letters are arbitrary and capricious for failure to explain changes, Resp. 20-21, fails for the reasons explained above, *see also* Mot. 29-30.

      Finally, Florida's assertion that the Court should deny the Department's motion to allow Florida to conduct discovery on *finality* and "probe the contentions in Defendants' declaration," Resp. 18, is meritless. A "factual attack" on jurisdiction means that the Department has challenged whether subject matter jurisdiction does, in fact, exist, as opposed to "merely … if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Scarfo v. Ginsberg*, 175 F.3d 957, 961 (11th Cir. 1999). It does not mean there is a *factual dispute* warranting discovery. Florida does not, and cannot, dispute the few facts contained in the Miller Declaration, ECF No. 12-1, which relate to steps Florida's own institutions are taking to comply with state law—matters about which the state has equal, if not greater, access. And since Florida has not disputed any fact from that declaration, there is nothing to probe through deposition. The cases on which Florida relies to suggest it "must" be afforded discovery, Resp. 18, do not say otherwise. The federal government commonly raises finality arguments in response to APA challenges; discovery is not permitted anytime an agency raises ripeness, *contra id.*

15

Dated: October 20, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

 /s/ Kate Talmor
KATE TALMOR
(Maryland Bar)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
(202) 305-5267
kate.talmor@usdoj.gov
*Attorneys for Defendants*