## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 23-cv-61188-JB

STATE OF FLORIDA,

v.

MIGUEL CARDONA,
in his official capacity as
Secretary of Education, *et al.*,

      Defendants.

_____/

## ORDER ON DEFENDANTS' MOTION
## TO DISMISS PLAINTIFF'S COMPLAINT

**THIS CAUSE** came before the Court on the Motion to Dismiss Plaintiff's Complaint (the "Motion") filed by Defendants Miguel Cardona, in his official capacity as Secretary of Education (the "Secretary"); James Kvaal, in his official capacity as Under Secretary of Education; Nasser Paydar, in his official capacity as Assistant Secretary for Postsecondary Education; Herman Bounds Jr., in his official capacity as Director, Accreditation Group, Office of Postsecondary Education; Richard Cordray, in his official capacity as Chief Operating Officer, Federal Student Aid; and Annmarie Weisman in her official capacity as Deputy Assistant Secretary for Policy, Planning, and Innovation, Office of Postsecondary Education (collectively, "Defendants"), ECF No. [11].  Plaintiff, the State of Florida, (the "State"), filed a response in opposition to the Motion (the "Response"), ECF No. [19], and Defendants filed a reply (the "Reply"), ECF No. [28].  The parties appeared before the undersigned for oral argument on the Motion (the "Hearing").  Upon due consideration of the

parties' written submissions, the arguments of the parties at the Hearing, and the pertinent portions of the record, it is hereby **ORDERED AND ADJUDGED** that the Motion is **GRANTED,** and the Complaint is **DISMISSED WITHOUT PREJUDICE**.

## I.  BACKGROUND

The State challenges the constitutionality of the federal government's use of private accreditation agencies as part of its process to approve postsecondary institutions as eligible institutions within the meaning of the Higher Education Act, 20 U.S.C. § 1001 *et seq.,* ("HEA"), and seeks an injunction on the continued enforcement of the accreditation requirement, which the Complaint acknowledges has been in place for decades. *See generally* ECF No. [1]. Specifically, the Complaint alleges that the HEA violates the Constitution for three reasons: (1) it violates the private nondelegation doctrine (Count I); (2) it violates the Spending Clause (Count II); and (3) it violates the Appointments Clause (Count III). *Id.* In the alternative, the Complaint alleges that three letters issued by the Department of Education (the "Department") in July 2022 violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) (Count IV). *Id.*

### A. The Eligibility Scheme Under the Higher Education Act

Under Title IV of the HEA, the Department disburses billions of dollars to students each year to assist them in paying the costs of a postsecondary education. *See* ECF No. [1] at ¶¶ 7, 41; 20 U.S.C. § 1070. Students can receive these federal funds in the form of a grant, loan, or work assistance. *See* 20 U.S.C. § 1091(a). The

funds, however, may only be used to pay tuition, or other costs related to their education, at "eligible institution[s]." *See id.*

A postsecondary school is only considered an "eligible institution" that can receive a student's Title IV funding if it meets various requirements prescribed by the HEA. *See id.* § 1001(a); *see also id.* § 1099c. Specifically, Section 1099c dictates that to be eligible, an institution must: (1) be authorized to operate within a state, (2) demonstrate "administrative capability and financial responsibility," and (3) attain accreditation by a recognized accrediting agency. *Id.* § 1099c(a). In addition, section 1094 outlines the requirements of the Program Participation Agreement, which an institution must adopt to qualify to receive students' Title IV funds. *Id.* § 1094(a). Specifically, Section 1094 states that "[t]he agreement shall condition the initial and continuing eligibility of an institution to participate in a [student assistance] program upon compliance with" various terms. *Id.* These terms cover a broad range of concerns, such as: various financial responsibilities pertaining to students, lenders, and the Department; provision of drug abuse and prevention programs to students, officers, and employees at the institution; establishment of a campus security policy; disclosure of information to the Department; completion of surveys for data collection; compliance with accrediting agency requirements; distribution of voter registration forms to students in certain states; disclosure of certain information in cases of sexual violence against students; and establishment of protocols to combat distribution of copyrighted material. *See id.* § 1094(a)(1)–(10), (12), (17), (21), (23), (26), (29). For

decades, this has been the statutory framework used to disburse financial aid to students for use at eligible institutions. *See* ECF No. [1] at ¶¶ 32–42.

At issue here is the HEA's requirement that a state institution attain accreditation by a private accrediting agency that is recognized by the federal government. Indeed, not all accrediting agencies are recognized by the Department. Recognized accrediting agencies are those which the Department has approved as providing "reliable authority as to the quality of education or training offered." 20 U.S.C. § 1099b(a). To become an approved accreditor, an agency must, among other requirements, demonstrate that it "consistently applies and enforces standards that respect the stated mission of the institution of higher education, including religious missions."[1]  *Id.* § 1099b(a)(4)(A). Further, it must evaluate whether the education the institution provides is "of sufficient quality to achieve. . . the stated objective for which the courses or the programs are offered." *Id.* To that end, the HEA requires accreditors to evaluate several areas of concern, such as curricula, faculty, facilities, and success in terms of student achievement. *Id.* § 1099b(a)(5).

While the HEA broadly delineates certain essential standards to be considered by accrediting agencies, the agencies independently determine how to assess the required standards and may implement additional standards beyond those mandated by statute. *See id.* § 1099b(a)(5), (g). Further still, the Department may not "exercise any direction, supervision, or control . . . over any accrediting agency or association." *Id.* § 3403(b). Specifically, the Department is prohibited from "promulgat[ing] any

---

[1] Approved accrediting agencies must apply for renewal of their status every five years. 20 U.S.C. § 1099b(d).

regulation with respect to the standards of an accrediting agency" and from establishing criteria beyond those enumerated by the statute. *Id.* § 1099b(o), (g).

Notwithstanding an accrediting agency's power to create and monitor standards, an agency cannot compel institutions to maintain membership. *See* § 1099b(a)(2)(A). Rather, accreditation agencies are required to maintain voluntary membership with participating institutions. *Id.* Institutions that are dissatisfied with their accreditor are permitted to change accreditors upon application to the Department demonstrating they have reasonable cause for the change. § 1099b(h). As of the filing of this Order, there are 123 recognized accreditors from which an institution may choose, and of those, twenty-four are accreditors that are approved to accredit an institution as a whole and not just certain programs. *See List of Agencies*, U.S. DEP'T OF EDUC. OFF. OF POSTSECONDARY EDUC.: DATABASE OF ACCREDITED POSTSECONDARY INSTS. AND PROGRAMS, https://ope.ed.gov/dapip/#/agency-list (last visited Oct. 2, 2024); *see* 20 U.S.C. § 1001(c) (requiring that the Secretary publish a list of recognized accrediting agencies). As of the filing of the Complaint, all of Florida's public universities and colleges were accredited and considered eligible institutions for purposes of Title IV funding. ECF No. [1] at ¶ 80.

## B. The July 19, 2022 Letters

In 2022, the Florida Legislature passed Senate Bill 7044 ("SB 7044"), mandating that all public colleges and universities switch their accreditor. *See* Fla. Stat. § 1004.85. The State alleges that with the passage of SB 7044, more than half

of Florida's institutions must switch accreditors within the next two years.  ECF No. [1] at ¶ 107.  The State further alleges that "Florida [enacted the statute] in an attempt to mitigate many of the harms caused by the statutory scheme at issue in this case."[2]  *Id*. at ¶ 19.  Since then, several Florida institutions have begun the process of switching accreditors and have sought approval from the Department for the same.  *Id*. at ¶ 104.

On July 19, 2022, the Department published two "Dear Colleague" letters and issued a letter to "Institutional Accrediting Agencies" in response to SB 7044 (collectively, the "Letters").  *See id*. at ¶¶ 99–102.  The first "Dear Colleague" letter, entitled "Guidance for Institutions Seeking to Change or Add Accrediting Agencies," outlined the criteria for determining "reasonable cause" for accreditor changes. Annmarie Weisman, *(GEN-22-10) Guidance for Institutions Seeking to Change or Add Accrediting Agencies*, U.S. DEP'T OF EDUC. FED. STUDENT AID (July 19, 2022), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-19/guidance-institutions-seeking-change-or-add-accrediting-agencies    (hereinafter the "Institutional Guidance Letter").  The summary portion of the Institutional Guidance Letter noted that the Department had recently received inquiries regarding the standards and procedures for an institution to either change its primary accreditor or obtain multiple accreditors.  *Id*.  Thus, the stated purpose of the Institutional Guidance Letter was to "reiterate the statutory and regulatory

---

[2] The State also cites to disputes between states and accrediting agencies as instigating the passage of SB 7044.  ECF No. [1] at 23–27.  The State alleges that accrediting agencies have engaged in a pattern of abuses which "undermine the States' sovereign control over their own institutions."  ECF No. [1] at 23.

standards and provide examples of factors Federal Student Aid . . . may consider in determining whether an institution has provided sufficient materials demonstrating reasonable cause for changing or adding an accrediting agency." *Id.* The Institutional Guidance Letter outlines the regulatory framework around the Department's obligation to determine whether an institution had reasonable cause to change its accreditor. *Id.*

The second "Dear Colleague" letter is entitled "Procedures for Institutions Seeking Approval of a Request to Change or Add Accrediting Agencies." Richard Cordray, *(GEN-22-11) Procedures for Institutions Seeking Approval of a Request to Change or Add Accrediting Agencies*, U.S. DEP'T OF EDUC. FED. STUDENT AID (updated Sept. 26, 2022), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-07-19/procedures-institutions-seeking-approval-request-change-or-add-accrediting-agencies-updated-sept-26-2022# (hereinafter the "Institutional Procedures Letter"). In its summary section, the Institutional Procedures Letter notes that it was issued to "provide[] guidance on the process institutions must follow that are seeking to change primary accrediting agencies or that are adding multiple accrediting agencies." *Id.*

In addition, the Department issued a letter addressed to "Institutional Accrediting Agencies" in response to inquiries that the Department received regarding the "voluntary membership" requirement for accrediting agencies provided in 34 C.F.R. § 602.14(a). Letter from Herman Bounds Jr., Dir. Accreditation Grp., Off. of Postsecondary Educ., Dep't of Educ., to Institutional Accrediting Agencies

(July 19, 2022), https://www.ed.gov/sites/ed/files/admins/finaid/accred/letter-to-institutional-accreditors.pdf (hereinafter the "Accreditor Letter"). The Department noted that it was writing to "respond to those inquiries and to clarify the voluntary membership requirement of the accreditation regulations." *Id.* at 1. The Accreditor Letter then reviewed the historical underpinnings of the requirement that participation with an accreditation agency be voluntary.

Specifically, in describing the voluntary nature of the relationship between an institution and its accreditor, the Accreditor Letter noted that "a voluntary association for quality assurance, as opposed to a compelled one or even one centralized through or by the federal government, is one of the unique features of American higher education." *Id.* This letter then noted that Florida Law SB 7044, requiring Florida's public institutions to seek new accrediting agencies, "potentially undermines the voluntary nature of the relationship" between the accreditor and the institution and the "independent roles" that institutions, accreditation agencies, and the federal government enjoy under the system established by Congress. *Id.* at 2.

To that end, the Accreditor Letter noted that the "Department has reexamined the issue of voluntary membership in two circumstances: when institutions seek to change accrediting agencies (or seek multiple accreditation) and when the Department reviews accrediting agencies as part of the recognition process." *Id.* The Accreditor Letter also noted that "agencies should conduct their own independent evaluation of whether an institutional change of accrediting agencies (or multiple agencies) is voluntary." *Id.* (emphasis omitted). The Accreditor Letter concluded that

if the "Department determines that an accrediting agency does not have a voluntary membership, as required for recognition by the Department . . . , the Department will be unable to recognize the accrediting agency." *Id.* at 1–2.

## C. The Complaint

Count I alleges that accrediting agencies exercise governmental authority in violation of the private nondelegation doctrine in two ways. First, the Complaint alleges that the HEA scheme "delegates the power to set eligibility standards for federal funds to private accrediting agencies, subject to limited oversight by the Department." ECF No. [1] at ¶ 113. Second, the Complaint alleges that the HEA further "delegates the power to apply those eligibility standards to those same agencies." *Id*. The State contends both are delegations of power which effectively permit agencies to open and close the "'spigot'" to billions of dollars in federal spending. *See id.* at ¶¶ 4–7 (citation omitted).

In Count II, the State asserts that the HEA violates the Spending Clause of Article I of the Constitution by imposing ambiguous and coercive conditions on the receipt of federal funds. *Id.* at ¶¶ 122–32. The State contends that the obligations under the HEA are not ascertainable for two reasons. *Id.* at ¶ 126. First, because the requirements for accreditation are not included within the text of the HEA, or any other statute. *Id.* at ¶¶ 125–27. Second, because the HEA allows accreditors to change their standards even after an institution is accredited, institutions are left uncertain about the rules they must follow. *Id.* at ¶ 128. Moreover, according to the State, this also renders the HEA coercive because failure to comply with new

standards jeopardizes the institution's eligibility to continue receiving Title IV funding from its students.  *Id*. at ¶¶ 129–31.

Count III alleges that the heads of accrediting agencies are federal officers and therefore must be appointed in a manner consistent with the Appointments Clause of Article II of the Constitution.  *Id*. at ¶¶ 133–39.  According to the State, "accrediting agencies wield significant authority of the United States because they set standards which determine the eligibility for billions of dollars of federal funds."  *Id*. at ¶ 136.  As such, the heads of these agencies must be appointed by the President and approved by the Senate.  *See id*. at ¶¶134–36.  Because no head of any recognized accrediting agency has been appointed by the President or confirmed by the Senate, the State argues that the HEA violates the Appointments Clause.  *Id*. at ¶¶ 137–39.

Finally, in Count IV, the State claims that the Letters violate the APA because they set "rules" that constitute reviewable final agency decisions as opposed to mere guidance.  *Id*. at ¶ 143.  The Complaint posits that the Letters are contrary to the law in that they read the "voluntary membership" requirement in a way that would "allow the federal government to dictate how states administer education—something the Department is expressly forbidden from doing" under the HEA.  *Id*. at ¶ 147.  Next, the State argues that the Letters are arbitrary and capricious because they fail to sufficiently explain Defendants' choice of action, they fail "to account for state sovereign prerogatives," and the explanation provided for issuing the Letters is "plainly nonsensical."  *Id*. at ¶¶ 148–50.  Lastly, the State contends that the Letters were required to be issued with notice and comment, as they affect the rights and

obligations of institutions by imposing requirements on those seeking to change accreditors. *Id*. at ¶¶ 151–53.

### D.   Defendants' Motion to Dismiss

In pursuit of dismissal, Defendants argue that the Complaint fails for threshold reasons as to each count. *See generally* ECF No. [11].  First, they argue that Count I should be dismissed because the private accrediting agencies do not wield any federal regulatory power. *See id*. at 21.  Specifically, Defendants submit that the HEA does not violate the private nondelegation doctrine because establishing substantive educational standards has never been a power of the federal government. *Id*. at 10–11, 23–24.  Because accreditation is not, and has never been, within the federal government's purview, the federal government cannot be delegating a power that it has never wielded. *See id*. at 23.  Moreover, Defendants argue that accreditors are not engaging in a legislative function since the scheme is entirely voluntary. *Id*. at 23–24, 27.  They argue that while accrediting agencies are "determin[ing] the metrics by which schools . . . are evaluated for quality control," they do not operate directly to regulate state conduct. *Id*. at 24.  Nor do accreditors decide whether an institution is eligible to receive funding, since funding is disbursed to students, not states. *Id*. at 24–25. Defendants also argue that if accreditors were exercising a federal power, then invalidating accreditation schemes would revert the

power to set standards back to the federal government, a position that the State does not accept.[3]  *Id*. at 27–28.

With respect to Count II, Defendants assert that the Spending Clause does not apply because student aid programs do not operate as conditional funding grants to the states.  *See generally id.* at 30–34.  The monies are given directly to students who use the funds at eligible institutions, be they private institutions or public institutions.  *Id*. at 33–34.  Even if student-aid programs were subject to the Spending Clause, Defendants maintain that the HEA is sufficiently clear to pass constitutional muster.  *Id*. at 34.  Defendants argue that the plain text of the HEA clearly mandates that institutions obtain accreditation to qualify as "eligible institutions" which can accept students' Title IV funding.  *Id*.  Defendants also contend that the HEA is not coercive because it: (i) imposes no statutory duty to participate in the program, (ii) allows institutions to select from various accreditors, and (iii) does not threaten existing funding.  *Id*. at 34–35.

As to Count III, Defendants argue that the heads of accrediting agencies are not subject to the Appointments Clause because they are not "Officers of the United States."  *Id*. at 28.  Defendants contend that the Appointments Clause only applies to federal officers, not heads of privately owned entities.  *See id*. at 28–30.

Finally, turning to Count IV, Defendants argue that the Court lacks jurisdiction to review whether the Letters violate the APA because they are not final

---

[3] The State notes in its Response that "[its] claims, if successful, place responsibility for regulating education back where it belongs: with the States."  ECF No. [19] at 3.

agency decisions. *See id.* at 35–37. Moreover, even if they are subject to judicial review, Defendants assert that they simply reiterate existing statutory obligations without imposing any new requirements. Defendants also contend that the Letters are permissible because they do not contradict existing law, do not set out standards that are arbitrary and capricious, and are not subject to notice and comment proceedings. *See id.* at 37–39.

## III.   ANALYSIS

Rule 8(a) of the Federal Rules of Civil Procedure only requires a short and plain statement of the claim showing that the pleader is entitled to relief, and as such, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading is facially plausible when it states enough facts for the court to draw a "reasonable inference" that the defendant is liable for the alleged conduct. *Id.* at 663. The factual allegations must demonstrate more than a "sheer possibility that a defendant has acted unlawfully." *Id.* When reviewing a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). However, a court need not accept a plaintiff's legal conclusions as true. *Iqbal*, 556 U.S. at 678.

**A.     The Department's Reliance on Private Accrediting Agencies Does Not Violate the Private Nondelegation Doctrine.**

Count I alleges that the HEA creates an unconstitutional scheme whereby the federal government improperly delegates a regulatory function to private accrediting agencies, in violation of the private nondelegation doctrine. *See generally* ECF No. [1] at ¶¶ 111–21. Plaintiff contends that accrediting agencies are both setting the terms by which institutions may receive federal funds *and* determining whether those standards have been met, both of which are exercises of government power. *Id.* at ¶ 113; ECF No. [19] at 4–6. Defendants reject the State's characterization, noting that accrediting agencies do not set laws that regulate institutions. Instead, Defendants respond that these agencies provide voluntary partnerships wherein an institution can choose its own accreditor, which works with the institution to establish standards. ECF No. [11] at 27. Defendants also assert that agencies do not have final decision-making authority over federal funds because the Department retains ultimate control over the disbursement of Title IV funds to students under the HEA. *See id.* at 25–26.

The private nondelegation doctrine is rooted in the Fifth Amendment's due process provision and prevents Congress from granting unchecked legislative power to a private entity. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 310–11 (1936) (finding that a statute allowing a private entity to set minimum wages and determine labor hours for competitors without any government oversight constituted an unconstitutional delegation of power); *Consumers' Rsch v. FCC*, 88 F.4th 917, 926–28 (11th Cir. 2023) (upholding an agency's delegation of statutory authority to a private

entity where the entity functioned subordinately to the agency and the agency retained authority and surveillance over the entity's activities); *Oklahoma v. United States*, 62 F.4th 221, 228 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2679 (2024) (mem) (stating that "the government may not empower a private entity to exercise unchecked legislative or executive power"). As such, "a private entity may not be the principal decisionmaker in the use of federal power, may not create federal law, may not wield equal power with a federal agency, or regulate unilaterally." *Oklahoma*, 62 F.4th at 229 (citations omitted). To do so would be "legislative delegation in its most obnoxious form." *Carter Coal*, 298 U.S. at 311.

Congress may, however, define the role of private parties in proposing regulations if their involvement is limited to serving as an "aid" to a government agency that maintains the authority to "approve[], disapprove[], or modif[y]" the proposed regulations. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). Therefore, a private entity can permissibly wield federal power so long as the private agency is subordinate to the federal agency, and the federal agency maintains authority and surveillance over the activities of the private agency. *See Consumers' Rsch.*, 88 F.4th at 926.

Setting aside the rhetoric and legal arguments contained in the Complaint,[4] the Court turns to the threshold issue in determining whether Count I states a cause

---

[4] Indeed, in its attack of the HEA's scheme, the Complaint presents more arguments than factual allegations. As such, the Motion at issue is often more of a response to the legal arguments in the Complaint than a presentation of legal arguments as to why the factual allegations are insufficient to state a claim, which is the typical posture of a motion to dismiss. When the rhetorical flourishes and policy arguments

of action: whether private accreditation agencies are exercising a legislative function.[5]  Before doing so, the Court clarifies two issues.

First, the Court's analysis as to Count I must be centered on the actual *function* that the private agency is undertaking.  Their function, based both on the statutory scheme and the factual allegations in the Complaint, is clear and simple: private accreditation agencies accredit postsecondary institutions.  They do not, as the State argues, determine which postsecondary institutions qualify to receive federal funds from students.  The determination of which institutions are eligible to participate in the scheme set out by the HEA is a *separate* function that the Department undertakes.  This process is outlined in the HEA and encompasses several *other* factors, including, but not limited to, whether the postsecondary institution is accredited by a private agency.  Accreditation does not, however, end the eligibility inquiry.  As such, the State's argument that the federal government delegates the power to set eligibility standards for the receipt of federal funds to these agencies collapses what the private agencies do (accredit postsecondary institutions) with what the federal government does with that information (use it along with various other factors to make decisions as to what institutions are eligible).  The two functions are not the same.  Because the issue before the Court as to Count I is whether the

---

are set aside, the Complaint, as to Counts I, II and III, is simply a challenge to a regulatory scheme on familiar constitutional grounds, which the Court proceeds to address.

[5] While the nondelegation doctrine examines whether the private entity is performing a legislative *or* executive function, the State's argument here is that accreditation agencies are performing a legislative function.

function conducted by the private agencies is a legislative function, the Court's analysis must rest on whether accrediting postsecondary institutions is a legislative function.

Second, if the Court were to find that the function at issue is a legislative function, the applicable legal standard would compel the Court to review whether the private agencies are subordinate to the federal agency, and whether the relevant federal agency-maintained authority and surveillance over the activities of the private entity. *See Consumers' Rsch.*, 88 F.4th at 926. However, given the commands of the HEA, this analysis is unnecessary. Specifically, the HEA expressly prohibits the federal government from exercising the type of control that would make a delegation of this function permissible. 20 U.S.C. § 3403(b) (prohibiting the Department from "exercise[ing] any direction, supervision, or control . . . over any accrediting agency or association.") As such, there is no dispute that the federal government does not exercise any such control over these private accreditation agencies, and the Court need only decide whether the private accreditation agencies are exercising a legislative function. If they are, the inquiry ends, and the Motion must be denied because the Complaint would state a cause of action sufficient to survive a motion to dismiss as to Count I.

Now, back to the issue at hand: whether, as the State argues, accreditation agencies are exercising Congress' regulatory power when they accredit postsecondary institutions. *See* ECF No. [1] at ¶ 114. In the seminal case of *Carter v. Carter Coal Company*, the Supreme Court evaluated the components of a statute which gave rise

to an impermissible delegation of Congressional authority.  298 U.S. at 310–12.  The Supreme Court invalidated the statutory scheme, which gave a private entity, a national commission of coal miners, coal producers, and private citizens created by Congress, the power to regulate the coal mining industry by establishing standards for fair competition, production, wages, hours, and labor relations.  298 U.S. at 280–84.  The national commission had the power to fix the minimum and maximum prices of coal at every mine in the United States, and compliance with the standards entitled coal producers to a ninety percent tax rebate.  *Id*.  The Court invalidated the scheme, finding that it improperly delegated legislative power to private persons.  *See id*. at 310–11.  In doing so, the Court held that the delegation "to private persons whose interests may be and often are adverse to the interests of others in the same business" was "clearly arbitrary" and violated due process.  *Id*. at 311.[6]  After *Carter Coal*, courts continued to look to whether the private agency at issue has "the authority to make laws."  *See Buckley v. Valeo*, 424 U.S. 1, 139–40 (1976) (internal quotation marks omitted), *superseded by statute on other grounds*, *see McConnell v. Fed. Election Comm'n,* 540 U.S. 93 (2003).

Under the standard set forth by the Supreme Court in *Carter Coal* and its progeny, the accreditation of postsecondary schools does not involve any recognized

---

[6] The Supreme Court had previously spoken on the matter in at least two other cases. *See also Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 118, 121–22 (1928) (finding a city ordinance conditioning the construction of a "home for children or for old people" upon the written consent of two thirds of neighboring property owners was an unconstitutional delegation); *Eubank v. Richmond*, 226 U.S. 137 (1912) (invalidating a zoning ordinance that allowed private property owners to set rules affecting the property rights of others without public standards).

federal regulatory action and is not an exercise of a legislative function.  In fact, as both parties concede, the federal government has *never* been involved in accrediting educational institutions.  ECF Nos. [11] at 1–2; [19] at 2–3 (stating that giving the federal government power over accreditation would "require rewriting federal law"). Both the Complaint and the Motion note that these private accreditation agencies existed long before the HEA and Defendants' use of the private accreditation agencies' recommendations. ECF Nos. [1] at ¶ 31, [11] at 2.  Indeed, these private agencies originated in the late nineteenth century in response to the need for educational standards and guidelines to evaluate the quality of postsecondary education programs.  ALEXANDRA HEGJI, CONG. RSCH. SERV., R43826, AN OVERVIEW OF ACCREDITATION OF HIGHER EDUCATION IN THE UNITED STATES 1–2 (2020) (hereinafter, the "CRS Report").  Accrediting agencies filled a role the federal government could not, since the "United States does not have a centralized authority exercising singular national control over" higher education.  *Id*. at 2.  The passage of the HEA cemented their role, using these pre-existing agencies as part of the process that the federal government put in place to ensure that federal funds were being used at institutions that met a minimum educational quality.  *See id*. at 7.

Moreover, unlike a single, congressionally chartered private entity making decisions for an entire industry, which has been scrutinized in past nondelegation precedent,[7] accrediting agencies are part of a diverse system wherein institutions can

---

[7] *See, e.g.*, *Adkins*, 310 U.S. at 387–88; *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 45 (2015) [hereinafter *Amtrak II*]; *Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 873–74 (5th Cir. 2022).

choose among multiple accreditors, and the agency does not make eligibility decisions. For example, the Department currently recognizes various accreditors, and as Defendants point out, none of these agencies were created by Congress, none exercise monopoly over their members, and all are voluntary membership organizations. *See* ECF No. [11] at 23–24; *see also List of Agencies, supra* p. 5. The State does not dispute this. For an accrediting agency to gain and retain its approval, it must demonstrate that it consistently applies and enforces standards that respect the institution's stated mission, including any religious missions. 20 U.S.C. § 1099b(a)(4)(A). In addition, upon reasonable cause and submission of prior accreditation materials, schools are free to switch accreditors. *See id.* § 1099b(h); 34 C.F.R. § 600.11.

Nor are accrediting agencies promulgating "generally applicable rules of private conduct." *Amtrak II*, 575 U.S. at 76 (Thomas, J., concurring in the judgment). For example, in *Amtrak II,* the Court analyzed the validity of an act that granted Amtrak and the Federal Railroad Administration ("FRA") the power to "'develop new or improved existing metrics and minimum standards for measuring the performance and service quality'" for all rail carriers. *Id*. at 48 (citation omitted). There, the standards were created by a congressionally chartered board, applied universally across the entire industry, and backed by penalties for non-compliance. *See id*. at 48– 49. The elements that made the standards in *Amtrak II* tantamount to law are absent here, where there are multiple accreditors to choose from, standards are set in a collaborative manner, participation is voluntary, and no fines are imposed.

Moreover, mere reliance on private entities does not equate to granting them governmental power or final authority. *See Sanjuan v. Am. Bd. of Psychiatry and Neurology*, 40 F.3d 247, 250 (7th Cir. 1994) (rejecting the argument that the American Board of Psychiatry and Neurology is a government actor despite government reliance on the private entity's certification to determine eligibility for some public positions); *Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. of Career Schs. & Colls.*, 44 F.3d 447, 449 n.1, 450–51 (7th Cir. 1994) (denying a non-constitutional claim against an accreditation agency and noting that a government body can rely on decisions made by a private association without transforming that association into a government entity itself)*; see also Blum v. Yaretsky*, 457 U.S. 991, 1010 (1982) (finding no state action on the part of nursing homes, even though their "decision to discharge or transfer a patient" prompted state adjustment of the patient's Medicaid benefit levels). Nor does a federal agency improperly subdelegate its authority when it "reasonabl[y] condition[s]" federal approval on an outside party's determination of some issue; rather, such conditions amount to legitimate requests for input. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566–67 (D.C. Cir. 2004); *State v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021).

The State contends that accrediting agencies are engaging in a legislative function because "every educational standard set by an accrediting agency is a condition that an institution must meet to be eligible to participate in Title IV programs." ECF No. [19] at 5. This argument relies on Justice Thomas' concurrence in *Amtrak II*, as well as Justice Alito's concurrence in that same case. *Id.* (citing

*Amtrak II*, 575 U.S. at 89 (Thomas, J., concurring in the judgment); *id.* at 58–59 (Alito, J., concurring)).  In his concurrence, Justice Thomas noted that "the creation of metrics and standards" is an "exercise of legislative power" when an entity "decide[s] the applicability of standards that provide content to generally applicable rules of private conduct."  *Amtrak II*, 575 U.S. at 89–90 (Thomas, J., concurring in the judgment).  However, that standard was not adopted by the majority opinion, nor has it been adopted by *any* court in the country.  In short, it is simply not the law.[8]

Likewise, the remaining arguments presented by the State are founded in Spending Clause jurisprudence or other distinguishable doctrines.  ECF No. [1] at ¶

---

[8] The State argues that "multiple courts of appeals have described the power accreditors wield in enforcing their standards as a 'delegated' government power."  ECF No. [19] at 6.  The two cases cited, however, involved challenges to accrediting agencies brought by educational institutions where courts observed that the case law had developed a right to common law due process in challenges to accreditors' decisions as a check on organizations that exercise significant authority in areas of public concern, such as accreditation and professional licensing.  *Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 169–70 (4th Cir. 2015); *Thomas M. Cooley L. Sch. v. A.B.A.,* 459 F.3d 705, 712 (6th Cir. 2006).  These cases presented no analysis on whether the functions of an accreditation agency—the functions at issue here—are legislative functions.  Indeed, in *Chicago School of Automatic Transmissions*, another case the State cites for the proposition that accrediting agencies exercise government power because they open and close the "spigot" of federal funds, the Supreme Court went on to note that "a governmental body may rely on the decisions of a private association without turning that association into 'the government' itself."  44 F.3d at 449, n.1; ECF No. [19] at 6 (citing *Chic. Sch.*, 44 F.3d at 449).  The last case the State relies upon for this point is *Buckley*, but the cited language is within the opinion's analysis of the Appointments Clause.  424 U.S. at 140–41.  The Court is not persuaded that there is any Circuit court authority, much less any authority binding on this Court, for the proposition that the power of an accrediting agency is a delegated legislative function.

61 (citing *Buckley*, 424 U.S. at 140 (assessing the constitutionality of the Federal Election Campaign Act's limits on campaign contributions and expenditures); *United States v. Dierckman*, 201 F.3d 915, 922 (7th Cir. 2000) (analyzing a challenge related to Congress' spending power); *Haight v. Thompson*, 763 F.3d 554, 568–69 (6th Cir. 2014) (same)). As such, they do not address how the functions at issue here are akin to any legislative function.[9]

The State both collapses the function of the private agencies and the federal government's eligibility process, and then applies a legal standard that is not controlling on this or any Court to set out its claim. The Department's reliance on private accreditors' decisions does not violate the private nondelegation doctrine because accrediting postsecondary institutions has never been, nor is it now, a legislative function. The State takes issue with the fact that they must be accredited at all to participate in the HEA scheme. *See* ECF No. [19] at 3 (stating that "Florida . . . seeks an injunction prohibiting the application of Title IV's accreditation requirements against its institutions"). This is a policy position that, as a sovereign, the State is free to advance as they see fit. But the State's obligation here, as a plaintiff prosecuting a lawsuit, is to show how the HEA violates the Constitution

---

[9] The Complaint alleges that the HEA limits the remedies available to educational institutions regarding accrediting agencies. ECF No. [1] at ¶ 52–55. Although Defendants do not offer much of a response, these claims do not go to the issue at hand: whether the agencies perform a legislative function. To be sure, these complaints may go to whether the accreditation system is fair to the institutions it accredits, but it does not speak to the issue the Court is tasked to review or to the constitutionality of the congressional scheme imposed by the HEA.

based on the facts as alleged and existing law.  To that end, Count I fails as a matter of law and should be dismissed.

### B. The HEA Does Not Violate the Spending Clause.

Count II sets forth a Spending Clause challenge to the accreditation scheme established by the HEA.  The Spending Clause authorizes Congress to "lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1.  Because "the Constitution does not give the federal government authority to require states to enact the laws or policies that Congress prefers[,] . . . Congress often uses its power to tax and spend as a work-around." *West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury,* 59 F.4th 1124, 1131 (11th Cir. 2023).  Indeed, Congress will offer "federal funds in exchange for states establishing preferred programs or enacting favored laws."  *Id.* It is well-settled, and the Supreme Court has long recognized, that "Congress may use this power to grant federal funds to the States, and it may condition such a grant upon" recipient states' agreement to take certain steps, including in areas that Congress otherwise would be powerless to regulate.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012) (hereinafter, "NFIB").  In so doing, Congress can influence state policy and regulation by imposing conditions that ensure federal funds are used to achieve legislative purposes.  *Id*; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (recognizing that Congress may "'further broad policy objectives by conditioning receipt of federal moneys upon compliance . . . with federal statutory . . . directives'") (citation omitted).

There are limits, however, to Congress' powers under the Spending Clause. These limits were clearly articulated by the Supreme Court in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), where the Court recognized that it was constitutionally permissible for Congress to influence the States "fix[ing] the terms on which it shall disburse federal money to the States." *Id.* at 17. Such power, of course, is not limitless, as Congress is compelled to speak "unambiguously" and "with a clear voice" when it imposes conditions on the State's receipt of federal funds. *Id.* Congress must speak clearly enough for "the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.*

*Pennhurst* limitations were further elaborated upon in *South Dakota v. Dole*, 483 U.S. 203 (1987). In *Dole*, the Court laid out five elements that conditional funding grants must satisfy to comply with the Spending Clause. *Id.* at 207–11. Specifically, the law at issue (1) must "advance the general welfare"; (2) any attached conditions must be "unambiguous[]"; (3) conditions must relate "'to the federal interest in particular national projects or programs'"; (4) conditions cannot violate another constitutional provision; and (5) conditions cannot "be so coercive . . . [that] 'pressure turns into compulsion.'" *Id.* (citations omitted). "All five factors are equally important and equally required." *West Virginia ex rel. Morrisey*, 59 F.4th at 1142.

The Complaint alleges that the accreditation system under the HEA violates the Spending Clause because it is unduly coercive and its standards are impermissibly ambiguous. *See* ECF No. [1] at ¶¶ 125–32. The State contends that the HEA is ambiguous in that it fails to include the specific standards that

institutions must meet to receive accreditation. *Id.* at ¶¶ 125–28.  Further, the State argues that the HEA is coercive because failure to meet these unspecified conditions jeopardizes the institution's accreditation. *Id.* at ¶¶ 125, 129–32.  Defendants move to dismiss Count II on the basis that the Spending Clause is inapplicable since Title IV funding goes to students, not States.  ECF No. [11] at 32–34.  Even if the Court were to find that the Spending Clause applies, Defendants argue that the HEA is sufficiently clear and voluntary such that it conforms with the requirements of the Spending Clause. *Id.* at 34–35.

The first question the Court must address is whether the Spending Clause applies to the HEA accreditation scheme.  Defendants argue that because the federal funds at issue go to the students, rather than any state, the Spending Clause is wholly inapplicable.  ECF No. [11] at 32–34.  The Court agrees.

There is no precedent for striking down an act of Congress on the grounds that it violates the Spending Clause when the funds at issue are not given to a state or local government entity.  Indeed, *every* case cited by either party involves a challenge to a statute or regulatory scheme that provided federal funds to a state or local government entity.[10]  Here, it is undisputed that the State is not receiving the funds.

---

[10] *See, e.g., Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 294–96 (2006) (determining whether there was clear notice of a condition for state and local agencies to receive federal funds to assist in educating children with disabilities); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 636–53 (1999) (assessing whether a county board of education receiving Title IX federal education funding complied with Title IX's nondiscrimination requirements); *New York v. United States*, 505 U.S. 144, 151–54 (1992) (resolving a constitutional challenge to an act offering states financial incentives to adhere to federal guidelines for the disposal of low-level radioactive waste); *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 658–

The funds are given to students who are then allowed to use the funds only at institutions that the federal government has deemed eligible.  Some of those institutions might be private institutions, while others are run by states or other local government entities.  For the Spending Clause limitations to apply, the Court would have to rewrite the congressional scheme and simply disregard what is undisputed: that the State is not the direct recipient of these funds.

The State responds that the fact that the students receive the funds rather than the State is immaterial because the State *eventually* receives the funds.  ECF No. [19] at 10.  Their argument is not incorrect; some of these funds do *eventually* end up with the State by virtue of the State's operation of postsecondary institutions.

---

60 (1985) (deciding whether a state violated a federal prohibition on using federal funds to supplant state and local funds for compensatory education programs designed to benefit disadvantaged children); *Fullilove v. Klutznick*, 448 U.S. 448, 453 (1980) (evaluating the constitutionality of a federal spending program requiring state and local governmental recipients of federal funds to spend the monies with businesses owned or controlled by federally-recognized minority groups, absent administrative waiver); *Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 130–33, 135–46 (1947) (examining a federal offer of appropriations to a state highway commission contingent upon compliance with statutory standards); *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937) (finding that the federal government's provision of funds to states that established unemployment programs did not constitute coercion); *West Virginia ex rel. Morrisey*, 59 F.4th at 1132 (challenging a coronavirus stimulus package provision prohibiting states from using federal funds to offset reductions in net tax revenue); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 796–99, 815–16 (11th Cir. 2022) (considering whether a county school board, as a recipient of Title IX funding, abided by Title IX's nondiscrimination obligations).

However, the State has provided no authority to support their position that being the indirect beneficiary of its students' federal funds implicates the Spending Clause.

The lack of legal authority in this area is not surprising given that the Spending Clause limitations speak to Congress' power to provide funding in a manner that does not offend the sovereignty of the states. A statutory scheme that provides funding to individuals who sometimes use those funds to pay state schools (but often use them to pay private institutions) is simply not a scheme that places conditions on the provision of funds to a state. To find otherwise would not only rewrite the congressional scheme provided for by the HEA, but it would serve to limit Congress' power to spend any time that the funds could be said to indirectly benefit a state.

The State argues there is a direct relationship between the State and the federal government in this context because the federal government must deem a state institution eligible to receive funds from students. ECF No. [19] at 10–11. Fair enough. States must enter into a "Program Participation Agreement" with the Department where they must agree to maintain accreditation to participate in Title IV programs. 20 U.S.C. § 1094(a); *see also* 34 C.F.R. § 668.14(b)(23). But here, too, the State offers no legal precedent for the proposition that the eligibility process found in the HEA implicates the Spending Clause because, although eligibility permits an institution to accept the funds offered to students, the funds are not provided directly to the institution. The HEA's structure is fundamentally different and does not involve an "'offer of benefits to a state'" conditioned on "'cooperation . . . with federal plans.'" *Dole*, 483 U.S. at 210 (citation omitted). Its purpose is not to "'encourage a

State to regulate in a particular way'" or "'influenc[e]'" state policy choices. *NFIB*, 567 U.S. at 576 (alteration in original) (quoting *New York,* 505 U.S. at 166). Unlike grants that directly fund state programs or require state actions to align with federal policies, Title IV funds are allocated directly to students.

But let us assume that the HEA scheme at issue *does* implicate the Spending Clause. The State argues that the eligibility scheme is constitutionally infirm because it is ambiguous and coercive. Specifically, the State insists that the HEA is ambiguous for two reasons: it does not set out the standards for accreditation in the text of the HEA, and it allows accreditors to change their standards freely. Further, the State argues that because institutions rely on student tuition paid through Title IV, the HEA is unduly coercive.

For a state to knowingly accept funds provided by the federal government, it must be able to adequately ascertain the obligations of the spending condition. *West Virginia ex rel. Morrissey*, 59 F.4th at 1141. A state's mere knowledge that strings attach to federal funds is not sufficient for those conditions to comply with the Spending Clause, as a state cannot knowingly accept conditions which it is unaware of or cannot ascertain. *Id.* at 1143. When determining whether a statute provides clear notice of conditions, we should begin by looking to its text. *See Arlington Cent.*, 548 U.S. at 296 ("In considering whether the [statute] provides clear notice, we begin with the text.").

Here, the HEA clearly states that institutions must receive accreditation to benefit from Title IV funds. 20 U.S.C. §§ 1001(a), 1099(c). Failure to maintain

accreditation forecloses their ability to accept Title IV funds from students. The State argues that the lack of specificity as to standards that agencies put forth is further compounded because accrediting agencies are also permitted to alter the standards for accreditation. *See* ECF No. [1] at ¶¶ 128–32. Defendants respond that the State's challenge fails because it improperly elevates individual standards to the level of a distinct "condition" for federal funding, without providing any justification for its reasoning. ECF No. [28] at 34. The only condition at issue, according to Defendants, is the requirement that institutions maintain accreditation—a requirement which is clearly enumerated by statute. *Id*.

The Court must be guided by the allegations in the Complaint, and the Complaint fails to state factual allegations that would permit this Court to determine whether there is anything ambiguous in the HEA. The allegation that the accreditation agency can change standards is not sufficient. Indeed, it does not appear from the face of this Complaint that such change has *ever* occurred, or that a change in the standards would occur without notice to the institution or an opportunity to cure. The Complaint is lacking allegations to support its broad claim on this point. Stating that the standards can change, without more, does not plausibly indicate ambiguity.

The State also contends that the HEA's accreditation requirement is overly coercive, and in doing so relies extensively, if not exclusively, on the Supreme Court's decision in *NFIB*, 567 U.S. at 579–80. Moreover, the State argues that the accreditation scheme here, like the provision challenged in the Affordable Care Act,

holds a "gun to the head" of the State's educational institutions because without federal funding, the institutions would be at risk of closing.  ECF No. [19] at 12.  The State's reliance on *NFIB* is seriously misplaced.

In *NFIB,* the states argued that certain provisions of the Affordable Care Act "'crossed the line distinguishing encouragement from coercion'" because of the way that Congress structured the funding.  *NFIB*, 567 U.S. at 579 (quoting *New York,* 505 U.S. at 175).  Instead of simply refusing to grant the new funds to states that decline the new conditions, "Congress . . . also threatened to withhold those [s]tates' existing Medicaid funds*." Id.* at 579–80.  The Supreme Court held that:

> [n]othing in our opinion precludes Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use. What Congress is not free to do is to penalize States that choose not to participate in that new program by taking away their existing Medicaid funding.

*Id.* at 585.  The coercion, therefore, was not because there were conditions placed on funding.  The coercion was that the legislative scheme dictated that failure to abide by the new conditions threated already *existing* programs.

Of course, that is not the case here, as the HEA does not give the Department the power to "penalize States that choose not to participate" in new accreditation standards "by taking away their existing . . . funding." *Id.*  As Defendants correctly note, non-compliance with accreditation requirements does not result in the loss of existing funds but rather impacts eligibility for a *future* source of funding.[11]

---

[11] Defendants point out that to be eligible to receive funding through Florida's Casey DeSantis Cancer Research Act, "an institution [must be] accredited by an accrediting agency or association recognized by" the Department.  Fla. Stat. § 381.915(3)(a).  The

Moreover, having to comply with accreditation standards to be eligible to receive funding, even when that funding is critical, does not make the scheme coercive.  As Justice Roberts, writing for the majority in *NFIB*, succinctly explained:

> Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds. In the typical case we look to the States to defend their prerogatives by adopting "the simple expedient of not yielding" to federal blandishments when they do not want to embrace the federal policies as their own.  The States are separate and independent sovereigns.  Sometimes they have to act like it.

*Id.* at 579 (citations omitted).  In short, neither the fact that the funds are conditioned, nor that they are a critical component of the State's ability to provide postsecondary education, is sufficient, under any precedent cited, to find that the HEA is coercive. In sum, there is no precedent for the view that the State presents here.  The Spending Clause simply does not apply.  But if it did, the Complaint fails to sufficiently allege that the HEA scheme is ambiguous or coercive.  As such, Count II must be dismissed for failure to state a claim.

## C. The HEA Does Not Violate the Appointments Clause.

The Appointments Clause requires that all "Officers of the United States" be appointed according to the following process:

---

State grants funding to National Guard members in pursuit of "an authorized course of study" if, in pertinent part, they are enrolled at an accredited public or private postsecondary institution.  *Id.* § 250.10(7).  Applicants seeking Florida licensure in certain professional fields are required to have obtained a diploma from a program accredited by a federally recognized accreditor or its overseas equivalent.  *See, e.g.*, *Id.* § 491.005(1)(b) (social workers); *id.* § 468.1155(2)(b) (speech language pathologists); Fla. Bar R. 20-2.1(d) (paralegals).  Defendants' argument that Florida itself requires accreditation to confer certain benefits is interesting, but it is not the point as the State's objection is not to whether institutions should be accredited, their objection is to the accreditation process being federally mandated.

> [The President] shall . . . , . . . by and with the Advice and Consent of the
> Senate, . . . appoint . . . Officers of the United States, whose
> Appointments are not herein otherwise provided for, and which shall be
> established by Law: but the Congress may by Law vest the Appointment
> of such inferior Officers, as they think proper, in the President alone, in
> the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2, cl. 2; *Edmond v. United States*, 529 U.S. 651, 659–660 (1997);

*see also Lucia v. SEC*, 585 U.S. 237, 243–44 & 244 n.3 (2018).  To be considered an

officer, an individual must occupy a recognized public office.  *Metcalf & Eddy v.*

*Mitchell*, 269 U.S. 514, 520 (1926).  A position must be classified as a public office if

it (1) involves significant authority pursuant to the laws of the United States; and (2)

is a "continuing" position established by law. *Lucia*, 585 U.S. at 245 (citing *United*

*States v. Germaine,* 99 U.S. 508, 511–12 (1878), and *Buckley,* 424 U.S. at 126)).

The State contends that the heads of accrediting agencies must be appointed

in a manner consistent with the Appointments Clause.  ECF No. [1] at ¶¶ 133–39.

Specifically, the State argues that the agency heads are "Officers" within the meaning

of the Appointments Clause because they exercise "significant government authority"

on a continuing basis.  *Id*.

As to the first prong, the State's argument is entirely predicated on its

assertion that accrediting agencies determine eligibility for federal funds.  *Id*. at ¶

136; *see also* ECF No. [19] at 2, 7.  The Court has already established that agencies

do not determine eligibility for federal funds—a function which lies with the

Department.  Consequently, the State has not alleged any plausible "significant

authority" that accreditation agencies exercise, which is required to transform a

private entity into a public office.  As a result, the heads of these agencies do not

qualify as "Officers" under the Appointments Clause.  *See Lucia*, 585 U.S. at 245.  For these reasons, Count III is dismissed.

### D. Count IV Does Not State a Cause of Action Under the APA.

Count IV of the Complaint asserts a claim under the APA on the grounds that the Letters are more than mere guidance; but that instead, they constitute final agency action that is arbitrary and capricious, contrary to law, and which was promulgated without required notice and comment.  ECF No. [1] at ¶¶ 141–53.  Before addressing the State's arguments,[12] it is important to review two of the requirements of the HEA's scheme that were present before and after the issuance of the Letters.  First, 20 U.S.C. § 1099b(h) addresses what is required when institutions change accreditor agencies and states that:

> [t]he Secretary shall not recognize the accreditation of any otherwise eligible institution of higher education if the institution of higher education is in the process of changing its accrediting agency or association, unless the eligible institution submits to the Secretary all materials relating to the prior accreditation, including materials demonstrating reasonable cause for changing the accrediting agency or association.

Second, accrediting agencies are required to have voluntary membership.  *See* 20 U.S.C. § 1099b(a)(2)(A).  Against this framework, the Court addresses the allegations set out in Count IV.

---

[12] The Court notes that as to Count IV the Complaint is particularly short on allegations of fact to support the State's argument.  Indeed, many of the points addressed herein were articulated in the Response, not the Complaint.

1. _The Letters Are Not Final Agency Action._

The first issue the Court considers is whether the Letters constitute final agency action. The APA limits judicial review to final agency action, not "preliminary, procedural, or intermediate agency action." 5 U.S.C. § 704. That requirement is jurisdictional, such that federal courts lack jurisdiction to review agency actions that are not "'final' within the meaning of 5 U.S.C. § 704." _Nat'l Parks Conservation Ass'n v. Norton_, 324 F.3d 1229, 1232 (11th Cir. 2003) (citation omitted). Agency action is "final" when it both (1) marks "the consummation of the agency's decisionmaking process" and (2) determines a party's "rights or obligations." _Bennett v. Spear_, 520 U.S. 154, 177–78 (1997) (citation omitted). By contrast, agency action that "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" is not considered "final." _Peoples Nat'l Bank v. Off. of Comptroller of Currency of the U.S._, 362 F.3d 333, 337 (5th Cir. 2004) (quoting _Rochester Tel. Corp. v. United States,_ 307 U.S. 125, 130 (1939)). Moreover, under the APA, a plaintiff does not have a complete and present cause of action "until she suffers an injury from final agency action." _Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,_ 144 S. Ct. 2440, 2450 (2024).

The State proposes that the Letters are subject to judicial review as final agency action because they changed both _when_ an institution must submit the information necessary for the Department to make its reasonable cause determination and _what_ information is collected. _See_ ECF Nos. [1] at ¶ 143; [19] at 13–17, 19. As to the State's first point, it argues that the Institutional Procedures

Letter replaced prior guidance, which was issued in 2016, and which required that institutions submit the necessary information to the Department when they *begin* the process of obtaining a new accrediting agency. *See* Robin Minor, *(General) Subject: Guidance for Schools Seeking New Accreditation*, U.S. DEP'T OF EDUC. FED. STUDENT AID (Aug. 5, 2016), https://fsapartners.ed.gov/knowledge-center/library/ electronic- announcements/2016-08-05/general-subject-guidance-schools- seeking-new-accreditation (hereinafter the "2016 Letter"). By contrast, the Institutional Procedures Letter requires submission of materials *prior* to initiation of that process. *See* Institutional Procedures Letter, *supra* p. 7.

The Institutional Procedures Letter also requires the institution to obtain *approval* before making the switch, whereas the 2016 Letter only required the institution to *notify* the Department prior to the switch. *See id.*; 2016 Letter, *supra* p. 36. Based upon these "changes," Plaintiff argues that the Letters "tread . . . new ground," "add[] . . . significant hurdle[s]," "withdraw agency officials' discretion,"[13] and "mark significant changes to the normal course of business." ECF No. [19] at 15– 16, 17, 19 (internal citations omitted).

---

[13] For the first time in its Response, the State also argues, albeit sparingly, that the Letters limit agency officials' discretion. ECF No. [19] at 15–17. This argument is without merit. The only language the State points to in support of this allegation is found in the Institutional Guidance Letter. *Id.* at 15, 17. There, the Department notes that it "must review the specific circumstances of the institution" in making a reasonable cause determination. Institutional Guidance Letter, *supra* p. 6. This does nothing to limit the agency's discretion as to whether the institution has shown reasonable cause; rather, it merely states that the circumstances must be reviewed before applying that discretion.

However, beyond those conclusory assertions, the State has not met its burden to allege in what ways the Letters adversely affect the rights of the State or its institutions, especially considering that institutions were *already* required to seek approval to change accreditors. *See* 34 C.F.R. § 600.11; *see also* 20 U.S.C. § 1099b(h). Indeed, *both* the 2016 and 2022 Letters require institutions to provide information to the Department to support their decision to change accreditors before that change could take effect.

Although the 2016 Letter does not include the word "approval," it does require that, along with "notification," the institution provide "documentation of its current accreditation" and "demonstrate a reasonable cause" for the change, among other requirements. *See* 2016 Letter, *supra* p. 36. Further, it states that "in order to avoid losing Title IV eligibility during [the] process, an institution should not drop its association with its current accrediting agency until after the Department provides written notice that it acknowledges the new accrediting agency as the institution's primary accrediting agency." *Id.* This is consistent with the language of Section 600.11, which already specified that the Secretary does not recognize the accreditation of any institution currently "in the process of changing" accreditors, unless it demonstrates reasonable cause and receives approval. *See* 34 C.F.R. § 600.11(a); *see also* 20 U.S.C. § 1099b(h). The documentation requested is clearly for the purpose of allowing the Department to comply with its obligation to determine whether an institution's request to change accreditors was based upon reasonable cause. The Letters, therefore, could not have "tread . . . new ground" for institutions

since they, in essence, "left the world just as [they] found it." *Clayton Cnty., Georgia v. Fed. Aviation Admin.,* 887 F.3d 1262, 1266–67 (11th Cir. 2018).  Similarly, no additional legal consequences could have flowed from the change the State complains of, as it does not involve any new obligations other than what was already required under the applicable regulation.  *See Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) (finding no final action where a "[l]etter neither announced a new interpretation of the regulations nor effected a change in the regulations themselves"); *see also AT&T Co. v. E.E.O.C.*, 270 F.3d 973, 975 (D.C. Cir. 2001) ("[A]n injury typically is not caused when an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.").

The same conclusion applies to the State's assertion that the Letters evidence final agency action because they were referenced as the Department's basis for requesting additional information from institutions.  ECF No. [1] at ¶¶ 106, 143.  Here, the State relies on a letter from the Department to a State institution, which, while citing to some of the Letters, clearly states that the information was being requested "[t]o proceed with [the Department's] reasonable cause review and to better understand [the institution's] request."  *Id*.; ECF No. [1-4] at 2.  Again, the Letters do not change what the Department has always been empowered to do under the HEA: grant or deny an institution's request to change accreditors based on a reasonable cause determination.  The State has not alleged that the information now sought by the Department could not have been requested prior to the Letters.  Indeed, the State did not allege in its Complaint that any State institution was injured in any

way by the "new" requests for information or that any institution had been denied its request to change accreditors.

In short, *when* the Department begins to collect documents to make its determination that an accreditor change is for reasonable cause is of no moment, as the Department's obligation to make that determination was unchanged by the Letters.   Nor can a change in *what* documents the Department collects for its reasonable cause determination be construed as altering the rights of the institutions, especially since there is no allegation that the documents requested after the Letters were issued could not have also been requested prior to their issuance.   Even if this Court were to find that the Letters should be invalidated pursuant to the APA, the Letters would have no impact on the Department's review of a Florida institution's request to change accreditors.   In the absence of the Letters, the State's public colleges and universities would still be under an identical obligation to demonstrate reasonable cause, 34 C.F.R. § 600.11.   Because the Letters restate existing obligations, they cannot be said to reflect the "consummation" of any decisionmaking process, and because no new legal consequences accrue from the Letters, the Court cannot conclude that the Letters are final agency action.

Second, in its Response, the State argues that the three Letters signify that the Department had reached its "final view on the matter[s]," thereby indicating consummation.   ECF No. [19] at 15 (alteration in original) (quoting *U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021)).   The State proposes that the Letters establish the Department's stance on Florida's SB 7044.  *Id*. at 14.   In this

regard, the State confuses what is meant by an agency's "final stance" or "final view" in the context of the APA. *See Riverkeeper v. U.S. EPA*, 806 F.3d 1079, 1080–84 (11th Cir. 2015) (citation omitted) (finding that an interim communication "express[ing] 'significant concerns about'" a state's compliance with statute, including "an admonition" to correct problems, was not a reviewable final action). The Eleventh Circuit in *Clayton County* explained that even when an agency goes much further and affirmatively opines that "a party's practices may potentially violate" statutory requirements, such a tentative opinion "does not necessarily mark the culmination of the agency's decisionmaking process."[14]  887 F.3d at 1268.  These Letters, at best, express concerns with the State law that mandated that public institutions change accreditors, but it provided no opinion as to whether it would result in the institutions failing to comply with the HEA's requirements.  Indeed, there is no allegation that the Department has made any such finding.

Finally, in its Response, the State argues that the Accreditor Letter adds a new requirement because it states that "'agencies should conduct their own independent evaluation'" as to whether institutions are switching accreditors voluntarily.  ECF No. [19] at 17 (quoting Accreditor Letter, *supra* p. 8).  However, the requirement that an agency maintain voluntary membership was enacted prior to issuance of the Letters.  20 U.S.C. § 1099b(a)(2); 34 C.F.R. § 602.14(a).  The State fails to demonstrate

---

[14] The State relies, in Response, on a blog post released by the Department in support of the claim that the Letters prompted the Department to take a "fresh look" at the pertinent regulations because of Florida's requirement that its postsecondary schools switch accreditors.  ECF No. [19] at 14.  Again, these conclusory arguments cannot be substituted for allegations that provide notice as to what the Letters added to the regulatory scheme that was not already there.

how this changed the existing landscape.  Without independent evaluation, accreditors would have no way to ensure that their membership remains voluntary, which was an existing requirement before the Letters.  Again, the Letters "left the world just as [they] found it."  *See Clayton Cnty.*, 887 F.3d at 1266–67.

In short, the Complaint has not sufficiently alleged what new obligations, rights, or legal consequences have been meted out by the Letters.  Nothing in the Letters departs from previously codified criteria regarding the need for the Department to review the cause for a change when an institution decides to change accreditors.  As such, the Letters do not meet the requirements for finality, they are not subject to judicial review, and the Court is without jurisdiction to review their compliance with APA standards.  *Id.*

     2. *The Letters Are Not Contrary to Law.*

The State also contends that the Letters are contrary to law "because they misapply the HEA's requirement that accrediting agencies" maintain voluntary membership by "assum[ing] that this requirement means that [the State] cannot tell the institutions it owns and operates to switch accreditors."  ECF No. [1] at ¶¶ 144–45.  Specifically, the State takes issue with the Accreditor Letter's statement that Florida's new legislation could "potentially undermine[] the voluntary nature of the relationship" between institutions and accrediting agencies.  *See* Accreditor Letter, *supra* p. 8 at 1–2.  The State argues that the Letters "fail[] to acknowledge" that the statute "does not prevent the sovereign States from running the institutions they own and govern."  *Id.* at ¶ 100.

As Defendants correctly note, "the Department was under no obligation, in writing to schools, to 'acknowledge' the self-evident fact that States can run public schools." ECF No. [11] at 39. What the Accreditor Letter *does* convey is that the HEA compels accreditors to maintain a voluntary membership and that this requires the Department to ensure that new institution-accreditor relationships are voluntary. *See* Accreditor Letter, *supra* p. 8. There is nothing incorrect about that statement.

The State maintains that the Accreditor Letter is contrary to law because it takes the position that "a State Legislature deciding that the State's institutions should change accrediting agencies makes the institutions' membership involuntary." ECF No. [19] at 20. This, however, is the State's interpretation of the federal government's position on the State's new law, and while the State can certainly have that opinion, the Letters do not say what the State presumes. Indeed, the State's reading of the Letters is not supported by the plain language of the Letters, which make no claim whatsoever as to the State's ability to direct its institutions to change accreditors and reach no conclusions as to the voluntariness of a change taken pursuant to the new law. The State's claim that the Letters are contrary to law is untethered to the language of the Letters themselves. As such, the claim as pled fails to state a cause of action under the APA for agency action that is contrary to law.

3. *The Letters Are Not Subject to Notice and Comment Rule Making.*

The State also argues that the Letters constitute a "rule" that was improperly issued without notice and comment rulemaking. ECF No. [1] at ¶¶ 151–53. However, it is well-settled that only substantive, or "legislative," rules are required to undergo

notice and comment; such rules impose binding obligations and have the "force and effect of law." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).  The Court has already found that the Letters impose no such obligations, and therefore, the Letters are not subject to notice and comment.

At best, the Letters constitute interpretive rules.  An interpretative rule, rather than a legislative rule which would require notice and comment, "typically reflects an agency's construction of a statute that has been entrusted to the agency to administer" without modifying the statute "'based on the agency's own authority.'" *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94–95 (D.C. Cir. 1997)).  "[T]he distinction between an interpretative rule and a substantive rule . . . likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id.* (alterations in original) (quoting *Syncor,* 127 F.3d at 94).

Here, as discussed above, any "interpretation" the Letters set forth is drawn directly from long standing, governing statutes, and regulations.  None of the Letters created "'any new law, right, duty, or have any effect independent of the statute.'" *Warshauer*, 577 F.3d at 1338 (alterations in original) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).  Rather, they merely advised the institutions as to what was already required.  *See Perez*, 575 U.S. at 96–97 (quoting *Shalala*, 514 U.S. at 99) (internal quotation marks omitted) ("[T]he critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's

construction of the statutes and rules which it administers."). Therefore, the Letters are not subject to notice and comment.

4.  *The Letters Are Not Arbitrary and Capricious.*

The State's arbitrary-and-capricious allegations appear to just repeat the arguments presented on its other claims—that Defendants changed substantive rules in contravention of the standards set forth by the APA.  ECF No. [19] at 20–21.  The State's allegations here are so vague that the Court cannot conclude that a cause of action has been plead as to this issue.

In sum, for the reasons noted above, the State has failed to state a cause of action and Count IV is dismissed.

## IV.   CONCLUSION

The State's sweeping criticism of the legislative scheme by which the federal government provides students with financial aid for their postsecondary education collapses distinct functions of the process, disregards undisputed facts, and then uses legal standards that are not controlling to urge the Court to deny the Motion.  For the reasons articulated above, the State's objection to the requirement that they comply with standards set by private agencies to receive federal dollars from its students simply fails to state a claim.  The State, of course, is not without recourse. It can seek to change the law in Congress, provide its own funding to students attending its schools, or compete in the marketplace without the use of federal funds, just to list a few examples.  But this Court is only empowered to look at the facts as they are plead, not rhetorical conclusions, and then apply the law as it exists, not as

the State would like it to be.  By those lights, what the State presented, at least in this Complaint, cannot stand.

      The State may choose to amend its Complaint to address the deficiencies identified herein.  Any amended complaint must be filed no later than fourteen days from the date of this Order.

      **DONE AND ORDERED** in Miami, Florida, this 2nd day of October 2024.

_____

**JACQUELINE BECERRA**
**UNITED STATES DISTRICT JUDGE**